**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein
Lucas E. Gilmore
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Brian J. Schall
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Counsel for Lead Plaintiff Nicholas Tiedt*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 24-cv-02712-PAB-TPO
(Consolidated with Civil Case No. 24-cv-02898-PAB-TPO)

---

Civil Case No. 24-cv-02712-PAB-TPO

JOHN K. ELLINGTON, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PARAGON 28, INC.,
ALBERT DACOSTA,
STEPHEN M. DEITSCH, and
KRISTINA WRIGHT,

Defendants.

---

Civil Case No. 24-cv-02898-PAB-TPO

NICHOLAS TIEDT, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PARAGON 28, INC.,
ALBERT DACOSTA,
STEPHEN M. DEITSCH,
KRISTINA WRIGHT, and
ERIK MICKELSON,

Defendants.

---

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 11

III. PARTIES .......... 12

A. Lead Plaintiff. .......... 12

B. Corporate Defendant. .......... 12

C. Executive Defendants. .......... 13

D. Relevant Non-Party Paragon 28 Executives. .......... 16

E. Former Paragon 28 Employees. .......... 16

IV. SUBSTANTIVE ALLEGATIONS .......... 20

A. Proper Inventory Management and Accounting for Inventory Were Critical for Paragon 28's Business. .......... 20

B. Paragon 28's Accounting for Inventory. .......... 22

1. Paragon 28's Obligation to Follow GAAP. .......... 22

2. Accurately Assessing Current Inventory Levels Was Necessary to Properly Value Paragon 28's Inventory and to Estimate Reserves for Excess and Obsolete Inventory. .......... 23

C. Defendants' Inventory Accounting Had a Material Effect on Key Financial Metrics in Paragon 28's Financial Reports. .......... 26

1. Paragon 28's Adjusted EBITDA and Gross Margin Were Material Financial Metrics to the Market. .......... 26

2. Paragon 28's Inventory Accounting Materially Affected its Adjusted EBITDA and Gross Margin. .......... 31

D. Paragon 28's Lacked Proper Inventory Controls During the Class Period. .......... 33

1. Paragon 28's Internal Control Framework. .......... 33

2. Paragon 28 Had Longstanding Weaknesses in its Inventory Tracking and Controls. .......... 34

3. During the Class Period, Paragon 28 Employees Relied on Multiple Sources of Inconsistent and Inaccurate Information to Track and Account for Inventory ... 36

4. Paragon 28's Lack of Inventory Controls Resulted in the Company Being Unable to Accurately Track and Value its Inventory ... 40

5. Paragon 28's Inventory Issues Were So Stark that Two Separate Dedicated Meetings Were Formed to Address the Problem. ... 43

6. Paragon 28's Inventory Audit Further Reveals the Lack of Proper Controls. ... 46

7. Paragon 28's Deliberate Steps to Not Report Inventory. ... 48

8. Paragon 28's Reckless Efforts to Reduce Non-Conforming Inventory and Inspect Products. ... 48

9. Paragon 28 Admitted to the Material Weaknesses in its Internal Controls Relating to Inventory ... 51

E. During the Class Period, Defendants Falsely Represented the Company's Financial Results, Misleadingly Affirmed Paragon 28's Internal Controls, and Misrepresented the Company's Inventory Status. ... 52

F. The Truth Begins to Emerge. ... 56

1. Paragon 28 Announces Deitsch's resignation on April 4, 2024. ... 56

2. On July 30, 2024, Defendants Disclose Inventory Accounting Errors Requiring Restatements of Important Financial Results. ... 58

3. Paragon 28 Filed Amended Financial Statements on August 8, 2024 Revealing the Full Extent of the Company's Financial Misstatements and Scope of Material Weaknesses in Internal Controls. ... 60

a. Restated Financial Results for Q1 2023 ... 61

b. Restated Financial Results for Q2 2023 ... 63

c. Restated Financial Results for Q3 2023 ... 65

d. Restated Financial Results for Q4 2023 and Full-Year 2023 ... 67

e. Restated Financial Results for Q1 2024 ... 69

f. Paragon 28's Amended 10-K and 10-Q Admitted That There Were Material Weaknesses in Internal Control Over Financial Reporting Throughout the Class Period ... 70

g. Defendants Address Restatements and Internal Control Revelations During August 8, 2024 Earnings Call. ... 72

4. Following the Restatements and Disclosure of Pervasive Internal Control Problems, Paragon 28's Chief Accounting Officer Departs. .................... 75

G. Paragon 28 Confirms Additional Material Weaknesses in Internal Controls that Were Present During the Class Period and Corroborate the Allegations of the Former Employees. ...................................... 76

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................................... 78

A. Defendants Made False and Misleading Statements Relating to Paragon 28's Q1 2023 Financial Results and Internal Controls in May 2023. ........................................................................................... 79

1. Paragon 28's May 4, 2023 8-K Falsely Stated Certain Q1 2023 Financial Results. ........................................................................................... 79

2. Paragon 28's May 4, 2023 Q1 2023 10-Q Repeated the False Financial Results and Falsely Affirmed the Adequacy of Paragon 28's Disclosure Controls. ........................................................................................... 80

3. Defendants' False Statements at the May 4, 2023 Earnings Call Misled Investors About Paragon 28's Financial Performance. ............................ 82

4. Deitsch Misleads Investors Regarding Paragon 28's Gross Profit Margins and Adjusted EBITDA During the May 10, 2023 Bank of America Healthcare Conference. ....................................................................... 84

5. Reasons Why Defendants' May 2023 Statements Were Materially False and Misleading. ........................................................................................ 85

a. Statements Regarding Q1 2023 Financial Results. ....................... 85

b. Statements Regarding Internal Controls. ..................................... 89

c. Materiality. ................................................................................... 91

B. Defendants Made False and Misleading Statements Concerning Q2 2023 Financial Results, Internal Controls, and the Company's Inventories in August and September 2023. ...................................................... 92

1. Defendants Misrepresented the Company's Financial Performance in the August 2, 2023 Press Release. ............................................................ 92

2. Paragon 28's August 2, 2023 10-Q Repeated the Falsely Stated Financial Results and Misleading Affirmance of Paragon 28's Internal Controls. .. 93

3. Defendants Mislead Investors About Paragon 28's Financial Results During the August 2, 2023 Earnings Call. ............................................. 95

4. Deitsch Repeats The False and Misleading Gross Margin Results During the Canaccord Genuity Growth Conference on August 9, 2023. .............. 97

5. Deitsch Falsely Touts Paragon 28's Adjusted EBITDA Performance and Misrepresents the Company's Inventory Status During the Morgan Stanley Global Healthcare Conference on September 11, 2023. .......................... 97

6. Reasons Why Defendants' August and September 2023 Statements Were False and Misleading. ................................................................................ 98

a. Statements Regarding Q2 2023 Financial Results. ...................... 98

b. Statements Regarding Internal Controls. .................................. 100

c. Statements Regarding Paragon 28's Inventories........................ 100

d. Materiality...................................................................................... 101

C. Defendants Made False and Misleading Statements Concerning Q3 2023 Financial Results, Internal Controls, and the Company's Inventories in November 2023......................................................................... 101

1. Paragon 28's November 7, 2023 8-K Contained False and Misleading Financial Results. ......................................................................... 101

2. The November 7, 2023 10-Q Repeats the Falsely Stated Financial Results and Omits the Material Weaknesses in Internal Controls Related to Paragon 28's Inventory Accounting. .................................................... 103

3. Defendants Repeat False Financial Results During a November 7, 2023 Earnings Call.......................................................................................... 105

4. Reasons Why Defendants' November 2023 Statements Were False and Misleading.......................................................................................... 105

a. Statements Regarding Q3 2023 Financial Results. .................... 105

b. Statements Regarding Internal Controls. .................................. 107

c. Materiality. .................................................................................... 107

D. Defendants Made False and Misleading Statements Concerning 4Q 2023 and Full-Year 2023 Financial Results, Internal Controls, and the Company's Inventories in February 2024. ................................................. 107

1. The February 29, 2024 Form 8-K Offers False Financial Results for Q4 2023 and FY 2023 and Mischaracterizes The Significant $4 Million Inventory Write-Off As a One-Time Action. ........................................ 107

2. The February 29, 2024 10-K Details False Financial Results for 4Q 2023 and Full-Year 2023 and Omits the Material Weaknesses in Internal Controls Related to Paragon 28's Inventories....................................... 109

3. Defendants Repeat Incorrect Financial Results and Understate the Extent of Inventory Challenges During the February 29, 2024 Earnings Call. ..111

4. Reasons Why Defendants' February 2024 Statements Were False and Misleading .......... 113

a. Statements Regarding Q4 2023 and FY 2023 Financial Results. 113

b. Statements Regarding Internal Controls. .......... 115

c. Statements Regarding Paragon 28's Inventories.......... 115

d. Materiality. .......... 116

E. Defendants Made False and Misleading Statements Concerning Q1 2024 Financial Results, Internal Controls, and the Company's Inventories in May 2024. .......... 116

1. The May 8, 2024 Form 8-K Presents False Financial Results For Q1 2024. .......... 116

2. The May 8, 2024 10-Q Repeats the Falsely Stated Financial Results and Fails to Disclose the Known Material Weaknesses in Internal Controls Related to Paragon 28's Inventory Accounting. .......... 117

3. During the May 8, 2024 Earnings Call, Defendants Repeat the False Financial Results and Fail to Disclose the Material Weaknesses in Internal Controls. .......... 118

4. Reasons Why Defendants' May 2024 Statements Were False and Misleading .......... 119

a. Statements Regarding Q1 2024 Financial Results. .......... 119

b. Statements Regarding Internal Controls. .......... 120

c. Materiality. .......... 120

VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .......... 120

VII. LOSS CAUSATION .......... 134

A. Corrective Disclosures .......... 135

B. Materialization of the Risk .......... 137

VIII. NO SAFE HARBOR .......... 139

IX. THE PRESUMPTION OF RELIANCE .......... 139

X. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS .......... 140

FIRST CLAIM FOR RELIEF FOR VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS .......... 143

SECOND CLAIM FOR RELIEF VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE EXECUTIVE DEFENDANTS ............................ 145

XI. PRAYER FOR RELIEF ............................................................................................ 146

XII. JURY TRIAL DEMANDED ........................................................................................ 147

Lead Plaintiff Nicholas Tiedt ("Lead Plaintiff"), by and through his counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of himself and all persons and entities who purchased or otherwise acquired Paragon 28, Inc. ("Paragon 28" or the "Company") securities during the period from May 5, 2023 to September 20, 2024, inclusive (the "Class Period").

Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing independent investigation of their undersigned counsel, including from the following sources: (i) Paragon 28 public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Paragon 28 securities; (vii) accounts from former Paragon 28 employees; and (viii) additional materials and data concerning the Company and industry as identified herein.

## I. INTRODUCTION

1. This securities fraud class action stems from Defendants Paragon 28's, its Chief Executive Officer Albert DaCosta's, and its former Paragon 28 Chief Financial Officer Stephen Deitsch's (collectively, "Defendants") knowingly false or deliberately reckless misstatements and omissions about how they managed, tracked, and valued Paragon 28's inventory, a critical aspect of the medical device company's business. By inaccurately reporting Paragon 28's inventory levels and reserves and masking critical deficiencies with its inventory management and internal controls,

Defendants were able to enhance Paragon 28's financial performance and conceal severe operational weaknesses. Defendants' fraud painted a deceptively positive picture of the Company, thereby attracting and retaining investors and maintaining an artificially inflated stock price. Ultimately, the truth about Paragon 28's inventory practices, financial performance and fundamental weaknesses in internal controls was revealed through a series of disclosure events, including key executive departures, financial restatements, and the Company's admission of ineffective internal controls  The inevitable materialization of the concealed financial and operational risks tied to Paragon 28's flawed inventory management directly caused the devasting stock price decline and investor losses that this action seeks to recover.

2. Paragon 28 is a medical device company that specializes in products and solutions for foot and ankle surgery. The Company develops and sells a wide range of implants, instruments, and surgical systems designed to treat various foot and ankle conditions, from fractures and deformities to joint replacements.

3. For a medical device company like Paragon 28, specializing in products for foot and ankle surgery, robust inventory management is not just important; it's absolutely foundational to its operational solvency and financial health. The nature of their products—implants, instruments, and surgical systems—demands a delicate balance: sufficient stock to meet the immediate, critical needs of surgeons and hospitals, while avoiding excess that can quickly become obsolete, damaged, or expired due to regulatory changes or product advancements. Mismanaging inventory directly imperils the Company's ability to fulfill orders, support ongoing surgical procedures, and ultimately, generate revenue. Financially, the consequences are severe: significant inventory write-downs or write-offs directly erode gross margins and Adjusted EBITDA,

impacting profitability and distorting the Company's true financial picture. Therefore, the ability to accurately track, value, and control inventory is not merely a logistical challenge but a cornerstone of Paragon 28's business strategy and a direct determinant of its reported financial success.

4. From May 5, 2023 to September 20, 2024, Defendants consistently presented a deceptive image of Paragon 28's financial health to investors, specifically by misrepresenting their critical ability to manage inventory. In SEC filings, earnings calls, and investor conference Q&As, they repeatedly affirmed the effectiveness of the Company's internal controls over financial reporting, not only through required certifications for Forms 10-Q and 10-K, but also by discussing the Company's inventory levels with investors and creating the impression that Paragon 28 could track and value its inventory without issue. They then touted the Company's Adjusted EBITDA performance as evidence of a return to profitability and emphasized an 80% or better gross margin baseline, a truly elite figure that would place Paragon 28 well above typical industry benchmarks for medical device companies, to further demonstrate Paragon 28's profitable business—metrics heavily dependent on accurate inventory valuation.

5. Unbeknownst to investors, however, Paragon 28's internal controls over financial reporting related to its inventory accounting were entirely defective. According to well-placed, reliable former Paragon 28 employees ("FE") with personal knowledge of the subject matter, and further corroborated by Defendants' later disclosures, Paragon 28 struggled to track its current inventory levels, whether in its warehouse or with third-party vendors. Inventory tracking problems were present before the start of the Class Period. According to FE-1, shortly after going public in October 2021, the Company transitioned to a new inventory tracking system without

pausing business operations. This resulted in inventory tracking issues that had not been rectified by the beginning of the Class Period in May 2023. Another former Paragon 28 employee, FE-5, who worked on improving Paragon 28's bin accuracy – *i.e.*, whether a bin contained the documented components – said the Company's bin accuracy of 53% at the start of their tenure in October 2022 was extremely poor for industry standards. The bin accuracy had only improved to around 81% in January 2025, shortly before FE-5 left the Company, a figure still considered "not good" by industry standards. Such poor marks on a fundamental metric of inventory control demonstrates a systemic failure to track inventory.

6. A significant cause of Paragon 28's inventory tracking issues, according to FE-1, was that the Company did not track higher-volume SKUs (including implants) by lot number. As such, FE-1 said there was no way to determine how much product was on hand or shipped to distributors. Issues were further exacerbated due to the use by Paragon 28 employees of uncoordinated, overlapping, and inconsistent information to track inventory. FE-4 described how there was "no system on my end to know what was in stock or what was needed," and that numerous floating documents meant there was no single source of true and accurate information. FE-1 said that employees "knew" information pulled from the systems was "wrong" so they relied on their own excels to track inventory. And FE-5 said once inventory was in the field, there was no way of knowing which components a salesperson used other than by receiving a ticker to reorder something. Things were no better with the Company's year-end audit, where Paragon 28 employees would physically count the inventory in the Colorado warehouse. FE-4 stated the information compiled during the audit was compared to another inventory figure, and the numbers

never matched. FE-5, who also worked on the audit, said that personnel from Deloitte & Touche LLP expressed concern regarding the accuracy of the inventory audit "during the heat of battle."

7. Lacking the ability to track inventory directly and foreseeably led to multiple problems within the Company. For example, FE-1 said Paragon 28's purchasing team provided incorrect figures regarding available products to senior management, including DaCosta, which formed the basis of sales goals that impacted bonuses. Salespeople would then promote products but later learn they could not support the sales due to lack of available inventory. FE-1 also stated there were no controls in place for recalls or other inventory tracking issues that may arise. The absence of basic inventory management safeguards resulted in the Company over-ordering replacement parts by as many as 20 times what was needed, mostly of uncommon sizes, as well as instances where inventory worth as much as $50,000 went missing. Taken together, these examples, along with others detailed herein, represent not just mismanagement but fundamental failures in core operational and financial controls.

8. The material weaknesses in Paragon 28's inventory management and accounting prevented the Company from accurately tracking the existence of inventory in its possession or with third parties and impeded inventory valuation, including with the calculation of its excess and obsolete inventory reserve. As a direct consequence of Paragon 28's faulty systems for inventory tracking and accounting, Defendants systemically *overstated* "inventories, net" and *understated* the Company's cost of goods sold. As a result, key reported financial metrics depending on these inputs – including Adjusted EBITDA and gross margin – were similarly misstated and painted a rosier picture of Paragon 28's financial performance than reality.

9. Defendants knew of and acted with flagrant disregard for Paragon 28's gravely deficient inventory controls. FE-1 directly attests to Defendant DaCosta's early and sustained awareness of the billing and inventory tracking failures that emerged post-IPO in October 2021. DaCosta participated in numerous internal meetings addressing Paragon 28's large inventory discrepancies throughout 2023. Further cementing their culpability, former employees confirm DaCosta's daily review of financial "dashboard" data and receipt of forecasting reports, and that both DaCosta and Deitsch were routinely furnished with "stockout reports" detailing current inventory levels for weekly inventory discussions, leaving no doubt as to their knowledge of the crisis. The collective testimony of multiple former employees from various departments detailing the existence and widespread knowledge of Paragon 28's deficient inventory controls and resulting problems further supports an inference of Defendants' knowledge, or deliberate reckless disregard, that Paragon 28 lacked the ability to track and value its inventory.

10. Defendants also deliberately took steps to not record inventory during the Class Period. Per FE-5, in Q2 and Q4 2023, FE-5 was told by Paragon 28's Supply Chain Director and Supply Chain Manager to stop receiving inventory so it would not be recorded on Paragon 28's books and not appear on its balance sheet. As a result, millions of dollars' worth of Paragon 28 inventory was not accounted for in Paragon 28's financial statements. Such an attempt to manipulate the Company's financial statements could not have been executed by middle management without the direct knowledge, approval, or reckless indifference of DaCosta and Deitsch, who bear the ultimate responsibility for the accuracy of Paragon 28's financial statements.

11. These deficient inventory controls and deliberate attempts to manipulate the financial results were so obviously material that Defendants must have been aware of their

materiality and that their non-disclosure would likely mislead investors as to Paragon 28's financial condition and operations. Nonetheless, in SEC filings, Defendants repeatedly quantified various measures of inventory accounting, including the excess and obsolete inventory reserve and inventories, net, and confirmed the accuracy of financial metrics dependent on these figures, including Adjusted EBITDA and gross margin. Defendants also signed certifications pursuant to the Sarbanes-Oxley Act of 2022, falsely attesting to the accuracy of Paragon 28's financial reporting and affirming the effectiveness of its internal controls. Defendants further underscored these misstated numbers in their prepared remarks during investor earnings calls and reiterated them when directly addressing analyst inquiries, reinforcing the misleading impression of sustained, exceptional profitability.

12. Defendants' misrepresentations about Paragon 28's Adjusted EBITDA, gross margin, and other financial results, internal controls over financial reporting, and inventory levels inflated or maintained the price of Paragon 28's common stock during the Class Period, allowing Paragon 28 shares to reach a Class Period high of $19.00 per share on June 1, 2023, and consistently traded at or above $12-$14 per share through the first quarter of 2024.

13. Like all unsustainable deceptions, Defendants' fraud at Paragon 28 was destined to unravel. The artificial inflation of financial metrics and the concealment of critical operational failures could not endure indefinitely, ultimately leading to the inevitable exposure of the truth.

14. Cracks in Defendants' façade emerged on April 4, 2024, when Paragon 28 issued a press release announcing that Deitsch had abruptly resigned as Chief Financial Officer and the Company's Audit Committee Chair, Kristina Wright, had stepped in as the interim Chief Financial

Officer. The news sent the price of Paragon 28 shares down $1.86 (-15%) to close at $10.20 that day.

15. With Wright at the helm as interim Chief Financial Officer for one quarter, the pervasive inventory accounting issues and resulting errors were immediately identified and corrected. On July 30, 2024, just a month after the close of the second quarter ended June 30, 2024, Paragon 28 filed an after-market Form 8-K. In the announcement, Defendants disclosed that the financial statements in the Form 10-Qs for Q1-Q3 2023 and Q1 2024 and the Form 10-K for FY 2023 should no longer be relied upon due to errors requiring a restatement. Defendants identified the inventory accounting errors as involving the "calculation of [Paragon 28's] excess and obsolete inventory reserve" which resulted in an overstatement of inventory and an understatement of cost of goods sold during the affected periods. In relation to the restatements, Defendants revealed that Paragon 28 had "identified one or more material weaknesses in its internal control over financial reporting," and therefore those internal controls and the disclosure controls and procedures were not effective as of December 31, 2023 and March 31, 2024. On this news, the price of Paragon 28 common stock fell by $1.24 per share, or 13.7%, to close at $7.79 on July 31, 2024.

16. Then, after the market closed on August 8, 2024, Paragon 28 filed its amended financial statements. Along with other metrics, Paragon 28 admitted that it understated its Adjusted EBITDA losses in a range of 40.6% to 122.3% and overstated its gross margin so that, in reality, the Company was not a consistent 80%+ gross margin business as Defendants repeatedly claimed during the Class Period. These restatements dated back to Paragon 28's Q1 2023 financial statements:

**Adjusted EBITDA** Values in thousands (except percentages)

| Rep. Period | Original | Restated | % Diff. |
|---|---|---|---|
| Q1 2023 | (1,417) | (2,740) | 93.4% |
| Q2 2023 | (2,629) | (5,370) | 104.3% |
| Q3 2023 | (1,249) | (2,777) | 122.3% |
| Q4 2023 | (4,423) | (7,187) | 62.5% |
| FY 2023 | (9,718) | (18,074) | 86% |
| Q1 2024 | (5,481) | (7,704) | 40.6% |

**Gross Margin**

| Rep. Period | Original | Restated | % Diff. |
|---|---|---|---|
| Q1 2023 | 82.9% | 80.3% | 3.1% |
| Q2 2023 | 82.6% | 77.3% | 6.4% |
| Q3 2023 | 80.3% | 77.4% | 3.6% |
| Q4 2023 | 74.5% | 69.9% | 6.2% |
| FY 2023 | 79.9% | 76.0% | 4.9% |
| Q1 2024 | 80.0% | 77.3% | 3.4% |

17. The August 8, 2024 disclosures also revealed the full scope of the internal control material weaknesses that plagued the Company during the Class Period. For the first time, Defendants admitted to a material weakness in Paragon 28's "control environment" as it "lacked a sufficient complement" of financial and accounting personnel who could properly conduct inventory accounting. This material weakness contributed to the absence of "controls designed and implemented to timely prevent a material misstatement in the accounting for the valuation of inventory," specifically related to "the calculation of excess and obsolescence reserve" and "capitalization of purchase price variances." The following year, in March 2025, Defendants would identify a further control deficiency, consistent with the testimony from former employees discussed herein, concerning the "existence and completeness of inventory on hand." This deficiency contributed to "errors" in the "accounting for the valuation and existence of inventory," including the "calculation of the excess and obsolescence reserve, capitalization of purchase price

variances, and the existence of inventory located both at the Company's warehouse and at third party vendors."

18. On this news, the price of Paragon 28 common stock feel by $1.67 per share, or 20%, to close at $6.64 on August 9, 2024.

19. Finally, on September 20, 2024, the direct and foreseeable materialization of the Defendants' fraud became starkly evident with the abrupt departure of Chief Accounting Officer Erick Mickelson. This pivotal resignation occurred mere weeks after the Company was forced to reveal its need to restate over a year of financial results and admit to pervasive internal control deficiencies. Despite Defendants' claims that Mickelson's stepping down was not due to any accounting or internal control issues – a position flatly contradicted by the catastrophic financial revelations and the timing of his announcement – the market reacted swiftly. This news sent Paragon 28's share price down $0.30, a 4.3% drop, to close at $6.57 per share on September 23, 2024, underscoring the market's clear recognition of the underlying crisis.

20. All told, Paragon 28's stock lost hundreds of millions in market capitalization during the Class Period, down more than 65% from its Class Period high.




21. By this Action, Lead Plaintiff seeks redress for losses he and other Paragon 28 investors suffered after purchasing securities during the Class Period at artificially inflated or maintained prices.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and are pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. During the Class Period, Paragon 28 maintained its principal executive offices at 14445 Grasslands Dr., Englewood, Colorado, 80112.

25. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## III. PARTIES

### A. Lead Plaintiff.

26. Lead Plaintiff, as set forth in the certification filed with this Court (ECF No. 20-2), purchased Paragon 28 securities during the Class Period and was damaged by Defendants' conduct alleged herein.

### B. Corporate Defendant.

27. Defendant Paragon 28 is a medical device company specializing in orthopedic foot and ankle solutions. On January 28, 2025, Zimmer Biomet Holdings, Inc. ("Zimmer Biomet") announced it entered into a definitive agreement to acquire Paragon 28. On April 21, 2025, Zimmer Biomet announced it had completed the acquisition of Paragon 28. Upon completion of the acquisition, Paragon 28 became a wholly-owned subsidiary of Zimmer Biomet. Accordingly, as of April 21, 2025, Paragon 28 was delisted from the NYSE and its shares ceased trading.

28. During the Class Period, Paragon 28 was incorporated in Delaware and its principal executive offices was located at 14445 Grasslands Drive, Englewood, CO 80012. The Company's

common stock traded on the NYSE, an efficient market, under the ticker symbol "FNA." As of September 20, 2024, Paragon 28 had approximately 83,542,291 shares of common stock outstanding, owned by at least hundreds, if not thousands, of investors. As set forth below, throughout the Class Period, Paragon 28 disseminated SEC filings, press releases, investor presentations, and other reports containing material misrepresentations and omissions concerning the Company's financial condition and internal controls.

**C. Executive Defendants.**

29. Defendant Albert DaCosta ("DaCosta") served as the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Board during the Class Period. After Paragon 28's acquisition by Zimmer Biomet in April 2025, DaCosta's new title was Global President, Foot and Ankle. During the Class Period, DaCosta made materially false statements and omissions about Paragon 28's financial condition and internal controls in the Company's public filings, at investor presentations, and during conference calls. DaCosta was also present when Defendant Deitsch and other Paragon 28 executives made misstatements or omissions on these subjects without correcting them despite having the duty, authority and control to do so. Per Defendants' SEC filings, as CEO and Chairman of the Board of Directors, DaCosta "possesse[d] detailed knowledge of the issues, opportunities and challenges facing the company, its business and its industry," was "most capable of effectively identifying strategic priorities and leading the consideration and execution of strategy," and was "close enough to Paragon 28's day-to-day operations to be able to identify key contributors and top performers within the Company[.]"[1] DaCosta therefore had actual knowledge of confidential proprietary information concerning the

[1] *See* Paragon 28's Definitive Proxy Statement dated April 6, 2023 at 20, 24.

Company and its business and operations. As CEO, DaCosta also shared primary responsibility for ensuring and certifying that the Company's SEC filings and other public statements or releases during the Class Period were complete, accurate, and did not omit material misleading information necessary under the circumstances to make them not misleading. Given his role and responsibilities as CEO, DaCosta possessed the power and authority to control, and approve of, the contents of the Company's press releases and investor and media presentations at all relevant times.

30. Defendant Stephen M. Deitsch, ("Deitsch") served as the Company's Chief Financial Officer ("CFO") until Paragon 28 announced the replacement of him effective April 3, 2024. This announcement followed Deitsch's March 29, 2024 resignation, which occurred just two days before the close of Paragon 28's Q1 2024 books. Prior to that time, during the Class Period, Deitsch made materially false statements and omissions about Paragon 28's financial condition and internal controls in the Company's public filings, at investor presentations, and during conference calls. Deitsch was also present when Defendant DaCosta made misstatements or omissions on these subjects without correcting them dispute having the duty, authority and control to do so. Deitsch had actual knowledge of confidential proprietary information concerning the Company and its business and operations, as he had the "responsibilities, duties, and authority usual and customary for [a CFO]."[2] As CFO, Deitsch also shared primary responsibility for ensuring and certifying that the Company's SEC filings and other public statements or releases during the Class Period were complete, accurate, and did not omit material misleading information

[2] *See* Paragon 28's Form 10-K dated February 29, 2024 for the period ended December 31, 2023("February 2024 10-K") at Ex. 10.7+.

necessary under the circumstances to make them not misleading. Given his role and responsibilities as CFO, Deitsch possessed the power and authority to control, and approve of, the contents of the Company's press releases and investor and media presentations at all relevant times.

31. Because of their positions with the Company, Defendants DaCosta and Deitsch (together, the "Executive Defendants") possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to shareholders, securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. This power is demonstrated by, among other things, the fact that Defendants DaCosta and Deitsch often quoted the financial results in the materials at issue and were the Company executives presenting during earnings calls and investor conferences. Further, as evidenced by their certifications of quarterly and annual reports attesting to the accuracy of the information presented in the reports and reflected in the related press releases and investor presentations, the Executive Defendants were provided with copies of these alleged misleading materials prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Executive Defendants are liable for the false statements pleaded herein as controlling persons within the meaning of Section 20(a) of the Exchange Act.

32. The Company is liable for the acts of the Executive Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the

wrongful acts complained of herein were carried out within the scope of their employment.

33. The scienter of the Executive Defendants and other employees and agents of the Company is similarly imputed to Paragon 28 under *respondeat superior* and agency principles.

**D. Relevant Non-Party Paragon 28 Executives.**

34. Kristina Wright ("Wright") served as Paragon 28's interim CFO from April 3, 2024 through August 5, 2024. Wright had been a member of Paragon 28's Board of Directors since 2021, and she chaired the Audit Committee. Wright became interim CFO right after Deitsch's resignation, which occurred just after the close of Q1 2024 ending March 31, 2024. The pervasiveness and scope of the Company's inventory accounting and internal control problems were immediately apparent to Wright. Wright's brief tenure as CFO lasted only for four months, yet in that time Wright oversaw the accurate reporting of financial results for Q2 2024 ending June 30, 2024, the restatement of certain financial results for each quarter in FY 2023 and Q1 2024, and the identification and disclosure of material weaknesses in Paragon 28's internal controls.

35. Erik Mickelson ("Mickelson") served as the Company's Chief Accounting Officer from April 2022 until Paragon 28 announced his departure on September 20, 2024. Mickelson's departure came just weeks after Paragon 28 disclosed material weaknesses in the Company's internal controls related to inventory accounting.

**E. Former Paragon 28 Employees.**

36. The following is a summary of the titles and background of the five former employees ("FE-") relied upon in this amended complaint.

**1. FE-1.**

37. FE-1 was employed by Paragon 28 in Colorado as a Product Manager from March 2021 to May 2022, and then as a Senior Product Manager until October 2023. In FE-1's role at Paragon 28, FE-1 worked with an engineering team of four members, and was responsible for overseeing surgeon contracts, reporting, and forecasting estimates of inventory availability and product lines and identifying targets who could support developing and marketing products.

38. FE-1 reported to Jim Edson, VP of Marketing & Product Management. Edson reported to Brendan Shook, EVP of Marketing & Medical Education, who in turn reported to Matt Jarboe, the Chief Commercial Officer. FE-1's forecasting of inventory availability and success rates were sent up FE-1's chain of command, and also to the finance and forecasting departments.

39. FE-1 had frequent interactions with DaCosta, and FE-1 attended weekly meetings also attended by DaCosta where inventory and forecasting of product lines were discussed.

**2. FE-2.**

40. Paragon 28 employed FE-2 as Sr. Design Quality Engineer in Colorado from September 2021 to April 2024. FE-2 worked on the quality control and design development process as well as risk management for new product development. FE-2 was hired by Paragon 28 to assist in the design and quality controls process, which was a requirement by the FDA. FE-2 was also involved in assisting with risk management, which FE-2 said was linked to design controls because design controls could help mitigate risk. FE-2 worked with Paragon 28 legacy product lines including the Gorilla Plating System, the Monster Hindfoot System, and the Bun-Yo-Matic Clamp.

41. FE-2 reported to Christopher Francklyn, Design Quality Manager. Mr. Francklyn reported to Tyler Braketa, Director of Quality Assurance, who in turn reported to Eric Lintula, VP of Quality and Regulatory Affairs. FE-2 believes Mr. Lintula reported to DaCosta.

**3. FE-3.**

42. FE-3 was employed by Paragon 28 as a Medical Sales Representative from February 2023 to December 2023. FE-3 was a 1099 contractor until April 2023, when FE-3 transferred to a different distribution agency in Detroit, Michigan and became a W2 employee.

43. FE-3 was responsible for selling all Paragon 28 products, including External Fixation Ring Systems, TTC Nails, Bun-Yo-Matic plates, and Cellular Bone Matrixes. FE-3's areas of responsibilities for sales included Northeast Ohio (*i.e.,* Cleveland, Akron, and Canton). As a sales representative, FE-3 was responsible for tracking inventory in the field.

44. While working at Paragon 28, FE-3 reported to Robert McGill, a distribution agency owner, from February 2023 to April 2023, and Jake Sloat, a Territory Manager, from April 2023 to December 2023. FE-3 also worked with Brian Decker, a Northwest Ohio sales representative. FE-3 interacted frequently via telephone and email with Scott Westerhold, the Great Lakes Regional Sales Director.

**4. FE-4.**

45. FE-4 worked at Paragon 28 as a Senior Financial Analyst from April 2022 to February 2024 in Colorado. FE-4 was responsible for analyzing financial data and other metrics for products to assist in driving decisions for product direction. The metrics were divided by segments and product family which included the Forefoot, Hindfoot, and Apex product families. FE-4 managed a financial dashboard of month-to-month product cash flow which was utilized to

forecast future product decisions. During FE-4's time at Paragon 28, FE-4 described how there was no inventory "system on [FE-4's] end to know what was in stock and what was needed."

46. FE-4 reported to several individuals, including Eunice Navarro, the Director of Corporate Finance and Consolidation between August 2022 and June 2023 and the Director of Business Intel and Analytics between June 2023 and July 2024; Calvin Ward, the Senior Director of Finance between June 2022 and March 2024 and current VP, Inventory Planning & Analysis; and Casey Long, Commercial Analytics Manager. FE-4 understood Ward and Navarro reported to Erik Mickelson and/or Steven Deitsch.

**5. FE-5.**

47. FE-5 worked at Paragon 28 as a Distribution Supervisor for inventory and receiving from October 2022 until February 2025 in Colorado. FE-5 was responsible for inventory and receiving and supervised the product receiving teams. FE-5 had 15 direct reports that were hourly wage earners.

48. As Distribution Supervisor for inventory, FE-5 and their team were responsible for cycle counting, inventory accuracy, and processing inventory that came from the quality department. FE-5 handled all inventory except for surgical kits (although FE-5 handled every piece that went into the surgical kits).

49. FE-5 was also Distribution Supervisor for receiving. In that role, FE-5 and his team were responsible for incoming new products from vendors such as screws, plates, instruments, and other sterilized products. Per FE-5, the incoming products would be verified against the packing slip and entered into the SAP system. The product would then go to the quality team to be checked.

50. Prior to departing Paragon 28, FE-5 reported to Zach Shannon, Manager of

Distribution and Continuous Improvement from May 2023 to March 2025. Shannon first reported to Andrew Wendel, who was the Director of Distribution between December 2020 and November 2024, and then Director of Inventory Optimization from November 2024 to April 2025. Shannon then reported to Omar Romo, a Supply Chain Director from August 2022 to November 2024 and the current Director of Distribution. Romo reported to Calvin Ward, the current VP, Inventory Planning & Analysis.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Proper Inventory Management and Accounting for Inventory Were Critical for Paragon 28's Business.

51. Paragon 28 is a medical device company exclusively focused on the foot and ankle orthopedic market. The Company provides orthopedic solutions, procedural approaches, surgical instrumentation, implants, and disposables. Its offerings cover a wide range of foot and ankle ailments, including fracture fixation, forefoot, ankle, progressive collapsing foot deformity (PCFD) or flatfoot, Charcot foot and orthobiologics.

52. In order to market and sell these products effectively, Paragon 28 has explained that it "must maintain significant levels of inventory and surgical instrumentation."[3] Per Paragon 28, "[i]nventories are considered finished goods and are purchased from third party contract manufacturers," these items consist of "implants, hardware, and consumables" and "are held in [Paragon 28's] warehouse, with third-party independent sales representatives or distributors, or consigned directly with hospitals."[4]

[3] February 2024 10-K at 45.

[4] *Id.* at 94.

53. Inventories play an important role in Paragon 28's financial performance. The Company spends "a significant amount of [] cash used in operations" to "maintain[] these levels of inventory."[5] The Company acknowledges that inventory levels in excess of customer demand, however, "may result in inventory write-downs or write-offs, which would cause [Paragon 28's] growth margin to be adversely affected and could impair the strength of [its] brand."[6] Similarly, Paragon 28 is "subject to the risk that a portion of [its] inventory will become obsolete or expire, which could have a material adverse effect on [its] earnings and cash flows due to the resulting costs associated with inventory obsolescence charges and costs required to replace such inventory."[7]

54. Given the impact on Paragon 28's earnings, inventory management is material. An investor would consider the state of the Company's inventory controls important before purchasing or selling Paragon 28 stock, and information that the Company lacked sufficient means to track and account for inventory would significantly alter the total mix of information available to current and potential investors. Paragon 28 thus acknowledges that the "results of operations will be materially harmed if [the Company is] unable to accurately forecast customer demand for [its] products and manage [its] inventory."[8]

---

[5] *Id.* at 45.
[6] *Id.*
[7] *Id.*
[8] *Id.*

## B. Paragon 28's Accounting for Inventory.

### 1. Paragon 28's Obligation to Follow GAAP.

55. At all times during the Class Period, Paragon 28 and the Executive Defendants were fully aware of the need to ensure that the Company's financial statements were prepared in conformity with generally accepted accounting principles ("GAAP").

56. GAAP is the official standard for accounting accepted by the SEC and is primarily promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"), in which standards are referenced as "Accounting Standards Codification" ("ASC"). GAAP is recognized by the accounting profession as the comprehensive set of accounting standards, conventions, and rules that companies in the United States must follow when preparing and presenting their financial statements.

57. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, regardless of footnotes and other disclosures. Regulation S-X provides that interim financial statements must also comply with GAAP. *See* 17 C.F.R. § 210.10-01(a). During the Class Period, Defendants represented that Paragon 28's financial statements were prepared and issued in conformity with GAAP and pursuant to SEC rules and regulations. *See, e.g., infra*, ¶ 213.

58. The Sarbanes-Oxley Act of 2002 ("SOX") further required DaCosta and Deitsch, as the CEO and CFO, to certify various aspects of the Company's quarterly and annual reports and the Company's underlying accounting processes. *See* 15 U.S.C. § 7241. Under SOX, DaCosta and Deitsch were responsible for the publicly filed information, so that investors relying on such information could have a higher level of confidence in them as the CEO and CFO were taking

ownership of the financial information. Accordingly, DaCosta as CEO and Deitsch as CFO had to certify that the financial statements and other financial information included in the reports were fairly presented in all material respects. *See* 15 U.S.C. § 7241 (codifying Section 302 of SOX); 17 C.F.R. § 240.13a-14(a); 17 C.F.R. § 240.15d-14(a). Pursuant to these provisions, during the Class Period DaCosta and Deitsch did in fact certify Paragon 28's financial statements and falsely stated therein that the Company's annual and quarterly reports did not contain any untrue statement of material fact or omit to state a material fact. *Id.*

**2. Accurately Assessing Current Inventory Levels Was Necessary to Properly Value Paragon 28's Inventory and to Estimate Reserves for Excess and Obsolete Inventory.**

59. Paragon 28's inventory accounting was governed by GAAP. For GAAP accounting, ASC 330-10-35-1B establishes that an assessment of the lower of cost and net realizable value is the guiding principle for measuring inventories.[9]

60. ASC 330 defines "net realizable value" as the estimated selling price in the ordinary course of business less reasonably predictable costs of completion, disposal, and transportation.[10] GAAP requires that "when evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs."[11] Such a loss "may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes."[12]

---

[9] *See* ASC 330, *Inventory* at 330-10-35-1B.
[10] *Id.* at 330-10-20.
[11] *Id.* at 330-10-35-1B.
[12] *Id.*

61. Stated differently, inventory value is measured by comparing the net realizable value (for example, the sale price of a Paragon 28 orthopedic product) minus the price of getting the goods to market (such as storage, materials, shipping costs, etc.). Accordingly, where there is evidence that the inventory is worth less than the associated costs of selling it, because of, for example, obsolescence, a company must recognize the difference as a loss during the time period when that damage or deterioration occurs.

62. In accordance with GAAP and ASC, during the Class Period, Paragon 28 stated inventories "at the lower of cost (weighted average cost basis) or net realizable value."[13]

63. To properly account for its inventory, Paragon 28 must have full understanding and an accurate count of existing inventory, whether in its own warehouses or with third-parties. This is because Paragon 28 "evaluate[s] the carrying value" of its inventories "in relation to historical sales, current inventory levels, and consideration of the life cycle of the product." [14]

64. The ability to track the existence of inventory is also critical for estimating a reserve for "obsolete and slowing-moving inventory," which is based on "current inventory levels and historical sales."[15]

65. The nature of Paragon 28's products, which come in different sizes and shapes to accommodate surgical needs and patient size, further underscores the importance of accurately

---

[13] *See* February 2024 10-K at 95. In the Amended Form 10-K dated August 8, 2024 for the period ended December 31, 2023 ("August 2024 Amended 10-K"), Defendants clarified that "[i]nventories are stated at the lower of cost or net realizable value, with the US inventory cost determined on a first-in-first out basis [] and the International inventory cost determined on weighed average cost basis." *See* August 2024 Amended 10-K at 108.

[14] February 2024 10-K at 95.

[15] *Id.*

tracking and accounting for inventory. As Paragon 28 explained when discussing its estimates for excess and obsolete inventory:

> The need to maintain substantial levels of inventory impacts our estimates for excess and obsolete inventory. ***Each of our implant systems are designed to include implantable products that come in different sizes and shapes to accommodate the surgeon's needs related to the patient's anatomical size. Typically, a small number of the set components are used in each surgical procedure. Certain components within each set may become obsolete before other components based on the usage patterns***. We adjust inventory values, as needed, to reflect these usage patterns and life cycle.[16]

66. Paragon 28's auditor, Deloitte & Touche LLP, similarly flagged the importance of properly tracking inventory. In the Form 10-K filed in February 2024, Deloitte identified for the first time "Inventories – Excess and Obsolete Inventories" as a "Critical Audit Matter."[17] Deloitte explained that the critical audit matter was required to be communicated to Paragon 28 because it "relate[d] to accounts or disclosures that are material to the financial statements."[18] Deloitte also noted that "[a] significant decrease in product demand or the development of new products could result in an increase in the amount of excess inventory on hand, which could lead to additional charges for excess and obsolete inventory."[19] Deloitte also "identified management's estimate of excess and obsolete inventories as a critical audit matter because of the high degree of subjectivity involved in developing the estimates and sensitivity related to changes in key assumptions including length of product life cycles."[20]

---

[16] *Id.* at 95.
[17] *Id.* at 99.
[18] *Id.*
[19] *Id.*
[20] *Id.*

67. The foregoing demonstrates that Paragon 28's inventory valuation depended on accurately tracking inventory to identify the products the Company had on hand and the products in the hands of its surgical partners, and when and how those products were used in each surgical procedure.

68. But as will be discussed below, and unbeknownst to investors, Paragon 28 lacked proper inventory controls during the Class Period that prevented it from accurately tracking its inventory in violation of GAAP. *See infra*, ¶¶ 94-142. These deficient inventory controls meant the Company could not "adjust inventory values, as needed, to reflect these usage patterns and life cycle," resulted in inventory accounting errors, and ultimately led to restatements of critical financial metrics during the Class Period.

## C. Defendants' Inventory Accounting Had a Material Effect on Key Financial Metrics in Paragon 28's Financial Reports.

69. Defendants' improper inventory accounting meant that, among other things, two key metrics promoted to investors during the Class Period – Adjusted EBITDA and gross margin – were misstated. Nonetheless, Defendants recklessly touted these metrics to investors even though they were each highly dependent on inputs that could not be calculated accurately because the Company could not track and value inventory.

### 1. Paragon 28's Adjusted EBITDA and Gross Margin Were Material Financial Metrics to the Market.

70. Adjusted EBITDA is a critical metric in financial analysis because it "provides a clearer picture of a company's profitability by excluding non-operational, non-recurring, and non-

cash expenses."[21] Investors rely on Adjusted EBITDA to "gauge a company's true earning potential and financial stability," as "[b]y stripping out one-time expenses," investors can "better compare companies across industries and assess long-term growth prospects."[22]

71. Throughout the Class Period, Defendants highlighted Paragon 28's Adjusted EBITDA to investors. *See, e.g., infra*, ¶¶ 212, 286. Paragon 28 defined Adjusted EBITDA as "earnings (loss) before interest expense, income tax expense (benefit), depreciation and amortization, stock-based compensation expense, employee stock purchase plan expense, non-recurring expenses and certain other non-cash expenses."[23]

72. Defendants described Adjusted EBITDA as a "key financial metric used by [] management in its financial and operational decision-making."[24] The provided Adjusted EBITDA results, "together with a reconciliation to net loss, helps identify underlying trends in [Paragon 28's] business and helps investors make comparisons between [the] company and other companies that may have different capital structures, tax rates, or different forms of employee compensation."[25] Defendants therefore believed that "Adjusted EBITDA provides useful information to investors and others in understanding and evaluating [Paragon 28's] operating results, enhancing the overall understanding of our past performance and future prospects, and allowing for greater transparency with respect to a key financial metric[.]"[26]

---

[21] *See* Mike Zaccardi, CMT, CFA, "Adjusted EBITDA: The Ultimate Financial Performance Metric" (April 8, 2025), https://www.sofi.com/learn/content/adjusted-ebitda-2/.

[22] *Id.*

[23] *See* February 2024 10-K at 88.

[24] *Id.* at 87

[25] *Id.*

[26] *Id.*

73. Although Paragon 28 had not delivered Adjusted EBITDA profit since going public in October 2021[27], Defendants nevertheless provided guidance during the Class Period that Paragon 28 would see an improvement on Adjusted EBITDA year-over-year between 2022 and 2023 and approach breakeven in 2023. *See e.g., infra*, ¶ 218.

74. Analysts also viewed the Company's Adjusted EBITDA results as material. For example, at the beginning of the Class Period in May 2023, analyst reports offered by Piper Sandler, Canaccord Genuity, and Needham & Co. all reported and commented on Paragon 28's Q1 2023 Adjusted EBITDA results.[28] In its write-up of the Q1 2023 earnings results, Piper Sandler noted that "management still expects improvements in adjusted EBITDA getting close to breakeven during '23."[29] Similarly, an August 2023 Needham & Co. report detailing the Company's Q2 2023 results had a top headline reading: "2Q23 revenue came in just above consensus while EBITDA came in just below consensus."[30] In May 2024, after Defendants stated that Adjusted EBITDA breakeven would be pushed out during the Q1 2024 earnings call, William Blair noted that "we believe optically . . . a push-out of EBITDA breakeven might weigh on

---

[27] *See, e.g.,* November 12, 2024 Paragon 28 Press Release, "Paragon 28 Reports Third Quarter 2024 Financial Results and Raises 2024 Net Revenue Guidance" (noting Paragon 28 had not delivered Adjusted EBITDA profit since the Company's October 2021 IPO).

[28] *See, e.g.,* "Paragon 28, Inc. (FNA): Strong Q1 Sales Again & Guidance Reiterated; Still Our Favorite Small Cap," Piper Sandler (May 4, 2023); "Paragon 28: Striding through Q1, on pace for a strong 2023," Canaccord Genuity (May 4, 2023); "FNA: Broad-Based Growth in 1Q23," Needham & Co. (May 5, 2023).

[29] *See* "Paragon 28, Inc. (FNA): Strong Q1 Sales Again & Guidance Reiterated; Still Our Favorite Small Cap," Piper Sandler (May 4, 2023) at 1.

[30] *See* "FNA: Broad-Based Growth Continued in 2Q23," Needham & Co. (Aug. 3, 2023) at 1.

sentiment in the near-term," further emphasizing the materiality of Adjusted EBITDA to investors.[31]

75. Along with Adjusted EBITDA, Defendants emphasized Paragon 28's gross profit margins during the Class Period. The gross profit is the difference between revenue and cost of goods sold (*see infra*, ¶ 82).[32] Gross margin is calculated as gross profit divided by net revenue.[33] A company's gross margin therefore reflects how efficiently a company produces its goods or services. For every dollar of revenue, the gross margin indicates how much is left after covering the direct costs of production (cost of good sold), before accounting for operating expenses like R&D, sales, and marketing. Gross profit margin is generally calculated as a percentage: the higher the gross margin, the more profit a company is generating on the goods.

76. The medical device industry is known for its high gross margins, driven by innovation, regulatory barriers, and intellectual property. While standard gross margins might range from 50% to the low 70% range for many established medical device companies like Styker and Zimmer Biomet, an 80% adjusted gross margin is an exceptionally high figure.[34] It places

[31] *See* "Paragon 28, Inc.: Solid Sales Momentum to Start the Year, but Delayed Path to Profitability Likely Weighs on Near-Term Sentiment," William Blair Research (May 8, 2024) at 1.

[32] *See* February 2024 10-K at 89.

[33] *Id.*

[34] *See, e.g.*, Zimmer Biomet, "Zimmer Biomet Announces Fourth Quarter and Full-Year 2023 Financial Results" (Feb. 8, 2024) at 22 (reflecting gross margins between 63.3% and 64.8%), https://investor.zimmerbiomet.com/~/media/Files/Z/ZimmerBiomet-IR/press-release/zimmer-biomet-press-release-q4-2023.pdf; Stryker, "Stryker Reports 2023 Operating Results and 2024 Outlook" (Jan. 30, 2024) (reporting 63.7% gross profit margin), https://thespinemarketgroup.com/stryker-reports-2023-operating-results-and-2024-outlook/.

Paragon 28 in an elite category, implying an exceptional value proposition, superior manufacturing efficiency and a strong competitive moat.

77. Investors would therefore interpret an over 80% gross margin as a strong signal of a highly profitable, scalable, and resilient business model. It would distinguish Paragon 28 as a top-tier performer in terms of operational efficiency within the medical device space

78. Gross margin also has a significant impact on an investor's valuation of a company and investment-decision making, as it is often a crucial input for various financial valuation models used by investors and analysts. A higher gross margin directly translates to higher projected profits and cash flows, which in turn leads to a higher enterprise value and valuation of the company's stock. If the actual gross margin is lower, the underlying assumptions of these models are flawed, leading to an inflated valuation.

79. For these reasons, Paragon 28's gross margin is material to investors. Accordingly, at numerous points during the Class Period, Defendants publicly represented to the market that Paragon 28 was "an 80% plus gross margin business" and reported gross profit margins at or exceeding that figure. *See, e.g., infra*, ¶¶ 220, 243, 276. The 80% gross margin figure was in line with analyst expectations and covered during the Class Period. In May 2023, Canaccord Genuity noted that Paragon 28's gross margin was 82.9%, "ahead of our 80.0% estimate."[35] Needham & Co. similarly noted in August 2023 that Paragon 28's "gross margin of 82.6 was … above consensus of 81.4%."[36] After Defendants reported Q1 2024 financial results in May 2024, Piper

[35] *See* "Paragon 28: Striding through Q1, on pace for a strong 2023," Canaccord Genuity (May 4, 2023) at 1.

[36] *See* "FNA: Broad-Based Growth Continued in 2Q23," Needham & Co. (Aug. 3, 2023) at 1.

Sandler flagged the gross margin of "80%, which was 100 bps worse than we model." [37]

### 2. Paragon 28's Inventory Accounting Materially Affected its Adjusted EBITDA and Gross Margin.

80. As explained above (¶¶ 59-68), properly accounting for Paragon 28's inventories and estimating a reserve for obsolete and excess inventory requires a thorough and complete understanding of the levels, usage patterns, and life cycle of inventory, whether the inventory is in the warehouse or with third-parties.

81. These inventory figures are important because they effect other metrics, like the "Cost of goods sold," that serve as a critical input into Paragon 28's Adjusted EBITDA and gross margin. These key earnings metrics were material to investors and analysts alike. *See supra*, ¶¶ 72, 74, 77-79.

82. The cost of goods sold are generally those costs directly attributable to manufacturing or selling the inventory of a business. Paragon 28's cost of goods sold "consist[ed] primarily of finished products purchased from third-party suppliers, shipping costs, excess and obsolete inventory adjustments and royalties."[38]

83. Inventory accounting affected Paragon 28's cost of goods sold in two ways. First, "[i]ncome (expenses) for excess and obsolete inventory are included in Cost of goods sold."[39] Second, for implants (i.e., finished products), the "[c]ost of goods sold is recognized at the time the implant is used in surgery and the related revenue is recognized."[40] Until the implant is used

[37] *See* "Paragon 28, Inc. (FNA): Mixed Q1 Results, Guide Reaffirmed but EBITDA Pushout Likely to Spook Some," Piper Sandler (May 8, 2024) at 1.

[38] February 2024 10-K at 88.

[39] *Id.* at 95.

[40] *Id.* at 88.

in surgery, "the cost of [Paragon 28's] implants is recorded as inventories, net in [the] consolidated balance sheets."[41]

84. The cost of goods sold had a significant influence on Paragon 28's gross profit and gross margin. Paragon 28 calculated "gross profit as net revenue less cost of goods sold, and gross margin as gross profit divided by net revenue."[42] As such, any *increase* in the cost of goods sold – including through charges due to the amount of excess and obsolete inventory or use of implants in surgery – would lead to a *decrease* in the Company's gross profit and gross profit margin.

85. A decrease in the Company's gross profit would also lead to an increase in net loss, which negatively impacted Paragon 28's Adjusted EBITDA.

86. Similarly, if a company's net inventory is overstated – including through failing to track an implant's use in surgery and recognizing it in the cost of goods sold – then that company's cost of goods sold is understated, resulting in an overstatement of gross profit and gross margin, net income, and retained earnings.

87. Calculating Paragon 28's key earnings metrics like gross profit margin and Adjusted EBITDA therefore depended on properly accounting for the existence and valuation of inventory. Accordingly, when Defendants disclosed the full restatements in August 2024, the corrections of the inventory accounting errors had a significant and material impact on the Company's gross margin and Adjusted EBITDA. Paragon 28 no longer had consistent 80% gross margins, and DaCosta described the new "baseline" as being around 75%. *See infra*, ¶ 192. And far from reaching profitability, Paragon 28's restated Adjusted EBITDA showed the Company had

---

[41] *Id.*

[42] *Id.* at 89.

understated its loss between 40.6% and 122.3% during the Class Period. *Id.*, ¶¶ 170, 173, 176, 180, 183.

**D. Paragon 28's Lacked Proper Inventory Controls During the Class Period.**

88. Defendants did not disclose Paragon 28's inability to track and value inventory until July and August 2024. This glaring deficiency was the root cause of the issues giving rise to this action.

**1. Paragon 28's Internal Control Framework.**

89. Paragon 28's inventory controls fell under the Company's overall internal control for financial reporting. The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") defines "internal control" as "a process effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."[43] A material weakness "is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."[44]

90. Since inventory management affected the proper accounting for Paragon 28's adjusted EBITDA and gross margin, among other things, the presence of deficient controls would

---

[43] J. Stephen McNally, CPA, "The 2013 COSO Framework & SOX Compliance: One Approach to an Effective Transition" (June 2013) at 4, https://www.coso.org/_files/ugd/3059fc_c98a93b420a34d28a4c79f57db0d2c93.pdf.

[44] *See* Public Company Accounting Oversight Board, "Auditing Standards for Audits of Financial Statements for Fiscal Years Ending on December 15, 2020 through December 14, 2024" at ASC 1305, para. .03.

be material and important to an investor's decision to buy or sell Paragon 28 stock, and would significantly alter the total mix of information available.

91. Accordingly, during the Class Period, Defendants represented to investors in SEC filings that management, including DaCosta and Deitsch, evaluated "the effectiveness of [Paragon 28's] internal control over financial reporting as of December 31, 2023, based on the framework in 'Internal Control –Integrated Framework' (2013) issued by [COSO]."[45]

92. In addition, in each of the Form 10-Qs and Form 10-K during the Class Period (*see infra*, ¶¶ 216, 239, 260, 274, 292), DaCosta and Deitsch were also required to certify, and did certify, that they were responsible for establishing and maintaining internal controls and to certify that they have evaluated the internal controls and reported on their effectiveness. *See* 15 U.S.C. § 7241(a)(4) (codifying Section 302 of SOX).

93. But as the Company's own admissions in its restatements and the following FE accounts demonstrate, DaCosta's and Deitsch's certifications were materially false and misleading. In reality, Paragon 28 lacked sufficient inventory controls and could not track and accurately value its inventory. These deficiencies put the accuracy of the Company's financial results, including Adjusted EBITDA and gross margin, at risk, and eventually led to material restatements of these key metrics. *See infra*, ¶¶ 170, 173, 176, 180, 183.

### 2. Paragon 28 Had Longstanding Weaknesses in its Inventory Tracking and Controls.

94. ***Paragon 28 struggled with inventory accounting since at least the time of its IPO in October 2021.*** According to FE-1, shortly after the IPO, the Company changed its inventory

[45] February 2024 10-K at 128.

tracking system from Microsoft Dynamics Great Plains to a different system. In making this transition to the new system, FE-1 said the Company did not pause business operations (e.g., inventory going out and getting sold), which resulted in billing issues, inventory tracking issues, and a long period of time "playing data catch up."

95. ***Paragon 28's management, including CEO DaCosta, was directly aware of significant inventory control issues that emerged early on, with DaCosta personally involved in discussions and providing guidance.*** FE-1 said that CEO DaCosta was aware of the issues involved in the transition, including inventory tracking, and sat in on numerous calls discussing the issues and gave guidance to get people moving in the right direction. FE-1 said the problems caused by the transition were widespread and obvious within the Company.

96. ***Well before the Class Period commenced in May 2023, Paragon 28's inventory tracking issues were a known and pressing concern at the highest levels of management.*** In January 2023, FE-1 personally presented on these issues for an hour and a half with the CLO, Executive VP of Sales and the employee who oversaw inventory. During the presentation, FE-1 discussed the issues that needed to be fixed regarding the soft-tissue products of which FE-1 was involved. The primary issue, per FE-1, was that there was not sufficient inventory to allow FE-1's team to hit sales numbers.

97. ***The root cause of Paragon 28's inventory crisis was its fundamentally deficient control systems, a critical flaw directly known to senior management, including CEO DaCosta.*** In FE-1's own words, Paragon 28 had deficient inventory tracking or control systems in place, as higher volume SKUs (including implants) were not tracked by lot numbers. As such, FE-1 said there was no way to determine how much product was on hand or shipped to distributors. But

according to FE-1, the sales number goals FE-1's team could not meet were based on incorrect figures regarding available products provided by the purchasing team to senior management, including DaCosta. Specifically, per FE-1, the purchasing team said a certain number of products would be available, when in reality, there was not sufficient inventory available.

98. ***Paragon 28's executives, including CEO DaCosta, were directly and consistently apprised of the Company's inability to accurately track its inventory and ascertain current stock levels.*** As part of FE-1's responsibilities, FE-1 sent weekly emails for months with spreadsheets and guidance updating the finance and forecasting departments and advising them of massive discrepancies in inventories. FE-1's forecasting reports – which included estimates of inventory availability – were also sent directly to DaCosta. FE-1 said their guidance was continually ignored.

99. ***Paragon 28's deeply flawed inventory controls, exacerbated by the system transition, rendered sales targets for Paragon 28's salesforce fundamentally unattainable, resulting in forfeited commissions and bonuses on products that were either missing or simply non-existent.*** The inventory issues resulting from the transition and otherwise ultimately caused FE-1 and FE-1's team to not hit target numbers, resulting in lost commissions and bonuses based on sales for products that were not available or went missing. According to FE-1, Paragon 28's salesforce did not receive bonuses as well due to these issues.

### 3. During the Class Period, Paragon 28 Employees Relied on Multiple Sources of Inconsistent and Inaccurate Information to Track and Account for Inventory.

100. Former employees confirm that during the Class Period, various teams within Paragon 28 used uncoordinated, overlapping, and inconsistent systems to track inventory. The

absence of a cohesive process to account for inventory ultimately led to errors in inventory accounting and evidence the Company's deficient internal controls.

101. ***Paragon 28's financial operations, critically overseen by CEO DaCosta and CFO Deitsch, used its SAP systems as the primary tool for tracking critical financial information, which produced internal dashboards that DaCosta reviewed daily.*** Per FE-4, an SAP system was utilized at Paragon 28. FE-4 could extract some sales data from SAP-SAC ("Sales Analytics Cloud") to assist in creating internal dashboards. FE-4 managed a financial dashboard of month-to-month product cash flow which was utilized to forecast product decisions. Per FE-4, internal dashboards were created for each product family, including but not limited to Forefoot, Hindfoot, and Apex product families. FE-4 said the internal dashboards for the product families contained regional sales data. According to FE-4, a majority of company personnel had access to internal dashboards, and FE-4 heard from superiors that DaCosta reviewed dashboard data on a daily basis.

102. Select inventory information was also available via SAP. FE-5 stated that their team utilized SAP to track inventory in and out. According to FE-5, everything that left the distribution center was "transacted" in SAP by his team – i.e., showing what it was and where it was going.

103. ***Paragon 28's inventory tracking was a chaotic mess, with employees unable to rely on a single, unified system, including SAP.*** In practice, however, Paragon 28 employees did not rely on or use a cohesive, unified, and effective system to track inventory, whether in SAP or elsewhere. Former employees confirmed that this problem persisted and resulted in poor inventory management and the Company relying on inaccurate and out-of-date inventory information.

104. For example, FE-4 said that "[i]nventory was always horrible" and described how "there was no system on my end to know what was in stock or what was needed." According to

FE-4, each Paragon 28 department worked on its own and inventory tracking, among other information, was "siloed" by department. FE-4 said everyone seemed to use a different method to track inventory, with some using Excel spreadsheets. FE-4 was a bridge that tried to bring all the information together.

105. Given overlapping and inconsistent methods to track inventory, FE-4 said "we sent around a BOM [bill of materials] on an Excel spreadsheet and prayed it was right." Multiple times during FE-4's employment at Paragon 28, and right up until FE-4 left the Company in February 2024, FE-4 got in trouble because the numbers on the spreadsheet were not accurate and up-to-date. FE-4 advised Calvin Ward (Senior Director of Finance) and Casey Long (Commercial Analytics Manager) that there were numerous floating documents and it could not be determined which ones were updated, as there was no single source of true and accurate information.

106. ***Despite the dire need for accurate inventory data, management's efforts to establish a single, reliable source at Paragon 28 for tracking inventory levels utterly failed throughout the Class Period.*** FE-4 believes a team, including their supervisors Eunice Navarro (Director of Business Intel) and Calvin Ward (Senior Director of Finance), was working on an inventory dashboard. But FE-4 was not involved in the project and by the time FE-4 left the Company in February 2024, it had not been completed.

107. ***Instead of relying on a unified company wide-system, Paragon 28 personnel haphazardly tracked critical inventory data on their own individual Excel spreadsheets.*** The inventory FE-4 was shown by managers was contained on an Excel spreadsheet. FE-1 similarly confirmed that individuals would rely on uncoordinated excel spreadsheets to track inventory. Per FE-1, people "knew" the information in the systems was "wrong" so they relied on their own

excels to track inventory. For example, FE-1 used 80 excel sheets to track every lot number of a product.

108. ***Beyond the distribution center, Paragon 28's inventory vanished into an information black hole, a direct consequence of the Company's disjointed and unreliable tracking systems.*** According to FE-5, once inventory was in the field, FE-5 did not perform any further tracking in SAP. FE-5 said there was not the same level of control of the inventory once it left the building. Also, for example, FE-5 said a restock team could re-order items, but the team had no way of knowing which components a salesperson used unless they received a ticker to reorder something.

109. ***During the Class Period, Paragon 28's persistent and chaotic field inventory management was a critical issue, one that Chief Commercial Officer Matt Jarboe was brought in to address.*** Paragon 28 sales people in the field also lacked a consistent, unified way to track inventory, another example of deficient inventory controls during the Class Period. For example, there was no uniform tracking system for surgical trays. FE-3, a sales representative from February 2023 to December 2023, said that upon joining Paragon 28, FE-3 and other sales representatives had to find their own application or system to track surgical tray movements so they could know where they were located or when they needed to restock. Per FE-3, it was an ongoing issue. FE-3 estimated using two to three different inventory tracking applications while working at Paragon 28. In July or August 2023, FE-3 recalls using an application called "red dot." In or around September/October 2023, FE-3 said that Paragon 28 had sales representatives use an application called "CodeREADEr: Barcode Scanner." These applications, according to FE-3, could track the location of surgical trays if they were scanned at the time they were dropped off at a hospital or

other location. Eventually, FE-3's sales region was told to use the "CodeREADEr: Barcode Scanner" application. FE-3 believed that this application was planned to be used-company wide under an initiative spearheaded by Matt Jarboe, the Chief Commercial Officer. Paragon 28 did not have a company-wide use of this application in place by the time FE-3 left Paragon 28 in December 2023.

110. ***Paragon 28's sales team bore the brunt of the Company's dysfunctional inventory tracking, with inadequate applications creating more problems than solutions.*** According to FE-3, the applications were ineffective. One issue with the applications was they did not track expiration dates, which resulted in poor inventory management. For instance, FE-3 remembered one incident in or around August 2023 where FE-3 received a magnesium based bone filling biologic that was expired and should not have been sent.

**4. Paragon 28's Lack of Inventory Controls Resulted in the Company Being Unable to Accurately Track and Value its Inventory.**

111. At the most fundamental level, Paragon 28's deficient inventory controls prevented the Company from maintaining accurate records of the inventory in its possession, which ultimately led to errors in inventory accounting and the restated financials.

112. ***Paragon 28's "bin accuracy" was well below industry standards during the Class Period.*** According to FE-5, "bin accuracy" was simply whether a physical bin contained the documented components. As explained by FE-5, "if [the bin location] says I have 50 screws, then I have 50 screws. If I don't, it is off." When FE-5 started working at Paragon 28 in October 2022, the bin accuracy was approximately 53%, which was extremely poor for industry standards. FE-5 said that 98.5% bin accuracy would be considered "good" under industry inventory accounting standards. During FE-5's tenure, FE-5 worked on improving accuracy and had it trending upwards.

It was around 81% in January 2025, just shortly before FE-5 left the Company. FE-5 said this figure was "still not good, but better."

113. ***Widespread knowledge of Paragon 28's inventory accuracy issues pervaded the distribution department, signaling a pervasive problem that demanded executive attention.*** FE-5 said it was well known within the distribution department that inventory accuracy was an issue. FE-5 also knew there was concern up at the VP level regarding inventory accuracy. FE-5 sent daily emails to Calvin Ward (VP of Inventory Planning & Analysis), regarding inventory accuracy metrics. Through these emails, Zach Shannon (Manager of Distribution and Continuous Improvement) Andrew Wendel (Director of Inventory Optimization), and Omar Romo (Director of Distribution) were also aware of these metrics.

114. ***Paragon 28's inability to properly track and value its inventory was a pervasive and systemic problem throughout the Class Period, as confirmed by former employees.*** This fundamental lack of control was evident in the Company's failure to even track individual components within a single product. For example, FE-1 described how a single product may contain 25 component parts (*i.e.*, "widgets") attached to it. Per FE-1, "[w]e had no idea where any of this [inventory] was," as the Company could not reliably track inventory in its warehouse, out in the field, or in procurement and product development. FE-1 said there were many new suppliers which took time to vet and there were no "standard operating procedures" in place for inventory tracking. FE-1 said the engineering department and procurement were reporting numbers that were grossly different from reality.

115. ***A stark example of these inventory control deficiencies emerged in 2023 concerning "Hindfoot" products.*** FE-1 described another example of an inventory control issue

that arose in 2023 regarding "Hindfoot" products, which were managed by product manager Mark Traina and were a differentiator for Paragon 28 and Paragon 28's largest product line. FE-1 said that Hindfoot products consisted of TTC nails and plates, in addition to microscopic screws used in the plates that were Paragon 28's bread and butter.

116. ***CEO DaCosta was totally informed of these significant inventory issues specifically effecting the Hindfoot products.*** With the Hindfoot product, the Company could not accurately track current inventory levels, creating tensions within Paragon 28's sales team and causing friction with customers. According to FE-1, Paragon 28 executives and managers told everyone within the Company that the inventory levels were good for these products even though Traina knew – and advised them – that there were glaring problems and overstatement of inventory. FE-1 said there were instances where the Paragon 28 salesforce would promote the products only to learn that they could not support the sales with inventory because it was not available, which damaged relationships with customers. It got so bad, that at one point, FE-1 reached out directly to sales staff alerting them that certain products were not ready to be launched. According to FE-1, DaCosta was totally informed of these inventory issues affecting the Hindfoot products.

117. ***Paragon 28's severely deficient inventory controls created an environment where sales personnel felt the need to "hoard[]" products.*** FE-4 also saw first-hand the negative effects of Paragon 28's deficient inventory controls on the Company's business. According to FE-4, sales representatives were "hoarding" products. FE-4 said that the sales representatives would tell FE-4 they did not have products on hand when they actually did. But per FE-4, there was not actionable data and no clear line of communication on anything related to the inventory.

118. ***The systemic breakdown in Paragon 28's inventory management directly and foreseeably impaired Defendants' ability to conduct proper inventory accounting, including because there were no controls in place for recalls or other inventory tracking issues that may arise.*** For instance, the Company seemingly lacked controls to prevent inventory from being over-ordered. According to FE-1, at one point in 2023, a shipping container of Hindfoot parts was lost. After it was lost, FE-1 said the Company over-ordered replacement parts, 20 times more parts than needed, mostly of uncommon sizes. These replacement parts, thousands of microscopic screws for the Hindfoot plates that would go inside people's bodies to fuse ankle joints, were never tracked by lot number, per FE-1. FE-1 said there were no controls in place for recalls or other inventory tracking issues that may arise.

119. ***Paragon 28's systemic failure to safeguard its inventory, leading to significant financial losses from missing products, was directly known to the C-Suite, including Chief Commercial Officer Matt Jarboe.*** FE-1 said that stored inventory in the warehouse was unsecured, and inventory would go missing just weeks after it was sent to the warehouse. FE-1 also recalled a particular project involving plantar plates for the foot. FE-1 said that out of 100 units in the first batch, 50 of them went missing. These units were valued at approximately $1,000 each, per FE-1. FE-1 discussed these inventory issues with Matt Jarboe (Chief Commercial Officer) and Jim Edson (VP of Marketing & Product Management), in person.

**5. Paragon 28's Inventory Issues Were So Stark that Two Separate Dedicated Meetings Were Formed to Address the Problem.**

120. ***The pervasive inventory chaos at Paragon 28 was a critical issue reaching the direct attention of CEO DaCosta and CFO Deitsch.*** Paragon 28's problems with its inventory controls were so pervasive and apparent during the Class Period that multiple groups within the

Company organized recurring meetings to formulate plans to address the significant inventory tracking and control issues. The information exchanged and discussed during these meetings reached the highest levels of Paragon 28 management, including DaCosta and Deitsch.

121. ***CEO DaCosta directly participated in weekly calls dedicated to resolving Paragon 28's escalating inventory tracking and control issues.*** Throughout 2023, according to FE-1, there was a dedicated call that took place once per week to try to fix tracking and inventory issues. FE-1 attended these calls, and said that DaCosta would be on the calls discussing these issues.

122. ***CEO DaCosta and CFO Deitsch were directly apprised of Paragon 28's critical inventory levels via "Stockout reports."*** FE-1 described Paragon 28 management as "micromanagers," and as such, excel spreadsheets entitled "Stockout reports" were prepared for the calls and emailed to the team by then Supply Chain Director Omar Romo. Per FE-1, the "Stockout reports" detailed current levels of inventory and contained information about the SKU #, the supplier name, and current on-hand quantity, among other things. FE-1 recalled DaCosta and Deitsch were on the email distribution list, along with Jeff Sears (SVP Ops), Matt Jarboe (Chief Commercial Officer), Brandon Svendsen (VP Commercial Ops), and Brendan Shook (EVP Marketing & Medical Education).

123. FE-1 explained that the "Stockout reports" were used to prove that the issues flagged by FE-1 – including the discrepancy between what procurement said was available according to their understanding of the inventory and what was actually in Paragon 28's inventories – were happening. Members from Paragon 28's Marketing and Sales team discussed issues during the calls related to every product family, including Hindfoot products. In addition, FE-1 said action items were created, including a "hot list," "stock out list," and "high rev/run" list.

According to FE-1, these items were discussed during the calls and attempts were made to formulate plans to identify issues and resolve them. FE-1 said by the time they left the Company in October 2023, there was an acknowledgement of a problem.

124. ***Despite DaCosta's knowledge of ongoing inventory issues, DaCosta nonetheless pressured his team to promote products not supported by current levels of inventory.*** For example, FE-1 worked with Paragon 28's R3ACT screw. FE-1's product release plan involved allowing consulting surgeons to use it, which would allow for the accumulation of case studies and providing of feedback, and then building from that work with consulting surgeons. FE-1 sent emails to consulting surgeons regarding this plan and cc'd DaCosta on these emails. According to FE-1, the consulting surgeons were excited about this plan. The plan, however, went out the window due to financial pressures in place and DaCosta's request that a press release announcing the product be sent out. Per FE-1, DaCosta made this request despite being told by FE-1, Jim Edson (VP of Marketing & Product Management), and Brendan Shook (EVP of Marketing & Medical Education) that the Company did not have enough product in inventory for a major release.

125. ***In response to Paragon 28's escalating inventory crisis, senior management from across multiple departments actively convened recurring monthly meetings starting in mid-2023.*** In mid-2023, FE-4 separately formed a cross-functional meeting including the sales department, business intelligence/analytics, biologics, and others to address the inventory issues. FE-4 said the monthly meetings were created to establish a new process to know what was in stock and what was not and to fine tune the process. FE-4 said there were senior employees on the calls including Calvin Ward (Senior Director of Finance), Morgan Jones (Supply and Demand Manager), Jack (Julian) Sneve (Senior Inventory Planner and Analyst) Casey Long (Commercial

Analytics Manager) and other managers, VPs, and directors. FE-4 recalls between two to five meetings taking place prior to FE-4's departure.

**6. Paragon 28's Inventory Audit Further Reveals the Lack of Proper Controls.**

126. Paragon 28's deficient and slapdash approach to inventory controls is also evidenced by the Company's annual audit, performed in 2023 and 2024 at the Company's warehouse in Colorado. As explained by the former employees, the annual audit revealed additional discrepancies between Paragon 28's records and the hand-counted inventory in its possession at year-end.

127. ***Paragon 28's annual physical inventory audits consistently exposed a troubling reality: the Company's reported inventory figures never aligned with the actual counts.*** According to FE-4, every December, an accounting manager would send an email requesting employees to volunteer to conduct a physical inventory audit. The audit was conducted in Paragon 28's warehouse which was part of its main office complex in Colorado. FE-4 participated in the audit on two occasions in December 2022 and December 2023.

128. Per FE-4, inventory auditors were divided into two teams: employees who conducted the actual counting and employees with a background in accounting and finance, like FE-4, who acted as data entry. FE-4 said the counts were conducted on paper sheets that contained 100,000s of SKUs. The SKUs would be physically counted and reported on the paper sheets and then passed to the salaried employees to enter the data. FE-4 described the process as "miserable."

129. FE-4 said the information compiled during the audit was entered onto an Excel spreadsheet. Very early on in FE-4's career at Paragon 28, FE-4 confirmed the use of an Excel spreadsheet to record information from the inventory audit during a conversation with Cody

Brubaker, a manager of Kit Production and Distribution Supervisor. FE-4 said the numbers entered into the Excel spreadsheet during the audit were compared to another figure, although FE-4 did not know the source of the other figure. FE-4 said the figures never matched.

130. ***During Paragon 28's deeply flawed December audits, even external auditor Deloitte expressed significant concern over the accuracy of the Company's inventory counts***. FE-5 also worked on the December audit, and confirmed that information recorded during the audit was entered into an Excel spreadsheet. FE-5 said that the inventory count consisted of a massive amount of data and FE-5 recalled handling about 700,000 units of inventory during the December 2024 audit. Per FE-5, the count sheets would be given to a room full of finance people and engineers whose job was to enter it into Excel spreadsheets. For the 2024 inventory audit, FE-5 said simple Excel errors were made (e.g., column adding errors) which resulted in $6 million dollars of adjustments.

131. According to FE-5, Deloitte was the auditor involved in the inventory audit. FE-5 routinely interacted with Deloitte personnel, and FE-5 said the Deloitte personnel expressed concern regarding the accuracy of the inventory audit "during the heat of battle." FE-5 explained that "something was way off" with the inventory audit because FE-5's personal accuracy numbers were near 80%, but when the final report was completed, it was showing 63% accuracy.

132. Accordingly, the persistent and significant mismatches revealed during the December inventory audits starkly exposed Paragon 28's systemic failure to properly account for its inventory during the Class Period, directly and foreseeably contributing to the accounting errors that necessitated the financial restatements at the core of this litigation.

**7. Paragon 28's Deliberate Steps to Not Report Inventory.**

133. ***Beyond flawed tracking, Paragon 28 actively engaged in a deceptive practice of stopping inventory receipts to control reported figures, a tactic that directly impacted what appeared on the Company's balance sheet.*** Paragon 28's inventory issues did not end with its lack of viable inventory controls. According to FE-5, there were several times during their tenure where FE-5 was told to stop receiving inventory. FE-5 said this happened 3-4 times during their tenure, including in Q2 and Q4 2023 and Q2 and Q4 2024. FE-5 received these directions from Omar Romo (when he was Supply Chain Director) and Jesus Regosa (Supply Chain Manager), who explained to FE-5 the reason was they did not want the inventory recorded on the books. FE-5 said they were trying to control how much inventory appeared on the balance sheet.

134. FE-5 said that by not receiving inventory, the inventory was not logged in SAP. By way of example, FE-5 said that "[i]f I have $5 million in inventory not received in SAP, it does not exist from a standpoint in SAP." FE-5 said the information in SAP would be reported to shareholders.

135. The end result of these directions is that Paragon 28 did not properly account or track for millions of dollars worth of inventory in SAP. Specifically, FE-5 said that as a result of these directions, there would be millions of dollars worth of new inventory from vendors just stacked up physically in the warehouse. FE-5 estimated that $5 million was the highest level of inventory not received in SAP pursuant to these directions.

**8. Paragon 28's Reckless Efforts to Reduce Non-Conforming Inventory and Inspect Products.**

136. As described below, Paragon 28 also experienced pervasive issues with non-conforming products. The systemic non-conforming product issues at Paragon 28 were not isolated

quality control problems but were inextricably linked to, and exacerbated by, the Company's systemic lack of proper inventory controls. While "non-conforming products" were documented, assigned non-conformance numbers, and physically segregated in a locked cage (and recorded on Excel/Smart Sheets), this internal tracking mechanism effectively became a separate, isolated inventory system that compounded the Company's overall inability to manage its stock. Moreover, the Company's efforts to resolve issues with non-conforming products meant the Company cut corners and risked products not meeting specifications and undergoing recalls.

137. ***The consistent generation of non-conformance reports at Paragon 28, detailing products failing to meet specifications, was a known and regularly reviewed issue at the highest technical levels, including by Chief Technology Officer Jason Edie.*** According to FE-2, non-conforming products were products that did not meet certain specifications, which could include manufacturing/engineering specs, or even be as trivial as not having the proper documentation, being improperly labeled, or having something spelled wrong on the paperwork. FE-2 said these products were documented on "non-conformance reports," assigned non-conformance numbers, and were segregated and placed in a locked cage in a building in Colorado and recorded on excels/"smart sheets." During a portion of FE-2's time at Paragon 28, Jason Edie was the Chief Technology Officer ("CTO"). While CTO, according to FE-2, Mr. Edie would have monthly reviews, where a portion of the review would be dedicated to reviewing the non-conforming data and what was currently non-conforming, what had been released, and what had been scrapped.

138. ***CEO DaCosta and CFO Deitsch were the driving force behind Paragon 28's urgent, months-long effort starting in late 2021 to clear out millions of dollars in non-conforming inventory.*** FE-2 said that upon joining Paragon 28 in September 2021, there was a big

push for the first six-to-eight months to resolve issues with non-conforming products and get them out the door. FE-2 estimated that when FE-2 first started, there was a few million dollars worth of non-conforming products. FE-2 recalled during a call that a promise was made that if the figure could be reduced by a certain amount, Paragon 28 would buy steak dinners for everyone.

139. FE-2 was told that the push to release non-conforming products came from upper management. FE-2 believed that DaCosta and Deitsch were behind the push. Nonetheless, FE-2 said the quality management department had to sign off on any release of non-conforming products. While over time non-conforming products were reduced down to a manageable level, per FE-2, new ones were still being created. Therefore, according to FE-2, the quality management department started closing them faster. FE-2 said all of the issues regarding the non-conforming products were addressed, but FE-2 did not always agree with the solution.

140. ***The Company's reckless conduct included releasing products with known defects – such as screws not meeting engineering specifications – and then losing all traceability once they left the building.*** For example, according to FE-2, some parts (*i.e.*, screws) used in products did not meet the engineering specifications they were designed for. FE-2 said that in a sampling of parts, there were specific percentages of conformance that had to be met. FE-2 said in cases where the percentage was not met, justifications for release were sometimes made depending on the need for the part, and they would be released. Once these lots left the building and were shipped out, they were not tracked, per FE-2.

141. By the time FE-2 left Paragon 28, there were still a lot of non-conforming products, but they were being closed right away. While Paragon 28 never underwent an FDA inspection

during FE-2's employment at the Company, FE-2 believed that Paragon 28 would not have passed an FDA audit if one had been performed.

142. ***Paragon 28 also critically compromised its quality by deliberately accelerating product inspection processes, ignoring vital tests for potential quality issues.*** A separate issue from the push to release non-conforming products involved Paragon 28's inspection of products. Specifically, FE-2 raised concerns that the process was being sped up and not all tests for potential quality issues were being conducted. Toward the end of FE-2's employment, FE-2 raised concerns regarding the inspection process being sped up to Meghan McKenna, a Quality Manager, and to Francklyn, in-person. According to FE-2, McKenna's response, which FE-2 was told in person and was heard by other employees, was that they were "willing to take on the risk of a recall." Francklyn's response was that they were being asked to do something and there was no time to fix it, per FE-2. FE-2 thought Paragon 28 wanted "yes people," and that people had the right answer but did not have the "cajónes" to stand up to different teams.

### 9. Paragon 28 Admitted to the Material Weaknesses in its Internal Controls Relating to Inventory.

143. As the accounts from Paragon 28's former employee demonstrate, the Company lacked sufficient controls to accurately track and value its inventory. As a result, Paragon 28 committed errors in inventory accounting that forced them to restate critical financial results.

144. The lack of proper inventory tracking and controls explained by the former employees were corroborated in August 2024, when Defendants admitted in the Amended Form 10-K to the existence of material weaknesses in internal controls, including the lack of "sufficient complement of financial and accounting personnel" to perform "accounting for inventory in accordance with GAAP." *See infra*, ¶ 185. Paragon 28 therefore lacked "controls designed and

implemented to timely prevent a material misstatement in the accounting for the valuation inventory," specifically relating to "the calculation of the excess and obsolescence reserve" and "capitalization of purchase price variances." *Id*. Defendants offered a further confirming admission in March 2025, in the Form 10-K for fiscal year 2024, when they identified a material weakness related to the "existence and completeness of inventory on hand." *See infra*, ¶ 203. This material weakness contributed to "errors" in the "accounting for the valuation and existence of inventory," including "the existence of inventory located both at the Company's warehouse and at third party vendors." *Id.*

**E. During the Class Period, Defendants Falsely Represented the Company's Financial Results, Misleadingly Affirmed Paragon 28's Internal Controls, and Misrepresented the Company's Inventory Status.**

145. Despite the widespread problems with Paragon 28's inventory controls, Defendants artificially inflated or maintained the Company's stock price during the Class Period by falsely reporting key financial results (Adjusted EBITDA and gross margin), affirming Paragon 28's internal controls, and misrepresenting the state of the Company's inventory. *See infra*, ¶¶ 208-298.

146. As described in detail above (*see, e.g., supra*, ¶¶ 95, 97-98, 101, 116, 121-124, 139), and in the forthcoming section detailing additional allegations of scienter (*see infra*, § VI), DaCosta and Deitsch were in positions where they could access, and had actual access, to material information concerning Paragon 28's deficient inventory controls. Moreover, as the most senior executives at Paragon 28 responsible for financial oversight, DaCosta and Deitsch routinely engaged with financial models and were highly fluent in the drivers of Paragon 28's profitability. DaCosta and Deitsch understood how operational inefficiencies impacting inventory tracking and valuation – which directly affect cost of goods sold – would undercut the accuracy of its key

financial results, Adjusted EBITDA and gross margin. Defendants thus lacked any reliable basis to tout those metrics, speak about the state of the Company's inventories, and affirm the effectiveness of internal controls. Defendants' conduct constituted an extreme departure from the standards of ordinary care and presented a danger of misleading investors that was either known to Defendants or was so obvious that Defendants must have been aware of it. Defendants' failure to provide complete and accurate information did in fact mislead investors and directly and foreseeably caused investors to suffer losses.

147. The Class Period starts on May 5, 2023. Over the next year, in press releases, investor presentations, quarterly reports on Form 10-Q, and the annual report on Form 10-K, Defendants reported financial results and certified the accuracy of financial reporting. But Defendants understood or recklessly disregarded the fact that the Company had significant inventory control issues that started after the Company went public and continued through the Class Period. *See, e.g.*, *supra*, ¶¶ 95, 97-98, 101, 116, 121-124, 139. These weak inventory controls meant Defendants could not accurately account for the Company's current inventory levels and properly value its inventory, resulting in error-filled inventory accounting that led to falsely reported financial results. *Id.*, ¶¶ 94-142.

148. Among Paragon 28 employees, the Company's inability to track and value inventory was readily apparent and pervasive. Per FE-5, just months before the Class Period started, Paragon 28's "bin accuracy" was a dreadful 53%, and had reached around 81% by the time FE-5 left in early 2025, which was "still not good." *Id.*, ¶ 112. According to FE-1, Paragon 28 did not track higher volume SKUs (including implants) by lot numbers, and there were no controls in place for recalls or other inventory tracking issues that may arise. *Id.*, ¶¶ 97, 118. As a result, the

Company engaged in massive over-ordering by as many as 20x than what was actually needed, lacked tracking of critical parts, and had instances where as much as $50,000 in inventory went missing. *Id.*, ¶¶ 114, 118-119. FE-1 also said that since there was no way to determine how much product was on hand or shipped to the distributors, sales team members were given goals based on inaccurate counts of inventory and would then promote the products with those goals in mind. *Id.*, ¶¶ 97, 116. But when the time came to support the sale, the salespeople would learn there was insufficient inventory. *Id.* The issues were so prevalent that FE-1 said DaCosta and other Paragon 28 executives attended weekly calls throughout 2023 to address the inventory issues. *Id.*, ¶¶ 121-123. Deitsch and DaCosta further received "Stockout reports" detailing current levels of inventory, and other Paragon 28 executives, including the Chief Commercial Officer, were told directly about inventory control problems. *Id.*, ¶¶ 119, 122. According to FE-1, by October 2023, there was an acknowledgment of a problem. *Id.*, ¶ 123.

149. But Paragon 28's inventory control issues did not stop Defendants from touting key financial metrics – gross margin and Adjusted EBITDA – that depended on accurate inventory accounting. For example, during the May 5, 2023 earnings call, Deitsch emphasized the falsely reported gross margin figure of 83% and stated the Company's expectation of a "$5 million to $10 million improvement in our adjusted EBITDA" in 2023. *See infra*, ¶ 219. Similarly, during the August 2, 2023 earnings call, Deitsch reaffirmed Paragon 28 as "an 80% plus gross margin business," and reiterated the Company's ability to reach cash flow break even based on "improvements to adjusted EBITDA." *Id.*, ¶¶ 242-243. Defendants made additional similar statements throughout the Class Period, and analysts were consistent in highlighting the Company's Adjusted EBITDA and gross margin performance (*see supra*, ¶¶ 74, 79). These results,

and Defendants' representations about them, were false and misleading when made, as Paragon 28's financial statements did not fairly and accurately present its results in violation of GAAP and SEC regulations.

150. Throughout the Class Period, Defendants also publicly filed SOX certifications executed by DaCosta and Deitsch falsely attesting to the accuracy of Paragon 28's financial statements and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures as follows:

| **Form** | **Filing Period** | **Filing Date** | **Signed/Certified By** |
|---|---|---|---|
| 10-Q | Quarterly period ended March 31, 2023 | May 4, 2023 | DaCosta<br><br>Deitsch |
| 10-Q | Quarterly period ended June 30, 2023 | August 2, 2023 | Da Costa<br><br>Deitsch |
| 10-Q | Quarterly period ended September 30, 2023 | November 8, 2023 | Da Costa<br><br>Deitsch |
| 10-K | Year ended December 31, 2023 | February 29, 2024 | Da Costa<br><br>Deitsch |
| 10-Q | Quarterly period ended March 31, 2024 | May 8, 2024 | Da Costa<br><br>Interim CFO Wright |

151. As discussed above, the Company's own admissions and the accounts from former employees of Paragon 28 reveal that these certifications were false because the Company's internal controls over tracking and valuing its inventory were materially weak. *See supra*, ¶¶ 94-144. Further evidence of Defendants' deficient internal controls comes from FE-5, who stated that on at least two occasions during the Class Period, Q2 and Q4 2023, FE-5 received instructions from the Supply Chain Manager and Supply Chain Director to not receive inventory so it would not be

recorded on the Company's balance sheet. *Id.*, ¶ 133. Such an instruction contradicts DaCosta and Deitsch's certification that they designed and maintained proper internal controls. Defendants also made these certifications despite being made aware by their auditor, Deloitte, of a "critical audit matter" during the Class Period concerning "excess and obsolete inventories." *Id.*, ¶ 66. Even with this knowledge, DaCosta and Deitsch failed to take necessary steps to ensure accurate and proper accounting of the excess and obsolete inventory reserve, which would later be restated. *See infra*, ¶¶ 171, 174, 177, 181.

152. Additionally, throughout the Class Period, Defendants publicly characterized and discussed Paragon 28's inventory levels when, in reality, the Company lacked sufficient controls to track existing inventory to support such statements. For example, during the February 29, 2024 earnings call Deitsch downplayed the announced $4 million inventory write-off as a one-time event and stated that the Company "expect[s] our annual gross profit margins to continue to be approximately 80% going forward." *Id.*, ¶ 276. In response to an analyst question about the write-off, Deitsch reiterated that "we don't expect adjustments of that order of magnitude at any time in the future." *Id.*, ¶ 279. Just months later, Defendants changed course and disclosed the need to restate their financial statements based on pervasive material weaknesses in the Company's internal controls related to inventory accounting.

**F. The Truth Begins to Emerge.**

**1. Paragon 28 Announces Deitsch's resignation on April 4, 2024.**

153. The risks posed by Defendants' misrepresentations and omissions to investors concerning Paragon 28's true financial performance began to materialize and ultimately were revealed through a series of disclosure events beginning on April 4, 2024.

154. Just days after the end of Q1 2024 – another quarter in which Defendants would ultimately need to restate certain key financial results – Paragon 28 announced that Deitsch, the Company's CFO, had resigned his position. Deitsch informed the Company of his intent to pursue an opportunity with OrganOx Limited, a commercial stage UK-based medical device company focused on therapeutic applications of isolated organ perfusion.

155. To replace Deitsch, Paragon 28 appointed Wright as interim CFO. Wright had been a member of the Company's Board of Directors and Chair of the Company's Audit Committee and a member of the Nominating and Corporate Governance Committee. Wright temporarily stepped down from those positions upon becoming the interim CFO.

156. On this news, Paragon 28 shares dropped $1.86, or 15%, to close at $10.20.



### 2. On July 30, 2024, Defendants Disclose Inventory Accounting Errors Requiring Restatements of Important Financial Results.

157. More revelations came in summer 2024, following the end of Q2 2024, the first financial quarter during the Class Period without Deitsch as CFO. After the market closed on July 30, 2024, Paragon 28 filed with the SEC a current report on Form 8-K (the "Restatement Announcement"). The Restatement Announcement disclosed that due to "***errors***" in the financial statements contained in the Q1-Q3 2023 and Q1 2024 Form 10-Qs and the Form 10-K for the full year 2023, those statements "***should no longer be relied upon***" and "***a restatement of these prior financial statements is required***":

> On July 30, 2024, the Audit Committee of the Board of Directors (the "Audit Committee") of Paragon 28, Inc. (the "Company"), in consultation with management, concluded that the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2023, contained within the Annual Report on Form 10-K for that year (and the associated audit report of the Company's independent registered accounting firm) and the unaudited condensed consolidated financial statements contained within the Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2023, June 30, 2023, September 30, 2023, and March 31, 2024 should no longer be relied upon due to errors in such financial statements, and therefore a restatement of these prior financial statements is required.

158. The Restatement Announcement detailed that as soon as Deitsch left Paragon 28, and after issuing its consolidated financial statements for the three months ended March 31, 2024, the Company "***identified errors in the accounting for inventory including the calculation of its excess and obsolete inventory reserve***." These errors resulted in the "***overstatement of inventory***" in Q1-Q4 2023 and Q1 2024, and "***an understatement in the cost of goods sold***" for the same period.

159. The Restatement Announcement contained the following summary of the estimated impacts of the restatement:

> During the year ended December 31, 2023, ***cost of goods sold was understated by $8.4 million*** and ***inventories, net was overstated by $8.0 million***[.]
>
> During the three months ended March 31, 2024, ***cost of goods sold was understated by $1.7 million and inventories, net was overstated by $9.7 million***.

160. As a result of the accounting errors and related restatement, Paragon 28 "***identified one or more material weaknesses in its internal control over financial reporting.***" Management (*i.e.*, DaCosta and other Paragon 28 senior executives) therefore "***concluded that [Paragon 28's] internal control over financial reporting was not effective as of December 31, 2023***, and ***[Paragon 28's] disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2023 and March 31, 2024.***"

161. Based on these material weaknesses, the Audit Committee concluded that "management's report on internal control over financial reporting as of December 31, 2023, and Deloitte's opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2023, ***should no longer be relied upon***."

162. The Company further disclosed that in light of the restatements and necessary remediation, Paragon 28 would report in its quarterly report for the period ended June 30, 2024 that its "***disclosure controls and procedures were not effective at the reasonable assurance level as of June 30, 2024.***"

163. Reacting to the revelations and the initial estimates of the impact of the restatements, an analyst from William Blair noted the "optics of lowered gross margins, especially when coupled with the potential for capital needs in 2025, could weigh on the stock."

164. The analyst proved prescient, as the price of Paragon 28 common stock feel by $1.24 per share, or 13.7%, to close at $7.79 on July 31, 2024, the day after the announcement.




**3. Paragon 28 Filed Amended Financial Statements on August 8, 2024 Revealing the Full Extent of the Company's Financial Misstatements and Scope of Material Weaknesses in Internal Controls.**

165. After the market closed on August 8, 2024, Paragon 28 filed its amended financial statements on Form 10-K/A and on Form 10-Q/A that revealed the extent of the Company's financial misstatements and the pervasiveness of its internal control issues.

166. The Company admitted in its Form 10-K/A filing that its previously disseminated financial statements must be restated. The restatements would correct "identified errors in the calculation of excess and obsolete inventory, as well as its accounting for inventory variances." These errors impacted "the valuation of inventory" resulting in an overstatement of "Inventories, net" as of March 31, 2023, June 30, 2023, September 30, 2023, December 31, 2023, and March 31, 2024, and had "a net understatement in Cost of goods sold for the respective interim periods

ended on such dates and for the fiscal year ended December 31, 2023." The Company said these "Misstatements" were "material in respect to the Original 2023 Annual Report."

167. In addition to filing its Form 10-K/A, the Company on August 8, 2024 filed restated financial statements for the quarter ended March 31, 2024 on Form 10-Q/A. Like for FY 2023, the Company revealed that it overstated its net inventories and understated its cost of goods sold, resulting in the need to restate those financial results depending on those metrics as inputs.

### a. Restated Financial Results for Q1 2023.[46]

168. According to the restated financials, for Q1 2023, Defendants overstated the Company's inventories, net by 1.4.%:

| | March 31, 2023 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| ASSETS | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 85,883 | $ — | | $ 85,883 |
| Trade receivables, net of allowance for doubtful accounts of $1,816 | 37,262 | — | | 37,262 |
| Inventories, net | 69,174 | (983) | (a) | 68,191 |

169. Defendants also understated the Company's cost of goods sold by 14.8%, which led to the Company overstating its gross profit by 3.1%, understating its operating loss by 17.1%, and understating its net loss by 19.4%:

[46] For § IV.F.3(a)-(e), information on the restated financial results come from the August 2024 Amended 10-K, August 2024 Amended 10-Q, and the investor presentation attached to the Form 8-K filed on August 8, 2024.

| | Three Months Ended March 31, 2023 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| Net revenue | $ 52,036 | $ — | | $ 52,036 |
| Cost of goods sold | 8,906 | 1,323 | (a) | 10,229 |
| Gross profit | 43,130 | (1,323) | | 41,807 |
| Operating expenses: | | | | |
| Research and development costs | 7,049 | — | | 7,049 |
| Selling, general, and administrative | 43,820 | — | | 43,820 |
| Total operating expenses | 50,869 | — | | 50,869 |
| Operating loss | (7,739) | (1,323) | | (9,062) |
| Other expense: | | | | |
| Other expense | (179) | (437) | (b) | (616) |
| Interest expense, net | (1,205) | — | | (1,205) |
| Total other expense | (1,384) | (437) | | (1,821) |
| Loss before income taxes | (9,123) | (1,760) | | (10,883) |
| Income tax benefit | (71) | — | | (71) |
| Net loss | $ (9,052) | $ (1,760) | | $ (10,812) |

170. The overstatement of inventories, net and understatement of costs of goods sold led the Company to falsely inflate its Q1 2023 gross margin by 3.1% and understate its Adjusted EBITDA loss by 93.4%:

| | 1Q 2023 |
|---|---|
| **Gross Profit as Previously Reported** | **$43,130** |
| *Gross Margin as Previously Reported* | *82.9%* |
| Effect of Restatement (from COGS) | ($1,323) |
| **Gross Profit as Restated** | **$41,807** |
| *Gross Margin as Restated* | *80.3%* |
| **Adjusted EBITDA as Previously Reported** | **($1,417)** |
| *Adjusted EBITDA Margin as Previously Reported* | *(2.7%)* |
| Effect of Restatement (from COGS) | ($1,323) |
| Effect of Restatement (from SG&A)[(1)] | -- |
| **Adjusted EBITDA as Restated** | **($2,740)** |
| *Adjusted EBITDA Margin as Restated* | *(5.3%)* |

**b. Restated Financial Results for Q2 2023.**

171. According to the restated financials, for Q2 2023, Defendants overstated the Company's inventories, net by 4.4% and understated its provision for excess and obsolete inventory for the six months ended June 30, 2023 by 550.2%:

| | June 30, 2023 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| ASSETS | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 56,747 | $ — | | $ 56,747 |
| Trade receivables, net of allowance for doubtful accounts of $1,706 | 34,331 | — | | 34,331 |
| Inventories, net | 85,225 | (3,724) | (a) | 81,501 |

| | Six Months Ended June 30, 2023 | | | | |
|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | Effect of Reclassification | As Restated |
| Provision for (reversal of) excess and obsolete inventories | (205) | 1,128 | (a) | — | 923 |

172. Defendants also understated the Company's cost of goods sold by 31% (and for six months ended June 30, 2023, 22.9%), which led to the Company overstating its gross profit by 6.5% (and for six months ended June 30, 2023, 4.7%), understating its operating loss by 29.3% (and for six months ended June 30, 2023, 23.7%), and understating its net loss by 21.6% (and for six months ended June 30, 2023, 20.6%):

| | Ref | Three Months Ended June 30, 2023 As Previously Reported | Adjustments | As Restated | Six Months Ended June 30, 2023 As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|---|
| Net revenue | | $ 51,009 | $ — | $ 51,009 | $ 103,045 | $ — | $ 103,045 |
| Cost of goods sold | (a) | 8,858 | 2,741 | 11,599 | 17,764 | 4,064 | 21,828 |
| Gross profit | | 42,151 | (2,741) | 39,410 | 85,281 | (4,064) | 81,217 |
| Operating expenses: | | | | | | | |
| Research and development costs | | 7,683 | — | 7,683 | 14,732 | — | 14,732 |
| Selling, general, and administrative | | 43,827 | — | 43,827 | 87,647 | — | 87,647 |
| Total operating expenses | | 51,510 | — | 51,510 | 102,379 | — | 102,379 |
| Operating loss | | (9,359) | (2,741) | (12,100) | (17,098) | (4,064) | (21,162) |
| Other (expense) income: | | | | | | | |
| Other (expense) income, net | (b) | (467) | 391 | (76) | (646) | (46) | (692) |
| Interest expense, net | | (803) | — | (803) | (2,008) | — | (2,008) |
| Total other expense, net | | (1,270) | 391 | (879) | (2,654) | (46) | (2,700) |
| Loss before income taxes | | (10,629) | (2,350) | (12,979) | (19,752) | (4,110) | (23,862) |
| Income tax expense | | 269 | — | 269 | 198 | — | 198 |
| Net loss | | $ (10,898) | $ (2,350) | $ (13,248) | $ (19,950) | $ (4,110) | $ (24,060) |

173. The overstatement of inventories, net and understatement of costs of goods sold led the Company to falsely inflate its Q2 2023 gross margin by 6.4% and understate its adjusted EBITDA loss by 104.3%:

| | 2Q 2023 |
|---|---|
| **Gross Profit as Previously Reported** | **$42,151** |
| *Gross Margin as Previously Reported* | *82.6%* |
| Effect of Restatement (from COGS) | ($2,741) |
| **Gross Profit as Restated** | **$39,410** |
| *Gross Margin as Restated* | *77.3%* |
| **Adjusted EBITDA as Previously Reported** | **($2,629)** |
| *Adjusted EBITDA Margin as Previously Reported* | *(5.2%)* |
| Effect of Restatement (from COGS) | ($2,741) |
| Effect of Restatement (from SG&A)[(1)] | -- |
| **Adjusted EBITDA as Restated** | **($5,370)** |
| *Adjusted EBITDA Margin as Restated* | *(10.5%)* |

**c. Restated Financial Results for Q3 2023.**

174. According to the restated financials, for Q3 2023, Defendants overstated the Company's inventories, net by 5.6% and understated its provision for excess and obsolete inventory for the nine months ended September 30, 2023 by 56%:

| | September 30, 2023 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| ASSETS | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 34,949 | $ — | | $ 34,949 |
| Trade receivables, net of allowance for doubtful accounts of $934 | 33,615 | — | | 33,615 |
| Inventories, net | 94,380 | (5,252) | (a) | 89,128 |

| | Nine Months Ended September 30, 2023 | | | | |
|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | Effect of Reclassification | As Restated |
| Provision for excess and obsolete inventories | 2,053 | 1,151 | (a) | — | 3,204 |

175. Defendants also understated the Company's cost of goods sold by 14.7% (and for nine months ended September 30, 2023, 19.8%) which led to the Company overstating its gross profit by 3.6% (and for nine months ended September 30, 2023, 4.4%), understating its operating loss by 17% (and for nine months ended September 30, 2023, 21.4%), and understating its net loss by 33.8% (and for nine months ended September 30, 2023, 24.5%):

| | | Three Months Ended September 30, 2023 | | | Nine Months Ended September 30, 2023 | | |
|---|---|---|---|---|---|---|---|
| | Ref | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| Net revenue | | $ 52,783 | $ — | $ 52,783 | $ 155,828 | $ — | $ 155,828 |
| Cost of goods sold | (a) | 10,394 | 1,528 | 11,922 | 28,158 | 5,592 | 33,750 |
| Gross profit | | 42,389 | (1,528) | 40,861 | 127,670 | (5,592) | 122,078 |
| Operating expenses: | | | | | | | |
| Research and development costs | | 7,244 | — | 7,244 | 21,976 | — | 21,976 |
| Selling, general, and administrative | | 44,126 | — | 44,126 | 131,773 | — | 131,773 |
| Total operating expenses | | 51,370 | — | 51,370 | 153,749 | — | 153,749 |
| Operating loss | | (8,981) | (1,528) | (10,509) | (26,079) | (5,592) | (31,671) |
| Other income (expense): | | | | | | | |
| Other income (expenses), net | (b) | 1,660 | (1,291) | 369 | 1,014 | (1,337) | (323) |
| Interest expense, net | | (1,119) | — | (1,119) | (3,127) | — | (3,127) |
| Total other income (expense) | | 541 | (1,291) | (750) | (2,113) | (1,337) | (3,450) |
| Loss before income taxes | | (8,440) | (2,819) | (11,259) | (28,192) | (6,929) | (35,121) |
| Income tax (benefit) expense | | (108) | — | (108) | 90 | — | 90 |
| Net loss | | $ (8,332) | $ (2,819) | $ (11,151) | $ (28,282) | $ (6,929) | $ (35,211) |

176. Defendants' overstatement of inventories, net and understatement of costs of goods sold led the Company to falsely inflate its Q3 2023 gross margin by 3.6% and understate its adjusted EBITDA loss by 122.3%:

| | 3Q 2023 |
|---|---|
| **Gross Profit as Previously Reported** | **$42,389** |
| *Gross Margin as Previously Reported* | *80.3%* |
| Effect of Restatement (from COGS) | ($1,528) |
| **Gross Profit as Restated** | **$40,861** |
| *Gross Margin as Restated* | *77.4%* |
| **Adjusted EBITDA as Previously Reported** | **($1,249)** |
| *Adjusted EBITDA Margin as Previously Reported* | *(2.4%)* |
| Effect of Restatement (from COGS) | ($1,528) |
| Effect of Restatement (from SG&A)[1] | -- |
| **Adjusted EBITDA as Restated** | **($2,777)** |
| *Adjusted EBITDA Margin as Restated* | *(5.3%)* |

**d. Restated Financial Results for Q4 2023 and Full-Year 2023.**

177. According to the restated financials, Defendants overstated the Company's gross profit by 6.1%, understated its operating loss by 24.6%, and understated its net loss by 14.1% for the three months ended December 31, 2023:

| | Quarter Ended December 31, | | | |
|---|---|---|---|---|
| | 2023 | | 2022 | |
| *(in thousands, except per share data)* | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Net revenue | $ 60,561 | $ 60,561 | $ 51,508 | $ 51,508 |
| Gross profit | 45,121 | 42,357 | 41,971 | 42,221 |
| Operating loss | (11,230) | (13,994) | (36,045) | (35,795) |
| Net loss | $ (19,559) | $ (22,323) | $ (38,763) | $ (38,479) |

178. According to the restated financials, Defendants overstated the Company's inventories, net by 8.2% and understated its provision for excess and obsolete inventory for the year ended December 31, 2023 by 1,246.9%:

| | Year ended December 31, 2023 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| ASSETS | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 75,639 | $ — | | $ 75,639 |
| Trade receivables, net of allowance for doubtful accounts of $1,339 | 37,323 | — | | 37,323 |
| Inventories, net | 98,062 | (8,016) | (a) | 90,046 |
| Provision for excess and obsolete inventories | (352) | 4,389 | (a) | 4,037 |

179. For the year ended December 31, 2023, Defendants understated the Company's cost of goods sold by 19.1%, which led to the Company overstating its gross profit by 4.8%, understating its operating loss by 22.4%, and understating its net loss by 20.2%:

| | Year Ended December 31, 2023 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| Net revenue | $ 216,389 | $ — | | $ 216,389 |
| Cost of goods sold | 43,598 | 8,356 | (a) | 51,954 |
| Gross profit | 172,791 | (8,356) | | 164,435 |
| Operating expenses: | | | | |
| Research and development costs | 30,078 | — | | 30,078 |
| Selling, general, and administrative | 180,022 | — | | 180,022 |
| Total operating expenses | 210,100 | — | | 210,100 |
| Operating loss | (37,309) | (8,356) | | (45,665) |
| Other income (expense): | | | | |
| Other income (expense), net | 154 | (1,337) | (b) | (1,183) |
| Loss on early extinguishment of debt | (5,308) | — | | (5,308) |
| Interest expense, net | (5,165) | — | | (5,165) |
| Total other expense | (10,319) | (1,337) | | (11,656) |
| Loss before income taxes | (47,628) | (9,693) | | (57,321) |
| Income tax expense | 213 | — | | 213 |
| Net loss | $ (47,841) | $ (9,693) | | $ (57,534) |

180. For the period ended December 31, 2023, Defendants' overstatement of inventories, net and understatement of cost of goods sold led the Company to falsely inflate its Q4 2023 gross margin by 6.2% and understate its Adjusted EBITDA loss by 62.5%. For year ended December 31, 2023, the gross margin was overstated by 4.9% and the Adjusted EBITDA loss was understated by 86%:

| | 4Q 2023 | FY 2023 |
|---|---|---|
| **Gross Profit as Previously Reported** | **$45,121** | **$172,791** |
| *Gross Margin as Previously Reported* | *74.5%* | *79.9%* |
| Effect of Restatement (from COGS) | ($2,764) | ($8,356) |
| **Gross Profit as Restated** | **$42,357** | **$164,435** |
| *Gross Margin as Restated* | *69.9%* | *76.0%* |
| **Adjusted EBITDA as Previously Reported** | **($4,423)** | **($9,718)** |
| *Adjusted EBITDA Margin as Previously Reported* | *(7.3%)* | *(4.5%)* |
| Effect of Restatement (from COGS) | ($2,764) | ($8,356) |
| Effect of Restatement (from SG&A)(1) | -- | -- |
| **Adjusted EBITDA as Restated** | **($7,187)** | **($18,074)** |
| *Adjusted EBITDA Margin as Restated* | *(11.9%)* | *(8.4%)* |

**e. Restated Financial Results for Q1 2024.**

181. According to the restated financials, for Q1 2024, Defendants overstated the Company's inventories, net by 9.3% and understated its provision for excess and obsolete inventory for the period ended March 31, 2024 by 511.9%:

| | March 31, 2024 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | As Previously Reported | | Adjustments | Ref | | As Restated |
| **ASSETS** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ | 58,222 | $ | — | | $ | 58,222 |
| Trade receivables, net of allowance for doubtful accounts of $2,268 | | 40,262 | | (567) | (b) | | 39,695 |
| Inventories, net | | 104,298 | | (9,672) | (a) | | 94,626 |

| | Three Months Ended March 31, 2024 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Ref | As Restated |
| Provision for excess and obsolete inventories | 471 | 2,411 | (a) | 2,882 |

182. For the period ended March 31, 2024, Defendants understated the Company's cost of goods sold by 13.6%, which led to the Company overstating its gross profit by 3.4%, understating its operating loss by 17.2%, and understating its net loss by 14.2%:

| | Three Months Ended March 31, 2024 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | As Previously Reported | | Adjustments | Ref | | As Restated |
| Net revenue | $ | 61,082 | $ | — | | $ | 61,082 |
| Cost of goods sold | | 12,186 | | 1,656 | (a) | | 13,842 |
| Gross profit | | 48,896 | | (1,656) | | | 47,240 |
| Operating expenses: | | | | | | | |
| Research and development costs | | 7,584 | | — | | | 7,584 |
| Selling, general, and administrative | | 54,215 | | 567 | (b) | | 54,782 |
| Total operating expenses | | 61,799 | | 567 | | | 62,366 |
| Operating loss | | (12,903) | | (2,223) | | | (15,126) |
| Other income (expense): | | | | | | | |
| Other income (expense), net | | 515 | | — | | | 515 |
| Interest expense, net | | (2,622) | | — | | | (2,622) |
| Total other expense, net | | (2,107) | | — | | | (2,107) |
| Loss before income taxes | | (15,010) | | (2,223) | | | (17,233) |
| Income tax expense (benefit) | | 224 | | (58) | (c) | | 166 |
| Net loss | $ | (15,234) | $ | (2,165) | | $ | (17,399) |

183. Defendants' overstatement of inventories, net and understatement of cost of goods sold led the Company to falsely inflate its Q1 2024 gross margin by 3.3% and understate its adjusted EBITDA loss by 40.6% for the period ended March 31, 2024:

| | 1Q 2024 |
|---|---|
| **Gross Profit as Previously Reported** | **$48,896** |
| *Gross Margin as Previously Reported* | *80.0%* |
| Effect of Restatement (from COGS) | ($1,656) |
| **Gross Profit as Restated** | **$47,240** |
| *Gross Margin as Restated* | *77.3%* |
| | |
| **Adjusted EBITDA as Previously Reported** | **($5,481)** |
| *Adjusted EBITDA Margin as Previously Reported* | *(9.0%)* |
| Effect of Restatement (from COGS) | ($1,656) |
| Effect of Restatement (from SG&A)[(1)] | ($567) |
| **Adjusted EBITDA as Restated** | **($7,704)** |
| *Adjusted EBITDA Margin as Restated* | *(12.6%)* |

**f. Paragon 28's Amended 10-K and 10-Q Admitted That There Were Material Weaknesses in Internal Control Over Financial Reporting Throughout the Class Period.**

184. The Company's 10-K/A filed on August 8, 2024 also added that "we have identified material weaknesses in the Company's internal control over financial reporting that caused our internal control over financial reporting to be ineffective as of December 31, 2023" and "our disclosure controls and procedures were not effective as of December 31, 2023, March 31, 2024 and June 30, 2024 for the same reason."

185. The Company revealed that "during the second quarter of fiscal year 2024, ***errors were identified with respect to our accounting for the valuation of inventory, including the***

***calculation of the excess and obsolescence reserve and capitalization of purchase price variances***." The Company explained that the "misstatements" resulted from the following "material weaknesses":

> [A] material weakness in the control environment component of COSO as the ***Company lacked a sufficient complement of financial and accounting personnel with the necessary technical and accounting knowledge, experience, and training related to accounting for inventory in accordance with GAAP***[.]
>
> [T]he material weakness in the control environment contributed to ***a lack of controls designed and implemented to timely prevent a material misstatement in the accounting for the valuation of inventory***. The ***control deficiencies constitute material weaknesses***, individually and in the aggregate, relating to: (i) ***the calculation of the excess and obsolescence reserve and (ii) capitalization of purchase price variances[.]***
>
> [A] material weakness in the monitoring component of COSO as ***management did not design and implement effective ongoing monitoring activities over the execution of business performance reviews and account analysis***, which resulted in the ***inability to identify material errors in the financial statements and to communicate all relevant internal control deficiencies to those parties responsible for taking corrective action in a timely manner***.

186. The Amended 10-K also detailed management's plan to remediate the material weaknesses and "strengthen its monitoring, control environment, and internal control over financial reporting":

> ***Evaluating and updating (as appropriate) the organizational design and reporting structure of the controllership function***, including evaluating the sufficiency, experience, and training of personnel within our accounting function.
>
> Hiring, developing, and retaining ***accounting resources with appropriate accounting and internal controls expertise related to accounting for inventory*** in accordance with GAAP.
>
> Engaging ***third-party resources with the appropriate technical knowledge and experience to assist with the accounting for inventory*** and designing and implementing related control activities.
>
> Designing and implementing ***additional and/or enhancing controls relating to the valuation of inventory***, including the calculation of the excess and obsolescence reserve and capitalization of purchase price variances.

> Designing and implementing ***effective monitoring activities over the execution of business performance reviews and account analysis and enhance communication of internal control deficiencies*** to those parties responsible for taking corrective action in a timely manner.

187. The Company noted that the material weaknesses "***will not be considered remediated until the remediation plan has been implemented and there has been appropriate time to conclude through testing that the controls are operating effectively***."

188. The 10-Q/A similarly added that "our disclosure controls and procedures were not effective as of March 31, 2024, as a result of the material weaknesses in our internal control over financial reporting[.]"

**g. Defendants Address Restatements and Internal Control Revelations During August 8, 2024 Earnings Call.**

189. Defendants further discussed these revelations during an August 8, 2024 earnings call. Interim CFO Wright discussed gross margin and steps in place to improve it, and acknowledged that Paragon 28 would have to "sell through the high cost inventory purchased in 2023":

> At this time, we believe gross margin has stabilized. ***We have several initiatives in place to drive improvements to gross profit, including ongoing actions to reduce pricing of legacy SKUs to pre-COVID levels. We expect a tailwind over time as we sell through the high cost inventory purchased in 2023.***

190. In response to an analyst question, DaCosta acknowledged that the Company would not "achieve EBITDA positivity" until 2025, and would not achieve "cash flow positivity" until 2026.

191. Also during the earnings call, DaCosta provided some additional insight into the inventory issues in response to a separate analyst question, and admitted the Company built "excess inventory" at "less than perfect pricing":

> Just looking at, again, every dollar, really putting a lot of emphasis, too, on inventory and working capital. So, from a net working capital perspective, you all know that last year and the year before, we had some significant headwinds because of supply chain, and that forced us to build some excess inventory to manage through that. ***Well, we did that at less than perfect pricing, right?*** And so, that's an area for us to eyeball and target is how do we leverage some of that inventory, help burn some of that down and create a tailwind for us moving forward. And so, all of those things are target areas for us.

192. DaCosta also addressed a question about how the "inventory burn down" would work, and revealed that Paragon 28's baseline for gross margin moving forward would be reduced to "around 75%," a sharp decline from the 80% gross margins the Company previously touted:

> Our baseline of gross margin today, as we stand with the corrected statements, our baseline is around 75%, right? ***And so, we don't anticipate – that 75% accounts for the increased pricing for some of the inventory build in 2023.*** And that will take us a little bit of time to burn that inventory down to where we can start to get to pre-COVID pricing on primarily our legacy SKUs, and to see a positive influence there.
>
> When we talk about burning down, there's two keys there. One is selling more, and two is ordering less***. So, we've got inventory today, which we've mentioned on previous calls. And part of that stockpiling that we communicated was essential to try to manage through the inventory shortage or capacity shortage issues in 2023 and 2022. We've got the opportunity now to position that inventory, burn some of that down without the need to replenish just yet***. So, that's essentially what we're communicating when we anticipate in the second half to see some modest effect from that burn-down.

193. When asked about Paragon 28's new CFO, Chadi Chahine, DaCosta provided insight into the Company's investments after going public and blamed "complexity" for the errors in its inventory accounting:

> On the other side of it is, when we went public, we made some investments, aggressive investments, to make sure we were positioning ourselves, as I mentioned, on two fronts. One, to take advantage of the opportunity and enhance some of our growth opportunities. But, two, really, just set us up to be a public company. There is some significant operational

expense associated with that, and building that team out to support future stages was something we really looked at building quickly in our post-IPO phase.

Now, to that end, looking at those pieces are what we're analyzing today, just making sure that, one, we don't over complicate things like I think some of the 8-K announcement found ***some areas where errors were being made just because of the complexity there***. And that's a real opportunity for us to simplify that process and put some controls there to ensure we don't make those kinds of errors. ***So, when we talk about simplification, there's tons of areas where we can improve.***

194. The corrective disclosures alleged in paragraphs 165-194 drove the price of the Company's shares down $1.67 (-20%), to close at $6.64, on August 9, 2024, further damaging Lead Plaintiff and the Class.



### 4. Following the Restatements and Disclosure of Pervasive Internal Control Problems, Paragon 28's Chief Accounting Officer Departs.

195. The fallout from Defendants' revelations regarding the financial condition and operations of Paragon 28 continued on September 20, 2024. That day, after the market closed, Paragon 28 revealed that its Chief Accounting Officer, Erik Mickelson, stepped down and was departing. While Paragon 28 said his departure was "not the result of any issue, concern or disagreement regarding the Company's accounting or internal control over financial reporting," Mickelson entered into a transition and severance agreement "in consideration of his release of claims against the Company."

196. This news sent the price of the Company's shares down $0.30 (-4.3%), to close at $6.57 on September 23, 2024.



### G. Paragon 28 Confirms Additional Material Weaknesses in Internal Controls that Were Present During the Class Period and Corroborate the Allegations of the Former Employees.

197. Additional disclosures in November 2024 and March 2025 further demonstrate the pervasiveness of the internal control issues at Paragon 28 during the Class Period.

198. On November 12, 2024, Paragon 28 filed a Form 10-Q for the period ended September 30, 2024. In that filing, the Company confirmed that as a result of the material weaknesses disclosed in August 2024, its ***"disclosure controls and procedures were not effective as of September 30, 2024 at a reasonable assurance level***." Paragon 28 repeated its plan for remediation of the material weaknesses, and again emphasized that they would "devote significant time and attention to remediate the material weaknesses as soon as reasonably practicable" and the "material weaknesses will not be considered remediated until the remediation plan has been implemented and there has been appropriate time to conclude through testing that the controls are operating effectively."

199. Paragon 28 filed its Form 10-K for the year ended December 31, 2024 on March 6, 2025. The annual report included management's report on internal control over financial reporting.

200. Management, including DaCosta as CEO and Chandi as CFO, assessed the effectiveness of the Company's internal control over financial reporting. Based on this assessment, and in contrast to management's prior certifications during the Class Period, management concluded that ***Paragon 28 "did not maintain effective internal controls over financial reporting as of December 31, 2024***."

201. This evaluation confirmed the presence of the same material weaknesses disclosed in August 2024. Management, however, identified additional new aspects of these material

weaknesses that demonstrate the Company's accounting issues were broader and more pervasive than previously disclosed and corroborate the accounts offered by the former employees.

202. First, management disclosed a "material weakness in the control environment component of COSO." While this material weakness in August 2024 was limited to the Company's inventory accounting, management now revealed that the Company "***lacked a sufficient complement of financial and accounting personnel with the necessary technical and accounting knowledge, experience, and training related to accounting in accordance with GAAP.***" In other words, Paragon 28 lacked a control environment to ensure its *overall accounting*, not just inventory accounting, complied with GAAP.

203. Second, consistent with the FEs' accounts of inventory controls during the Class Period, management identified a new control deficiency related to "***the existence of inventory located both at the Company's warehouse and at third party vendors.***" This control deficiency concerning the "***existence and completeness of inventory on hand***" contributed to "***errors***" in the "***accounting for the valuation and existence of inventory***."

204. Paragon 28's independent auditor, Deloitte & Touche LLP, provided additional insight into the control deficiency related to the existence of inventory on hand. Like in the February 2024 10-K, Deloitte identified management's estimate of excess and obsolete inventories as a critical audit matter. *See supra*, ¶ 66. Deloitte further noted that a "feature of the orthopedic business is the high level of product inventory required, some of which is located at customer premises and is available for customers' immediate use." This inventory includes "[c]omplete sets of products, including large and small sizes[.]" Per Deloitte, the "outer sizes are used less frequently than standard sizes and towards the end of the product life cycle are inevitably in excess

of requirements." Accordingly, "[a]djustments to carrying value are therefore required to be made to orthopedic inventory to anticipate this situation."

205. Third, Paragon 28 management identified a new "material weakness in the monitoring component of COSO" as Paragon 28's management "***did not design and implement effective ongoing monitoring activities over . . . the application of GAAP***." This material weakness "resulted in the ***inability to identify material errors in the financial statements*** and to ***communicate all relevant internal control deficiencies to those parties responsible*** for taking corrective action in a timely manner."

206. Finally, management identified new material weaknesses related to "***customer pricing around recorded revenue and general IT controls***":

> [A] material weakness resulting from the lack of designed and documented controls within the process of recording customer pricing or pricing changes at the Company's domestic and international operations. Specifically, the Company did not document and maintain review controls over validating accuracy on initial contract pricing and changes during the year.

> [A] material weakness from the failure to design and maintain effective information technology ("IT") general computer controls over the IT systems used within the processing of key financial transactions at the Company's international operations. Specifically, management did not design and maintain user access controls to ensure appropriate segregation of duties over the preparation and review of journal entries, or adequately restrict user and privileged access to financial applications, programs, and data to appropriate company personnel.

207. Nearly seven months after first disclosing these material weaknesses in internal controls, the Company confirmed that they had not yet been remediated.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

208. Lead Plaintiff alleges that, without limitation, the statements highlighted in bold and italics within this Section were materially false, misleading, and omitted material information that should have been disclosed. Any other non-bolded and non-italicized language included in

block quotes are meant to provide context for the alleged false and misleading statements and omissions.

209. As alleged herein, the false and misleading statements artificially inflated or artificially maintained the price of Paragon 28's stock. As described below, Defendants created an impression of a state of affairs related to the Company's financial condition and internal controls that differed in a material way from the one that actually existed.

210. Each statement attributed to Defendants DaCosta and Deitsch was also made by Defendant Paragon 28, because they were speaking as the CEO and CFO, respectively, of Paragon 28. Each statement contained in a public filing, presentation, or press release issued by Paragon 28 was made by Paragon 28. The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

## A. Defendants Made False and Misleading Statements Relating to Paragon 28's Q1 2023 Financial Results and Internal Controls in May 2023.

### 1. Paragon 28's May 4, 2023 8-K Falsely Stated Certain Q1 2023 Financial Results.

211. The Class Period begins on May 5, 2023, the day after Paragon 28 filed a Form 8-K (the "May 2023 8-K"), signed by Deitsch. The May 2023 8-K included a press release announcing financial results for the first quarter ended March 31, 2023. In the release, Defendants falsely represented the following financial results, each of which were later restated:

> ***Gross margin was 83% of the first quarter of 2023*** compared to 84% in the first quarter of 2022.
>
> ***Net loss was $9.1 million for the first quarter of 2023***, compared to net loss of $9.2 million for the first quarter of 2022.
>
> ***Adjusted EBITDA was a $1.4 million loss for the first quarter of 2023, a 57.1% improvement***, compared to a $3.3 million loss in the first quarter of 2022.

In the financial statements detailed in the press release, the Company also falsely represented that its: ***(a) net inventories were $69.174 million; (b) cost of goods sold was $8.906 million; (c) gross profit was $43.13 million; (d) operating loss was $7.739 million; (e) net loss was $9.052 million; and (f) adjusted EBITDA was a $1.417 million loss***. Defendants would later restate all of these results and admit they were not accurate.

212. The press release in the May 2023 8-K included a statement from DaCosta, who emphasized the Company's "impressive top-line growth" and improvement in adjusted EBITDA year-over-year by citing false and overstated EBITDA improvement:

> "Paragon 28 is off to a great start in 2023. We are thrilled with our 27% constant-currency net revenue growth for the first quarter, particularly given the comparison to our very strong first quarter of 2022, which grew 25% on a constant-currency basis. ***Our impressive top-line growth, and our 57% year-over-year improvement in Adjusted EBITDA for the quarter,*** was the result of excellent execution by each of our global teams." said Albert DaCosta, Chairman and Chief Executive Officer. "This exceptional performance demonstrates our leadership across the entire foot and ankle market, and the benefits of our exclusive focus. I am extremely confident in our prospects in 2023 and beyond."

**2. Paragon 28's May 4, 2023 Q1 2023 10-Q Repeated the False Financial Results and Falsely Affirmed the Adequacy of Paragon 28's Disclosure Controls.**

213. Paragon 28 also filed a quarterly report on Form 10-Q on May 4, 2023 with the SEC, signed by DaCosta and Deitsch, which reported on the Company's financial and operating results for the first quarter ended March 31, 2023 ("Q1 2023 10-Q"). The Company falsely reported the same financial results disclosed in the May 4, 2023 press release, as detailed in paragraph 211. Per the Q1 2023 10-Q, the financial statements reflecting these results were "***prepared in conformity with accounting principles generally accepted in the U.S. ("U.S.***

***GAAP") and pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC") for interim financial information***."

214. The Q1 2023 10-Q offered additional detail regarding the Company's "Cost of Goods Sold" and "Gross Profit Margin" for 1Q 2023:

> *Cost of Goods Sold and Gross Profit Margin.* ***Cost of goods sold increased $2.1 million, or 31%,*** from $6.8 million during the three months ended March 31, 2022 ***to $8.9 million during the corresponding period in 2023,*** primarily due to increased variable costs from higher net revenue combined with an increase in outbound freight costs and excess and obsolete inventory costs during the three months ended March 31, 2023. As a result, ***gross profit margin for the three months ended March 31, 2023 decreased to 82.9%,*** compared to 83.6% in the same period of 2022.

215. For Adjusted EBITDA and net loss, the Company's Q1 2023 10-Q repeated false financial results that Defendants would later admit were incorrect and then restate in August 2024:

> Net loss decreased from $9.2 million for the three months ended March 31, 2022 ***to $9.1 million for the three months ended March 31, 2023***.
>
> Adjusted EBITDA improved from a $3.3 million loss for the three months ended March 31, 2022 to a ***$1.4 million loss for the three months ended March 31, 2023***.

216. The Q1 2023 10-Q also attached Sarbanes-Oxley certifications by DaCosta and Deitsch. These certifications included the following representations to investors and shareholders:

> (1) ***The "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"***
>
> (2) DaCosta and Deitsch ***"[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to [them] by others within those entities, particularly during the period in which this report is being prepared[.]"***
>
> (3) DaCosta and Deitsch ***"[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial***

> ***reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]"***
>
> (4) DaCosta and Deitsch ***"[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report [their] conclusions about the effectiveness of the disclosure controls and procedures . . . based on such evaluation[.]"***
>
> (5) DaCosta and Deitsch ***"disclosed, based on [their] most recent evaluation of internal control over financial reporting, to [Paragon 28's] auditors and the audit committee . . .[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Paragon 28's] ability to record, process, summarize and report financial information***" and "***[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting[.]"***
>
> (6) ***"The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."***

217. Along similar lines, the Q1 2023 10-Q stated that DaCosta and Deitsch had evaluated Paragon 28's disclosure controls and procedures and concluded they were "effective at the reasonable assurance level":

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective at the reasonable assurance level.***

**3. Defendants' False Statements at the May 4, 2023 Earnings Call Misled Investors About Paragon 28's Financial Performance.**

218. On May 4, 2023, Defendants DaCosta and Deitsch hosted an earnings call to discuss Paragon 28's Q1 2023 earnings. In his prepared remarks, Deitsch repeated the false results for gross profit margin and adjusted EBITDA:

***Gross profit margin for the first quarter of 2023 was 82.9%*** compared to 83.6 in the first quarter of 2022. ***This small percentage decrease was primarily due to an increase in excess and obsolete inventory costs.***

. . .

***Adjusted EBITDA for the first quarter of 2023 was a $1.4 million loss, representing a 57% improvement*** compared to the $3.3 million loss in the first quarter of 2022. ***On a dollar basis, we have experienced sequential quarterly improvements in adjusted EBITDA every quarter since the start of 2022***. P28's revenue growth rates are expected to continue well above market growth rates, and this expected revenue growth, ***combined with steady increases in operating margin***, will bring P28 closer to breakeven adjusted EBITDA on an annualized basis throughout the year.

219. During the Q&A, Deitsch responded to an analyst's question asking about the Company's return to profitability. In his response, Deitsch underscored the falsely reported gross profit margin of 83% to support the misleading narrative that the Company was on the road back to profitability and that Paragon 28 was on course to report a "$5 to $10 million improvement in [Paragon 28's] adjusted EBITDA" in 2023:

Yeah. George, it's still the same from what we had talked about last quarter where we said we expect $5 million to $10 million improvement in our adjusted EBITDA this year, which would have us approaching breakeven. So it's going to be soon when Paragon sort of pierces the profitability on an EBITDA basis. We continue to make great progress on driving high-quality growth, ***which drives strong gross margins. As you saw, we delivered 83% again this quarter. So it all starts there***. And then just making investments where they matter, continue to make investments in things like sales force expansion, new product development, international expansion and so on. So that's where we focus our time, energy, and money, and we leverage everything else. And so excited about our pathway to continued profit – improved profitability and cash flow over time.

220. In response to a separate question regarding Paragon 28's gross profit margin, and whether 83% was a "one-off," Deitsch reiterated that the Company was "an 80%-plus margin business":

No one-offs. Just good solid contribution from a lot of very strong products that we were able to secure for pretty reasonable pricing from our partners. So our team works really

> hard to get product at reasonable price and then our sales teams and our contracting teams work to make sure we get paid appropriately. ***And so nothing unusual in the 83% margin. We do continue to recommend, think about our business as an 80%-plus margin business and comfortable with that level as you think about your models going forward***.

### 4. Deitsch Misleads Investors Regarding Paragon 28's Gross Profit Margins and Adjusted EBITDA During the May 10, 2023 Bank of America Healthcare Conference.

221. On May 10, 2023, Deitsch and DaCosta participated in the Bank of America Healthcare Conference. At the conference, when asked by the moderator about Paragon 28's gross profit margin, Deitsch repeated the false gross margin result and repeated the Company's expectation to do better than 80% gross margin, a result that came about only because the Company's deficient inventory controls led to flawed inventory accounting:

> And, you know, it's – as we expand internationally, somebody asked the question, will we see an erosion in our margins? And I said you may see a little bit of a step down in gross margin. But overall profit margins will continue to expand because Germany, for example where we expect to do more business there in the future, lower prices on products but with more efficient distribution channel as compared to the US. So net-net, a very profitable business opportunity for us. So 80% is a good parameter of where we think long, mid term, long term models should be at. And we expect to do better than 80%. ***And I think the lowest we've delivered is 81% since we've gone in public. 82.9% this most recent quarter, which we're really proud of.*** And that drove a lot of leverage across our P&L and including ***a 50% adjusted EBITDA improvement year-over-year.***

222. Another analyst's question at the conference addressed Paragon 28's Adjusted EBITDA and whether the Company could "see some positive EBITDA" in Q4. In response, Deitsch repeated the Adjusted EBITDA figure from Q1 2023 that would later be restated. The restated Adjusted EBITDA figure also meant the Company did not have sequential improvement in each of the last five quarters:

> Yeah, I think that's right, Craig. I mean, we said after our finish to 2022 that we expect a $5 million to $10 million improvement in EBITDA. And last year, we were just over a $10 million loss intentionally, by the way, because we made a lot of terrific investments that we were happy to make and will continue to make. So, yeah, we will continue to see

improvements in leverage. You know, ***last five quarters, as you pointed out, have shown sequential improvement each quarter*** and EBITDA really follows the gross profit dollar distribution in the quarter and quarters of the year. So with that concentration of revenue, particularly in the fourth quarter, you see a lot of EBITDA, you know, the best EBITDA quarter of each year. ***So, you know, we did negative $1.3 million for the first quarter of this year.*** That's probably a good way to think about it for the next couple of quarters and then ramping up as we get into the end of the year to probably very likely a positive number.

**5. Reasons Why Defendants' May 2023 Statements Were Materially False and Misleading.**

**a. Statements Regarding Q1 2023 Financial Results.**

223. Each of the above identified statements regarding Q1 2023 financial results marked in bold and italicized in ¶¶ 211-216, 218-222, including those (i) reporting and characterizing certain financial results, (ii) claiming that the financial statements were "prepared in conformity with [GAAP]" and "pursuant to the rules and regulations of the SEC," and (iii) certifying that the Q1 2023 10-Q report did not contain "any untrue statement of a material fact or omit to state a material fact" and "fairly present[ed], in all material respects, the financial condition and result of operations of the Company," were materially false and misleading and omitted material facts for the following reasons.

224. First, Defendants failed to disclose material adverse facts about the Company's financial reporting, specifically the extensive control issues that prevented Paragon 28 from accurately tracking and valuing its inventory, rendering the financial statements unreliable. For example, without limitation, Paragon 28 experienced inventory tracking issues shortly after going public in October 2021 during a transition to a new system, and FE-5 explained that upon joining Paragon 28 in October 2022, the Company's "bin accuracy" was only 53%, well below industry standards. *See supra*, ¶¶ 94-95, 112. According to FE-1, these inventory tracking issues continued into 2023, because the Company did not track higher-volume SKUs (including implants) by lot

number, and there were no controls in place for recalls or other inventory tracking issues that may arise. *Id.*, ¶¶ 96-97, 118. This led to the Company, among other instances, engaging in massive over-ordering of products with uncommon sizes and simply losing approximately $50,000 of inventory. *Id.*, ¶¶ 118-119. In addition, since there was no way to determine how much product was on hand or shipped to distributors, the sales team was given goals based on inaccurate counts of inventory, and would later learn that there was insufficient inventory to support the sale. *Id.*, ¶¶ 97, 117. The inventory issues got so bad in and throughout the Class Period that FE-1 said there was a dedicated call that took place once per week to try and fix tracking and inventory issues. *Id.*, ¶¶ 121-123. FE-1 said DaCosta and Deitsch were on the email distribution list related to these meetings, and would receive "Stockout reports" detailing current levels of inventory *Id.* DaCosta would also participate in these calls. *Id.* Other senior executives of the Company, including the Chief Commercial Officer, were informed directly about inventory control issues. *Id.*, ¶¶ 109, 119, 122. Nonetheless, even months after the end of the Class Period, in January 2025, FE-5 stated that Paragon 28's bin accuracy was only around 81%, which was still not "good." *Id.*, ¶ 112; *see generally* ¶¶ 94-142.

225. Second, Paragon 28's deficient inventory controls led to inflated and false results of key financial metrics, including Adjusted EBITDA and gross margin, that would mislead investors. When valuing inventory and estimating a reserve for "obsolete and slow-moving inventory," Paragon 28 relied upon "current inventory levels" and "consideration of the life cycle of the product," among other factors. *Id.*, ¶¶ 63-67. Accurate inventory valuation and reserves for excess and obsolete inventory are important because they serve as critical inputs into metrics, like the cost of goods sold, that affect the Company's Adjusted EBITDA and gross margin results. *Id.*,

¶¶ 83-87. Defendants' inability to track and value inventory meant they understated the cost of goods sold. *Id.*, ¶158. By understating the cost of goods sold, Defendants could report higher gross profit and higher gross margins. *Id.*, ¶¶ 84-86. In turn, an increase in gross profit decreased the Company's reported net loss, which raised its Adjusted EBITDA and showed the Company making strides to breakeven and being on the road to profitability. *Id.* Defendants' fraudulent conduct therefore allowed Paragon 28 to report false and misleading results for these key metrics that they repeatedly emphasized to investors.

226. Third, Paragon 28 and the Executive Defendants were fully aware of the need to ensure the Company's financial statements, including its accounting of excess and obsolete inventories, were prepared in conformity with GAAP and SEC regulations. Defendants instead filed the false and misleading financial statements alleged above. SEC Regulation S-X states that financial statements filed with the SEC, including interim financial statements, that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. *See supra*, ¶ 57. Paragon 28's financial statements were not prepared in accordance with GAAP in several ways. For instance, without limitation, the Company violated ASC 330-10-35-1B through its errors in calculating its excess and obsolete inventory and its inability to track and account for the existence of inventory. *Id.*, ¶¶ 94-142, 171, 174, 177, 181. These inadequate controls also led Defendants to fail to record charges to income related to Paragon 28's excess and obsolete inventory, resulting in artificially inflated earnings and operating margins, and artificially lower expenses. *Id.* Defendants further violated GAAP by delaying the recording of inventory in order to falsify Paragon 28's true inventory levels. *Id.*, 133. Finally, Defendants falsely certified that the

Q1 2023 10-Q did not contain any untrue statement of material fact or omit to state a material fact. *Id.*, ¶ 216.

227. Fourth, the financial misstatements are not disputed. On July 30, 2024 and August 8, 2024, Defendants' ability to hide their ongoing accounting fraud came to an end. Paragon 28 announced that as a result of the improper accounting practices, the Company was forced to restate its reported consolidated financial statements. The fact that Defendants restated Paragon 28's financial statements is an admission that: (i) the financial results originally issued during the Class Period and their public statements regarding those results were materially false and misleading; (ii) the financial statements reported during the Class Period were incorrect and based on information available to Defendants at the time the results were originally reported; and (iii) the financial statements could no longer be relied upon as being accurate.

228. The financial metrics that Defendants represented were true in May 2023 were false as follows:

| Metric for Q1 2023 | Original | Restated/Actual | % Diff. |
|---|---|---|---|
| Inventories, net | 69,174 | 68,191 | 1.4% |
| Cost of goods sold | 8,906 | 10,229 | 14.8% |
| Gross profit | 43,130 | 41,807 | 3.1% |
| Operating loss | (7,739) | (9,062) | 17.1% |
| Net loss | (9,052) | (10,812) | 19.4% |
| Gross margin | 82.9% | 80.3% | 3.1% |
| Adjusted EBITDA | (1,417) | (2,740) | 93.4% |

Values in thousands (except for percentages).

**b. Statements Regarding Internal Controls.**

229. Each of the above identified statements regarding internal controls marked in bold and italicized in ¶¶ 216-217, including (i) DaCosta's and Deitsch's certification that Paragon 28 had internal controls over financial reporting and disclosure controls and procedures that provided reasonable assurance of the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, (ii) DaCosta's and Deitsch's certification that they had evaluated the controls as to their effectiveness and disclosed all significant deficiencies and material weaknesses in those controls, and (iii) the statement that as a result of DaCosta and Deitsch's evaluation, the disclosure controls and procedures were "effective at the reasonable assurance level," were materially false and misleading for the following reasons.

230. First, the deficient inventory controls described herein (*see, e.g., supra*, ¶¶ 94-142) contradict Defendants' statements in May 2023 certifying to the propriety of the Company's internal controls and the confirming the effectiveness of those controls.

231. Second, pursuant to SOX, the Executive Defendants had to certify that they were responsible for designing, establishing, and maintaining internal control over financial reporting and disclosure controls and procedures to ensure the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. *See supra*, ¶ 92 (citing 15 U.S.C. § 7241(a)(4)). The Executive Defendants also were required to certify that material information relating to the Company was made known to the CEO and CFO during the period in which the quarterly or annual reports were being prepared. *Id*. Finally, the Executive Defendants had to confirm they had evaluated the effectiveness of Paragon 28's disclosure controls and procedures, and have disclosed to auditors and the audit committee "[a]ll significant deficiencies and material

weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Paragon 28's] ability to record, process, summarize and report financial information." *Id.*

232. Contrary to their requirements under SOX, however, Defendants did not disclose to investors that Paragon 28's internal controls suffered from material weaknesses and were ineffective. *Id.*, ¶¶ 94-142, 185. Defendants have since admitted that in Q1 2023, Paragon 28 had a material weakness in the "control environment component of COSO" as the Company "lacked a sufficient complement of financial and accounting personnel with the necessary technical and accounting knowledge, experience, and training related to accounting for inventory in accordance with GAAP." *Id.*, ¶185. This material weakness resulted in the absence of "controls designed and implemented to timely prevent a material misstatement in the accounting for the valuation of inventory," specifically relating to "the calculation of excess and obsolescence reserve" and "capitalization of purchase price variances." *Id*. These lack of controls also meant that Defendants failed to properly assess the risk of material misstatements caused by inaccurate accounting for excess and obsolete inventories. *Id.*, ¶ 66. Defendants further failed to disclose a control deficiency related to the "existence of inventory located both at the Company's warehouse and at third party vendors," which contributed to "errors" in the "accounting for the valuation and existence of inventory." *Id.*, ¶ 203. Defendants also omitted that the Company had a "material weakness in the monitoring component of COSO as management did not design and implement effective ongoing monitoring activities over the execution of business performance reviews and account analysis." *Id.*, ¶ 185. As a result, the Company had the "inability to identify material errors in the financial statements and to communicate all relevant internal control deficiencies to those parties

responsible for taking corrective action in a timely manner." *Id*. Accordingly, the Company's internal control over financial reporting and disclosure controls and procedures were not effective when Defendants falsely certified the Q1 2023 10-Q.

**c. Materiality.**

233. Defendants' false and misleading statements in May 2023 were material. A reasonable Paragon 28 investor would consider the above representations or omissions important in determining whether to buy or sell the Company's stock, and the undisclosed facts or details about the true state of affairs would have significantly altered the total mix of information available to investors. Misstatements of Paragon 28's adjusted EBITDA loss masked a trend that the Company was not on the road to profitability, but rather would have a greater adjusted EBITDA loss in 2023 compared to 2022. *See supra*, ¶ 180. Paragon 28's misstatements, moreover, hid the Company's declining gross profit margin, a metric it consistently touted to analysts and investors. *Id.*, ¶¶ 76-79. The Company's understatement of costs of goods sold, and subsequent restatement, resulted in an overstatement of profits and understatement of operating losses. *Id.*, ¶¶ 168-170. Restatements, moreover, are required for "material" accounting errors that existed at the time financial statements were prepared. *See* SFAS 154. (ASC 250-10). By issuing the restatements, Defendants acknowledged that the financial statements for the restated periods were materially inaccurate and did not comply with GAAP and were therefore false and misleading when issued. *See supra*, ¶ 57. As for the internal control statements, systemic issues with Paragon 28's inventory controls and related material weaknesses could jeopardize Paragon 28's operations and financial well-being, which would concern the Company's investors and impact their decision to invest in Paragon 28 securities. *Id.*, ¶ 90. Finally, the market had a significant reaction to the disclosure of

the restatements and internal control deficiencies, as Paragon 28's common stock dropped 13.7% after the July 30, 2024 Restatement Announcement and 20% after the Company filed its restated financials and fully disclosed the internal control material weaknesses on August 8, 2024. *Id.*, ¶¶ 164, 194.

**B. Defendants Made False and Misleading Statements Concerning Q2 2023 Financial Results, Internal Controls, and the Company's Inventories in August and September 2023.**

**1. Defendants Misrepresented the Company's Financial Performance in the August 2, 2023 Press Release.**

234. On August 2, 2023, Paragon 28 filed a Form 8-K (the "August 2023 8-K") signed by Deitsch. The August 2023 Form 8-K included a press release announcing financial results for the second quarter ended June 30, 2023. The release included false financial results that Defendants would later need to restate based on improper inventory accounting caused by undisclosed material weaknesses in internal controls:

> ***Gross margin was 82.6% for the second quarter of 2023*** compared to 82.0% in the second quarter 2022. ***Gross margin was 82.8% for both the six months ended June 30, 2023*** and 2022.
>
> ***Net loss was $10.9 million for the second quarter of 2023, an increase of 13.5%***, compared to a net loss of $9.6 million for the second quarter of 2022. ***Net loss was $20 million for the six months ended June 30, 2023, an increase of 5.9%***, compared to a net loss of $18.8 million for the six months ended June 30, 2022.
>
> ***Adjusted EBITDA was a $2.6 million loss for the second quarter of 2023, an improvement of 17.0%***, compared to a $3.2 million loss in the second quarter of 2022. ***Adjusted EBITDA was a $4.0 million loss for the six months ended June 30, 2023, an improvement of 37.5%***, compared to a $6.5 million loss for the six months ended June 30, 2022.

In the financial results included in the August 2023 8-K, Paragon 28 also falsely reported that its: ***(a) net inventories were $85.225 million; (b) provision for excess and obsolete inventory***

***was reversed by $205,000; (c) cost of goods sold was $8.858 million ($17.764 million for six months ended June 30, 2023); (d) gross profit was $42.151 million ($85.281 million for six months ended June 30, 2023); (e) operating loss was $9.359 million ($17.098 million for six months ended June 30, 2023); (f) net loss was $10.898 million ($19.950 million for six months ended June 30, 2023); and (g) Adjusted EBITDA was a $2.629 million loss ($4.046 loss for six months ended June 30, 2023)***.

235. In the press release in the August 2023 8-K, DaCosta made false statements when touting the Company's Adjusted EBITDA improvement, which would later be restated due to Defendants' fraudulent conduct:

> "Paragon 28's second quarter 2023 net revenue grew 21% constant currency, driven by growth in each segment, highlighting the benefits of our balanced business model. ***Further, our Adjusted EBITDA for the second quarter and six months ended June 30, 2023 both improved meaningfully compared to last year, demonstrating strong ongoing leverage in our operations***" said Albert DaCosta, Chairman and Chief Executive Officer. "There is a great energy around P28 coming from the surgeon community, and we are excited to be able to provide them innovative solutions to help foot and ankle patients around the world."

**2. Paragon 28's August 2, 2023 10-Q Repeated the Falsely Stated Financial Results and Misleading Affirmance of Paragon 28's Internal Controls.**

236. Along with the Form 8-K, Paragon 28 also filed with the SEC a quarterly report on Form 10-Q on August 2, 2023, signed by DaCosta and Deitsch, which reported on the Company's financial and operating results for the second quarter ended June 30, 2023 (the "Q2 2023 10-Q"). The Company reported the same financial results disclosed in the August 2, 2023 press release, as detailed in paragraph 234, and repeated the statement from the May 4, 2023 Form 10-Q that the financial statements were ***"prepared in conformity with [GAAP]"*** and ***"pursuant to the rules and regulations of the [SEC]."***

237. The Q2 2023 10-Q included additional false details regarding the Company's "Cost of Goods Sold" and "Gross Profit Margin" in the three months ended June 30, 2023 and six months ended June 30, 2023:

> *Cost of Goods Sold and Gross Profit Margin.* ***Cost of goods sold increased $1.2 million, or 16%***, from $7.6 million during the three months ended June 30, 2022 to ***$8.9 million during the corresponding period in 2023***, primarily due to increased variable costs from higher net revenue combined with an increase in outbound freight costs. ***Gross profit margin for the three months ended June 30, 2023 increased to 82.6%***, compared to 82.0% in the same period of 2022.
>
> . . .
>
> *Cost of Goods Sold and Gross Profit Margin.* ***Cost of goods sold increased $3.3 million, or 23%***, from $14.4 million during the six months ended June 30, 2022 to ***$17.8 million during the corresponding period in 2023,*** primarily due to increased variable costs from higher net revenue combined with an increase in outbound freight costs. ***Gross profit margin for the six months ended June 30, 2023 remained consistent at 82.8%***, in-line with the same period of 2022.

238. For Adjusted EBITDA and net loss, the Company repeated false figures that it would ultimately restate in August 2024:

> Net loss increased from $9.6 million for the three months ended June 30, 2022 to ***$10.9 million for the three months ended June 30, 2023***, and from $18.8 million for the six months ended June 30, 2022 to ***$20.0 million for the six months ended June 30, 2023***.
>
> Adjusted EBITDA improved from negative $3.2 million for the three months ended June 30, 2022 to ***negative $2.6 million for the three months ended June 30, 2023***, and from negative $6.5 million for the six months ended June 30, 2022 to ***negative $4.0 million for the six months ended June 30, 2023.***

239. The Q2 2023 10-Q attached Sarbanes-Oxley certifications by DaCosta and Deitsch assuring investors of the same matters alleged in paragraph 216 above. The Q2 2023 10-Q further stated Defendants DaCosta and Deitsch had evaluated Paragon 28's disclosure controls and procedures and concluded they were "***effective at the reasonable assurance level***."

**3. Defendants Mislead Investors About Paragon 28's Financial Results During the August 2, 2023 Earnings Call.**

240. On August 2, 2023, Defendants DaCosta and Deitsch hosted Paragon 28's Q2 2023 earnings call. In his prepared remarks, Deitsch repeated the falsely stated results for gross profit margin and adjusted EBITDA:

> ***Gross profit margin was 82.6% for the second quarter of 2023***, compared to 82% last year.
>
> . . .
>
> ***Adjusted EBITDA for the second quarter of 2023, improved by 17% to a $2.6 million loss***. Second quarter adjusted EBITDA included approximately $2 million of one-time expenses composed of investments in organizational structure and other growth initiatives. ***On a year-to-date basis, our adjusted EBITDA improved by 38% to a $4 million loss***. We continue to expect 2023 adjusted EBITDA to improve by $5 million to $10 million as compared to the $10.7 million loss in 2022.

241. Deitsch, in his prepared remarks, misleadingly represented that the Company had the means to determine the causes of Paragon 28's inventory growth, omitted any issues involving excess and obsolete inventory, and falsely spoke on the state of the Company's inventory when, in reality, Paragon 28 had deficient controls to track and properly value its inventory:

> Beyond the inventory growth requirements to support new product launches and our expanding commercial footprint, ***increased supplier lead times have significantly contributed to our inventory growth. Specifically, these longer lead times have required us to increase our par levels of inventory. Our inventory balance also includes a higher than normal level of incomplete kits or work in process inventory awaiting delivery of final components to complete sets that otherwise would have been deployed to our sales force contributing to revenue in the quarter***.

242. During the conference call, Deitsch also reiterated Paragon 28's ability to reach cash flow break even based on, among other things, ***"improvements to adjusted EBITDA"*** that were based on false and inaccurate accounting of Paragon 28's inventory.

243. In response to an analyst question regarding Paragon 28's gross profit margins, Deitsch reaffirmed the Company as "an 80% plus gross margin business," a figure that would later be restated, as the Company's gross margins were actually declining and below 80% as of Q2 2023. Deitsch also falsely stated that any "extra cost" was just "carrying the additional inventory on our balance sheet today" and experiencing long "lead times," giving the false impression that Paragon 28 was on top of its inventory management when the Company could not actually track and value its inventory:

> Q: So I guess, I'm just trying to understand, how should we think about gross margins through the first half of the year, is that how we should really be thinking about them through the second half of the year? Or is there anything that we should be calling out there?
>
> Deitsch: Hey, Kle. Thanks. ***And one of the things we've been pretty consistent about saying is, think about our business as an 80% plus gross margin business and we have continued to perform above that in an 82% to 83% range, which we think really reflects the value of our products and the price that we're getting them for, we're selling them for and the price we're procuring it for.***
>
> We haven't seen any significant impact at this point in time in terms of the actual procurement cost year-over-year. Our supply team has done a terrific job of managing that. ***Where we have some extra cost is just carrying the additional inventory on our balance sheet today. We're buying products that are all valid and good products we just have more than we normally would have given the longer lead times.*** So we expect as we move forward that we want -- as these lead times decrease, that will be able to work through this inventory and get back to a more normalized level of days of inventory on hand**.**
>
> And then further, ***as we also complete sets and replenish existing sets and get them back out into the field where we've had back orders.*** We expect that to drive more revenue. And so it'll have the benefit of more revenue in the future as we move forward and complete those sets. ***And we also expect that inventory balance to come down. So 80%, I think, or thereabouts is the right way to model our gross margins***. And if we continue to do well on our pricing of our products and manage supply chain to get products at the right price***, we can potentially do better than that like we have the last several quarters.***

**4. Deitsch Repeats The False and Misleading Gross Margin Results During the Canaccord Genuity Growth Conference on August 9, 2023.**

244. Deitsch participated in the Canaccord Genuity Growth Conference on August 9, 2023. During the conference, Deitsch repeated the falsely stated gross margin for Q2 2023:

> You know, the last thing that I would mention on this slide is, you know, to reiterate Albert's point about our growth, we grew 25% in 2022, and then 24% first half of this year. So high growth in a big market with ***compelling financial margins as well, 82.6% margins in the second quarter.*** So that drives a lot of dollars that we can reinvest into the business as we see appropriate to continue the success and growth of our business.

**5. Deitsch Falsely Touts Paragon 28's Adjusted EBITDA Performance and Misrepresents the Company's Inventory Status During the Morgan Stanley Global Healthcare Conference on September 11, 2023.**

245. Morgan Stanley held its Global Healthcare Conference on September 11, 2023, at which Deitsch and DaCosta participated in a question and answer session with analysts.

246. During the conference, Deitsch responded to an analyst's question about achieving EBITDA profitability and repeated the false Adjusted EBITDA results and confidence that the Company would improve its Adjusted EBITDA in 2023. Deitsch made these comments with knowledge or deliberate reckless disregard of the fact that Paragon 28 had deficient controls to value and track its inventory which would affect an accurate calculation of Adjusted EBITDA:

> Yeah, happy to. And I think maybe as the back drop, the company has a long history of being EBITDA positive. And really since –from 2015 through 2021, the company was EBITDA positive. And then post IPO, we made the decision to take advantage of a lot of different investment opportunities that were in front of us. We did th[e] things like accelerating R&D opportunities, things like the Disior acquisition that brought over 25 engineers and a very, very small revenue base, but a lot of product development potential and power. Things like salesforce expansion both here and internationally Things like infrastructure to support a scaling business, including SAP and supply chain leaders that really can take us to the next level of excellence there.
>
> And so those investments we've leveraged in 2023 and ***we've seen nice year-over-year improvements in adjusted EBITDA, double-digit gains in adjusted EBITDA.*** And

> we said $5 million to $10 million of improvement this year from 2022 where we were about negative $10.7 million. So we expect to be close to break even this year on the high end of the range. And next year, we expect to continue to lever the investment base we built and grow our revenue at a much faster pace than our operating expenses. So, to answer very directly, we expect next year to be EBITDA positive. We haven't given a range for that yet, but we'll be clearly in positive territory next year and continuing to scale that moving forward.

247. Deitsch also spoke positively on the state of Paragon 28's inventory and inventory management. Deitsch, however, omitted all facts regarding the Company's deficient controls, creating a false impression that Paragon 28 had a handle on its inventory tracking and valuation that would later be belied by the financial restatements:

> That combined with additional and continued improvements in our free cash flow driven by normalization of our working capital. ***We've really built up a lot of inventory over the last 12 months. And the reasons for that have been everything from just needing more inventory to satisfy par levels, given the longer lead times.*** NPI launches that we're going to fully take advantage of. And then also just sets being build out for our expanded salesforce, not all of which these sets we were talking about earlier have been able to drive our revenue. And so a lot of great things to come from earnings profitability, but also cash flow leverage going forward.

### 6. Reasons Why Defendants' August and September 2023 Statements Were False and Misleading.

#### a. Statements Regarding Q2 2023 Financial Results.

248. Each of the above identified statements regarding Q2 2023 financial results marked in bold and italicized in ¶¶ 234-240, 242-246, including those (i) reporting and characterizing certain financial results, (ii) claiming that the financial statements were "prepared in conformity with [GAAP]" and "pursuant to the rules and regulations of the SEC," and (iii) certifying that the Q2 2023 10-Q report did not contain "any untrue statement of a material fact or omit to state a material fact" and "fairly present[ed], in all material respects, the financial condition and result of

operations of the Company," were materially false and misleading and omitted material facts for the reasons stated in ¶¶ 224-227 and *supra,* §§ IV.A.-D.

249. In addition, the statements regarding the Q2 2023 financial results were false and misleading because in Q2 2023, FE-5 was told to stop receiving inventory so it would not be reported on the Company's balance sheet. *See supra*, ¶ 133. Accordingly, any financial results depending on proper inventory accounting were incorrect and were not prepared in accordance with GAAP.

250. Finally, the financial metrics that Defendants represented were true in August and September 2023 were false as follows:

| **Metric for Q2 2023** | **Original** | **Restated/Actual** | **% Diff.** |
|---|---|---|---|
| Inventories, net | 85,225 | 81,501 | 4.4% |
| Provision for (reversal of) excess and obsolete inventory (six months ended June 30, 2023) | (205) | 923 | 550.2% |
| Cost of goods sold (three and six months ended June 30, 2023) | 8,858<br>17,764 | 11,599<br>21,828 | 31%<br>22.9% |
| Gross profit (three and six months ended June 30, 2023) | 42,151<br>85,281 | 39,410<br>81,217 | 6.5%<br>4.7% |
| Operating loss (three and six months ended June 30, 2023) | (9,359)<br>(17,098) | (12,100)<br>(21,162) | 29.3%<br>23.7% |
| Net loss (three and six months ended June 30, 2023) | (10,898)<br>(19,950) | (13,248)<br>(24,060) | 21.6%<br>20.6% |

| | | | |
|---|---|---|---|
| Gross margin (three months ended June 30, 2023) | 82.6% | 77.3% | 6.4% |
| Adjusted EBITDA (three months ended June 30, 2023) | (2,629) | (5,370) | 104.3% |

Values in thousands (except for percentages).

**b. Statements Regarding Internal Controls.**

251. Each of the above identified statements regarding internal controls marked in bold and italicized in ¶ 236, including (i) DaCosta's and Deitsch's certification that Paragon 28 had internal controls over financial reporting and disclosure controls and procedures that provided reasonable assurance of the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, (ii) DaCosta's and Deitsch's certification that they had evaluated the controls as to their effectiveness and disclosed all significant deficiencies and material weaknesses in those controls, and (iii) the statement that as a result of DaCosta and Deitsch's evaluation, the disclosure controls and procedures were "effective at the reasonable assurance level," were materially false and misleading for the reasons stated in ¶¶ 230-232 and *supra*, §§ IV.D., F.3.f., G.

**c. Statements Regarding Paragon 28's Inventories.**

252. Each of the above identified statements regarding Paragon 28's inventories marked in bold and italicized in ¶¶ 241, 243, and 247, including citing "increased supplier lead times" and "longer lead times" as the reason for "inventory growth," "the additional inventory on our balance sheet today," and the building up of inventory over "the last twelve months", were materially false and misleading because Defendants omitted the fact that the Company lacked proper inventory controls during Q2 2023. *See supra*, ¶¶ 94-142, 184-188, 197-207. Defendants therefore had no

reliable bases to discuss and characterize Paragon 28's inventory levels and the reasons for growth and created a false and misleading impression about those levels and the Company's ability to track and value its inventory.

#### d. Materiality

253. Defendants' false and misleading statements in August and September 2023 were material for the reasons discussed in ¶ 233 and *supra,* §§ IV.A-D, F.1-4.

## C. Defendants Made False and Misleading Statements Concerning Q3 2023 Financial Results, Internal Controls, and the Company's Inventories in November 2023.

### 1. Paragon 28's November 7, 2023 8-K Contained False and Misleading Financial Results.

254. In connection with its earnings for Q3 2023, Paragon 28 filed a Form 8-K with the SEC on November 7, 2023 attaching a press release and investor presentation (the "November 2023 8-K"). In the November 2023 8-K, Defendants falsely represented certain financial results that were calculated through improper inventory accounting and would later be restated:

> ***Gross margin was 80.3% for the third quarter of 2023*** compared to 81.5% in the third quarter of 2022. ***Gross margin was 81.9% for the nine months ended September 30, 2023***, compared to 82.4% for the nine months ended September 30, 2022.
>
> ***Net loss was $8.3 million for the third quarter of 2023, a decrease of 14.3%***, compared to a net loss of $9.7 million for the third quarter of 2022. ***Net loss was $28.3 million for the nine months ended September 30, 2023, a decrease of 1%***, compared to [a net] loss of $28.6 million for the nine months ended September 30, 2022.
>
> ***Adjusted EBITDA was a $1.2 million loss for the third quarter of 2023, an improvement of 54.1%***, compared to a $2.7 million loss in the third quarter of 2022. ***Adjusted EBITDA was a $5.3 million loss for the nine months ended September 30, 2023***, an improvement of 42.4%, compared to a $9.1 million loss for the nine months ended September 30, 2022.

In the financial results detailed in the November 2023 8-K, the Company also reported that its: ***(a) net inventories were $94.38 million; (b) provision for excess and obsolete inventory for the nine***

***months ended September 30, 2023 was $2.053 million; (c) cost of goods sold was $10.394 million ($28.158 million for the nine months ended September 30, 2023); (d) gross profit was $42.389 million ($127.670 million for the nine months ended September 30, 2023); (e) operating loss was $8.981 million ($26.079 million for the nine months ended September 30, 2023); (f) net loss was $8.332 million ($28.282 million for the nine months ended September 30, 2023); and (g) adjusted EBITDA was a $1.249 million loss (a $5.295 million loss for nine months ended September 30, 2023)***. Defendants would later restate all of these results.

255. The press release quoted DaCosta, who emphasized the Company's improving adjusted EBITDA:

> "Paragon 28's business fundamentals are as strong as ever and continue to position us for sustainable long-term growth. Through the third quarter, we grew revenue 20% and ended the quarter with record numbers of U.S. sales representatives and surgeon customers ***while also improving EBITDA by over 50% compared [to] the third quarter of 2022***[,]" said Albert DaCosta, Chairman and Chief Executive Officer.

256. In the investor presentation attached to the Form 8-K, Defendants repeated the false adjusted EBITDA figure, "***aEBITDA from ($2.7M) to ($1.2M)***" and misrepresented a "***54% YoY improvement in 3Q 2023***":




2. **The November 7, 2023 10-Q Repeats the Falsely Stated Financial Results and Omits the Material Weaknesses in Internal Controls Related to Paragon 28's Inventory Accounting.**

257. Paragon 28 also filed with the SEC a quarterly report on Form 10-Q on November 7, 2023, signed by DaCosta and Deitsch, which reported on the Company's financial and operating results for the third quarter ended September 30, 2023 (the "Q3 2023 10-Q"). In it, the Company falsely reported the same financial results disclosed in the November 7, 2023 press release, as detailed in paragraph 254, and repeated the false statement from the Q1 2023 and Q2 2023 Form 10-Qs that the financial statements were ***"prepared in conformity with [GAAP]"*** and ***"pursuant to the rules and regulations of the [SEC]."***

258. The Q3 2023 10-Q further falsely represented the Company's "Cost of Goods Sold" and "Gross Profit Margin" in the three months ended September 30, 2023 and nine months ended September 30, 2023:

> *Cost of Goods Sold and Gross Profit Margin*. ***Cost of goods sold increased $1.9 million, or 22%***, from $8.5 million during the three months ended September 30, 2022, to ***$10.4 million during the corresponding period in 2023,*** primarily due to increased variable costs from higher net revenue and higher inventory excess and obsolescence expense. ***Gross profit margin for the three months ended September 30, 2023, decreased to 80.3%***, compared to 81.5% in the same period of 2022.
> . . .
>
> *Cost of Goods Sold and Gross Profit Margin*. ***Cost of goods sold increased $5.2 million, or 23%***, from $22.9 million during the nine months ended September 30, 2022, ***to $28.2 million during the corresponding period in 2023***, primarily due to increased variable costs from higher net revenue combined with higher inventory excess and obsolescence expense and an increase in outbound freight costs. ***Gross profit margin for the nine months ended September 30, 2023 decreased to 81.9%,*** compared to 82.4% in the same period of 2022.

259. In the Q3 2023 10-Q, with respect to Adjusted EBITDA and net loss, the Company repeated false financial figures that it later acknowledged were false and restated in August 2024:

> Net loss decreased from $9.7 million for the three months ended September 30, 2022, to ***$8.3 million for the three months ended September 30, 2023***, and from $28.6 million for the nine months ended September 30, 2022, ***to $28.3 million for the nine months ended September 30, 2023***.
>
> Adjusted EBITDA improved from negative $2.7 million for the three months ended September 30, 2022, to ***negative $1.2 million for the three months ended September 30, 2023***, and from negative $9.2 million for the nine months ended September 30, 2022, to ***negative $5.3 million for the nine months ended September 30, 2023***.

260. The Q3 2023 10-Q also attached Sarbanes-Oxley certifications by Defendants DaCosta and Deitsch assuring investors of the same matters alleged in paragraph 216 above. With respect to the Company's disclosure controls and procedures, the Form 10-Q disclosed that disclosure controls and procedures ***were not effective at the reasonable assurance level due to an interest rate swap agreement not being "appropriately evaluated for accounting and disclosure***

***considerations.”*** DaCosta and Deitsch did not make any reference to the Company’s issues with tracking and valuing its inventories.

### 3. Defendants Repeat False Financial Results During a November 7, 2023 Earnings Call.

261. On November 7, 2023, Defendants DaCosta and Deitsch hosted Paragon 28’s third quarter of 2023 earnings call. In his prepared remarks, Deitsch repeated the falsely stated results for gross profit margin and adjusted EBITDA. While doing so, Deitsch also gave the false impression that Paragon 28 could accurately track its inventory when referring to “increased inventory reserves”:

> ***Adjusted EBITDA for the third quarter of 2023 improved by 54.1% to a $1.2 million loss. On a year-to-date basis, our adjusted EBITDA improved by 42.4% to a $5.2 million loss, with gross profit margin at 81.9%. Gross profit margin for the quarter was 80.3%. It was approximately 1 percentage point less than the third quarter last year due to increased inventory reserves***.

262. In response to a separate question about the Company’s inventory levels, Deitsch gave the misleading characterization that inventory levels had been “atypical” when, in truth, Defendants could not reliably determine inventory levels due to deficient controls.

### 4. Reasons Why Defendants’ November 2023 Statements Were False and Misleading.

#### a. Statements Regarding Q3 2023 Financial Results.

263. Each of the above identified statements regarding Q2 2023 financial results marked in bold and italicized in ¶¶ 254-261, including those (i) reporting and characterizing certain financial results, (ii) claiming that the financial statements were “prepared in conformity with [GAAP]” and “pursuant to the rules and regulations of the SEC,” and (iii) certifying that the Q3 2023 10-Q report did not contain “any untrue statement of a material fact or omit to state a material

fact" and "fairly present[ed], in all material respects, the financial condition and result of operations of the Company," were materially false and misleading and omitted material facts for the reasons stated in ¶¶ 224-227 and *supra,* §§ IV.A.-D.

264. Furthermore, the financial metrics that Defendants represented were true in November 2023 were false as follows:

| Metric for Q3 2023 | Original | Restated/Actual | % Diff. |
|---|---|---|---|
| Inventories, net | 94,380 | 89,128 | 5.6% |
| Provision for excess and obsolete inventories (nine months ended September 30, 2023) | 2,053 | 3,204 | 56% |
| Cost of goods sold (three and nine months ended September 30, 2023) | 10,394<br><br>28,158 | 11,922<br><br>33,750 | 14.7%<br><br>19.8% |
| Gross profit (three and nine months ended September 30, 2023) | 42,389<br><br>127,670 | 40,861<br><br>122,078 | 3.6%<br><br>4.4% |
| Operating loss (three and nine months ended September 30, 2023) | (8,981)<br><br>(26,079) | (10,509)<br><br>(31,671) | 17%<br><br>21.4% |
| Net loss (three and nine months ended September 30, 2023) | (8,332)<br><br>(28,282) | (11,151)<br><br>(35,211) | 33.8%<br><br>24.5% |
| Gross margin (three months ended September 30, 2023) | 80.3% | 77.4% | 3.6% |
| Adjusted EBITDA (three months ended September 30, 2023) | (1,249) | (2,777) | 122.3% |

Values in thousands (except for percentages).

**b. Statements Regarding Internal Controls.**

265. Each of the above identified statements regarding internal controls marked in bold and italicized in ¶ 260, including (i) DaCosta's and Deitsch's certification that Paragon 28 had internal controls over financial reporting and disclosure controls and procedures that provided reasonable assurance of the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, (ii) DaCosta's and Deitsch's certification that they had evaluated the controls as to their effectiveness and disclosed all significant deficiencies and material weaknesses in those controls, and (iii) the statement that as a result of DaCosta and Deitsch's evaluation, the disclosure controls and procedures were "not effective at the reasonable assurance level" for reasons unrelated to inventory controls, were materially false and misleading for the reasons stated in ¶¶ 230-232 and *supra*, §§ IV.D., F.3.f., G.

**c. Materiality.**

266. Defendants' false and misleading statements in November 2023 were material for the reasons discussed in ¶ 233 and *supra,* §§ IV.A-D, F.1-4.

## D. Defendants Made False and Misleading Statements Concerning 4Q 2023 and Full-Year 2023 Financial Results, Internal Controls, and the Company's Inventories in February 2024.

### 1. The February 29, 2024 Form 8-K Offers False Financial Results for Q4 2023 and FY 2023 and Mischaracterizes The Significant $4 Million Inventory Write-Off As a One-Time Action.

267. On February 29, 2024, Paragon 28 filed a Form 8-K with the SEC attaching a press release and investor presentation concerning the Company's Q4 2023 and full-year 2023 financial results (the "February 2024 8-K"). Like the other 8-K press releases from prior quarters,

Defendants falsely represented certain financial results that would be restated due to errors in inventory accounting:

> ***Gross profit margin was 74.5% for the fourth quarter of 2023*** compared to 81.5% in the fourth quarter of 2022. ***Gross profit margin was 79.9% for the full year 2023***, compared to 82.1% for the full year 2022. ***Related to the recent inventory stockpiling, during the fourth quarter of 2023 the Company recorded inventory write-downs totaling $4.0 million which reduced fourth quarter and full year 2023 gross profit margins by 6.6 and 1.8 percentage points, respectively***.
>
> ***Net loss was $19.6 million for the fourth quarter of 2023***, compared to a net loss of $38.8 million for the fourth quarter of 2022. ***Net loss was $47.8 million for the full year 2023***, compared to a net loss of $67.3 million for the full year 2022.
>
> ***Adjusted EBITDA for the fourth quarter of 2023, negatively impacted by the $4.0 million of inventory write downs, was a $4.4 million loss*** compared to a $1.5 million loss in the fourth quarter of 2022. ***Adjusted EBITDA for the full year 2023, negatively impacted by the $4.0 million of inventory write downs during the fourth quarter 2023, was a $9.7 million loss*** compared to a $10.7 million loss for the full year 2022.

268. In the financial statements detailed in the February 2024 Form 8-K, the Company falsely reported the following 4Q 2023 and full-year 2023 results that would be restated in July and August 2024:

> <u>Three-Months-Ended December 31, 2023</u>: ***(a) cost of goods sold was $15.440 million; (b) gross profit was $45.121 million; (c) gross profit margin was 74.5%; (d) operating loss was $11.230 million; (e) net loss was $19.559 million; and (f) adjusted EBITDA was a $4.423 million loss***.
>
> <u>Year-Ended 2023</u>: ***(a) net inventories were $98.062 million; (b) provision for excess and obsolete inventory was reversed by $352,000; (c) cost of goods sold was $43.598 million; (d) gross profit was $172.791 million; (e) gross profit margin was 79.9%; (f) operating loss was $37.309 million; (g) net loss was $47.841 million; and (h) adjusted EBITDA was a $9.718 million loss***.

269. The press release from the February 2024 8-K also gave the false impression that the Company's significant inventory write-off of $4 million was a one-time event ***"[r]elated to the***

***recent inventory stockpiling"*** and not, in reality, ongoing issues affecting the Company's ability to track and value its inventory.

270. Defendants also published an investor presentation on February 29, 2024 in the 8-K. The investor presentation repeated the incorrect adjusted EBITDA figures disclosed in the press release and misrepresented that the $4.0 million inventory write-off was a one-off event: "***4Q 2023 aEBITDA declined from ($1.5M) to ($4.5M); FY aEBITDA improved by $1.0M to ($9.7M); both negatively impacted by $4.0M of inventory write-downs recorded in the fourth quarter.***"




**2. The February 29, 2024 10-K Details False Financial Results for 4Q 2023 and Full-Year 2023 and Omits the Material Weaknesses in Internal Controls Related to Paragon 28's Inventories.**

271. Paragon 28 filed an annual report on Form 10-K with the SEC, signed by DaCosta and Deitsch, on February 29, 2024. The Form 10-K reported on the Company's financial and

operating results for the quarter ended December 31, 2023 and full-year 2023. The Company reported the same year-end financial results disclosed in February 29, 2024 press release, as detailed in paragraph 268, and repeated the statement from the prior Form 10-Qs that the financial statements were ***"prepared in conformity"*** with GAAP**.**

272. The Form 10-K further detailed the Company's "Cost of Goods Sold and Gross Profit Margin" that would later be restated and falsely claimed that the $4 million inventory write-off in 4Q 2023 was "related to the recent inventory stockpiling" and not ongoing issues affecting the Company's ability to track and value its inventory:

> ***Cost of goods sold increased $11.1 million***, ***or 34%***, from $32.5 million during the year ended December 31, 2022, ***to $43.6 million in the same period in 2023***, primarily due to increased variable costs from higher net revenue. ***Gross profit margin for the year ended December 31, 2023, decreased to 79.9%***, compared to 82.1% in the same period of 2022 primarily due to higher costs of procured product, increased revenue contribution from our international business with lower gross profit margins ***and inventory write-downs totaling $4.0 million during the fourth quarter of 2023 related to the recent inventory stockpiling***, partially offset by lower freight as a percentage of revenue.

273. For Adjusted EBITDA and net loss, the Company repeated figures that it would ultimately restate in August 2024:

> ***Net loss decreased $19.5 million, or 29%***, from $67.3 million for the year ended December 31, 2022, to ***$47.8 million for the year ended December 31, 2023***.
>
> ***Adjusted EBITDA improved*** from negative $10.7 million for the year ended December 31, 2022, to ***negative $9.7 million for the year ended December 31, 2023***.

274. The Form 10-K also attached Sarbanes-Oxley certifications by DaCosta and Deitsch assuring investors of the same matters alleged in paragraph 216 above. The Form 10-K also stated that DaCosta and Deitsch had evaluated Paragon 28's disclosure controls and procedures and concluded they were "***effective at the reasonable assurance level***." Similarly,

DaCosta and Deitsch determined that "***internal control over financial reporting was effective as of December 31, 2023***."

**3. Defendants Repeat Incorrect Financial Results and Understate the Extent of Inventory Challenges During the February 29, 2024 Earnings Call.**

275. On February 29, 2024, Defendants DaCosta and Deitsch hosted an earnings call. Deitsch repeated the falsely stated results for gross profit margin in his prepared remarks:

> Supply chain headwinds continued into the fourth quarter, but were in line with our expectations and were far less significant than the impacts we experienced during the second and third quarters of 2023. Importantly, our supply chain environment continues to improve. ***Gross profit margin for the quarter was 74.5%, compared to 81.5% in the fourth quarter of 2022. For the full year 2023 gross profit margin was 79.9%, compared to 82.1% for the full year 2022.***

276. In addition, like in the press release, investor presentation, and Form 10-K, Deitsch downplayed the $4 million inventory write-off as a one-time event that would not affect the Company's ability to achieve 80% gross margin moving forward:

> ***Related to the recent inventory stockpiling***, the company recorded non-cash inventory write-downs totaling $4 million during the fourth quarter of 2023***, which reduced fourth quarter and full year 2023 gross profit margins by 6.6 and 1.8 percentage points respectively***. ***This adjustment had no impact on our operations during the fourth quarter, and we expect our annual gross profit margins to continue to be approximately 80% going forward.***

277. Deitsch's prepared remarks also included him touting the Company's adjusted EBITDA performance, which would have to be restated only six months later due to errors in inventory accounting:

> ***Adjusted EBITDA for the fourth quarter of 2023 was a $4.4 million loss compared to a $1.5 million loss in the prior year period. For the full year 2023, adjusted EBITDA was a $9.7 million loss, an improvement of $1 million compared to the prior year period.*** Both fourth quarter and full year 2023 adjusted EBITDA included the $4 million inventory write-down. We expect operating leverage to continue to improve in 2024 and we are committed to driving positive adjusted EBITDA on an annual basis beginning this year.

278. Deitsch also cited "***continu[ing] to execute on our plans to improve inventory efficiency***" as a factor leading to "cash flow breakeven" without any mention that the Company, in reality, lacked proper controls to track and value its inventory and "improve inventory efficiency."

279. During the Q&A, an analyst raised the $4 million write-off, and asked Deitsch whether inventory "write-downs are essentially over at this point." In response, Deitsch stated that "[o]ur inventory levels ended up exactly where we had anticipated they would," and Defendants "don't expect adjustments of that order of magnitude at any time in the future." These were false statements given that the Company had significant inventory control problems preventing any accurate accounting that would later result in restatements. The full exchange during the earnings call was as follows:

> Q: And you had mentioned last quarter the step up in inventory that you expected and obviously closing at around $100 million. I think that's kind of what you anticipated. I want to make sure that's sort of in line and then also that you think the write-downs are essentially over at this point?
>
> Deitsch: Yeah, no, I think that's a great question. ***Our inventory levels ended up exactly where we had anticipated they would.*** And as we go into this year, as we've said, we expect significant improvements in operating cash flow and free cash flow. And we believe that and we have great visibility to that. And it's going to be driven by positive EBITDA, it's going to be driven by leveraging the existing inventory investments we've made. ***And so we don't expect and are planning for and we will not have the kind of inventory increases that we saw last year.*** So that's all going to bode very well from a cash flow perspective improvement in 2024.
>
> And to your point, the adjustments that we made in the fourth quarter was a non-cash charge, increasing the level of reserves on just a much higher level of inventory. ***So we don't expect adjustments of that order of magnitude at any time in the future. Those kinds of adjustments, you always have inventory adjustments, but not to the size and scale we saw in the fourth quarter.***

### 4. Reasons Why Defendants' February 2024 Statements Were False and Misleading.

#### a. Statements Regarding Q4 2023 and FY 2023 Financial Results.

280. Each of the above identified statements regarding Q4 2023 and FY 2023 financial results marked in bold and italicized in ¶¶ 271-275 and 277, including those (i) reporting and characterizing certain financial results, (ii) claiming that the financial statements were "prepared in conformity with [GAAP]" and "pursuant to the rules and regulations of the SEC," and (iii) certifying that the FY 2023 10-K report did not contain "any untrue statement of a material fact or omit to state a material fact" and "fairly present[ed], in all material respects, the financial condition and result of operations of the Company," were materially false and misleading and omitted material facts for the reasons stated in ¶¶ 224-227 *supra,* §§ IV.A.-D.

281. In addition, the statements regarding the FY 2023 financial results were false and misleading because in Q4 2023, FE-5 was told to stop receiving inventory so it would not be reported on the Company's balance sheet. *See supra*, ¶ 133. FE-4 also described participating in a December 2023 inventory audit where the compiled inventory figures in Paragon 28's Colorado warehouse did not match other internal figures for the inventory on-hand. *Id.*, ¶¶ 127-129; *see also* ¶¶ 130-132. Accordingly, any financial results depending on proper inventory accounting were incorrect and were not prepared in accordance with GAAP.

282. Finally, the financial metrics Defendants represented were true in February 2024 were false as follows:

| Metric for Q4 2023 | Original | Restated/Actual | % Diff. |
|---|---|---|---|
| Gross profit (three months ended December 31, 2023) | 45,121 | 42,357 | 6.1% |

| | | | |
|---|---|---|---|
| Operating loss (three months ended December 31, 2023) | (11,230) | (13,994) | 24.6% |
| Net loss (three months ended December 31, 2023) | (19,559) | (22,323) | 14.1% |
| Gross margin (three months ended December 31, 2023) | 74.5% | 69.9% | 6.2% |
| Adjusted EBITDA (three months ended December 31, 2023) | (4,423) | (7,187) | 62.5% |

Values in thousands (except for percentages).

| Metric for FY 2023 | Original | Restated/Actual | % Diff. |
|---|---|---|---|
| Inventories, net (year ended December 31, 2023) | 98,062 | 90,046 | 8.2% |
| Provision for (reversal of) excess and obsolete inventory (year ended December 31, 2023) | (352) | 4,037 | 1,246.9% |
| Cost of goods sold (year ended December 31, 2023) | 43,598 | 51,954 | 19.1% |
| Gross profit (year ended December 31, 2023) | 172,791 | 164,435 | 4.8% |
| Operating loss (year ended December 31, 2023) | (37,309) | (45,665) | 22.4% |
| Net loss (year ended December 31, 2023) | (47,841) | (57,534) | 20.2% |
| Gross margin (year ended December 31, 2023) | 79.9% | 76.0 | 4.9% |
| Adjusted EBITDA (year ended December 31, 2023) | (9,718) | (18,074) | 86% |

Values in thousands (except for percentages).

**b. Statements Regarding Internal Controls.**

283. Each of the above identified statements regarding internal controls marked in bold and italicized in ¶ 274, including (i) DaCosta's and Deitsch's certification that Paragon 28 had internal controls over financial reporting and disclosure controls and procedures that provided reasonable assurance of the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, (ii) DaCosta's and Deitsch's certification that they had evaluated the controls as to their effectiveness and disclosed all significant deficiencies and material weaknesses in those controls, and (iii) the statements that as a result of DaCosta and Deitsch's evaluation, the disclosure controls and procedures were "effective at the reasonable assurance level" and the "internal control over financial reporting was effective as of December 31, 2023," were materially false and misleading for the reasons stated in ¶¶ 230-232 and *supra*, §§ IV.D., F.3.f., G.

**c. Statements Regarding Paragon 28's Inventories.**

284. Each of the above identified statements regarding Paragon 28's inventories marked in bold and italicized in ¶¶ 267, 269-270, 272, 276, 278-279, including characterizing the $4 million inventory write-off as a one-time event due to "recent inventory stockpiling" and assuring investors the Company did not "expect adjustments of that order of magnitude at any time in the future, noting the Company "continue[d] to execute on our plans to improve inventory efficiency," and stating that inventory levels "ended up exactly where we had anticipated they would," were materially false and misleading for the reasons stated in ¶ 252 and *supra*, §§ IV.D., F.3.f, G.

**d. Materiality.**

285. Defendants' false and misleading statements in February 2024 were material for the reasons discussed in ¶ 233 and *supra*, §§ IV.A-D, F.1-4.

## E. Defendants Made False and Misleading Statements Concerning Q1 2024 Financial Results, Internal Controls, and the Company's Inventories in May 2024.

### 1. The May 8, 2024 Form 8-K Presents False Financial Results For Q1 2024.

286. Paragon 28 filed with the SEC a Form 8-K on May 8, 2024 attaching a press release and investor presentation concerning the Company's financial results for the first quarter ended March 31, 2024 (the "May 2024 8-K"). Defendants announced false financial results that would be restated due to errors in inventory accounting:

> ***Gross profit margin was 80.0% for the first quarter of 2024 compared to 82.9% in the first quarter of 2023.***
>
> ***Net loss was $15.2 million for the first quarter of 2024, compared to net loss of $9.1 million for the first quarter of 2023.***
>
> ***Adjusted EBITDA was a $5.5 million loss for the first quarter of 2024, a $4.1 million decrease, compared to a $1.4 million loss in the first quarter of 2023.***

287. In the financial results detailed in the May 2024 8-K, the Company reported the following 4Q 2023 results: ***(a) net inventories were $104.298 million; (b) provision for excess and obsolete inventory was $471,000; (c) cost of goods sold was $12.186 million; (d) gross profit was $48.896 million; (e) gross profit margin was 80.0%; (f) operating loss was $12.903 million; (g) net loss was $15.234 million; and (h) Adjusted EBITDA was a $5.481 million loss***. Defendants would restate these results months later in July and August 2024.

288. The investor presentation also repeated the false Adjusted EBITDA figure that would eventually be restated, "***1Q 2024 aEBITDA declined from ($1.4M) to ($5.5M)***":




**2. The May 8, 2024 10-Q Repeats the Falsely Stated Financial Results and Fails to Disclose the Known Material Weaknesses in Internal Controls Related to Paragon 28's Inventory Accounting.**

289. The May 8, 2024 Form 10-Q filed with the SEC, and signed by Defendant DaCosta and interim CFO Wright, reported on the Company's financial and operating results for the quarter ended March 31, 2024 (the "Q1 2024 10-Q"). The Company reported the same false financial results disclosed in the May 8, 2024 press release, as detailed in paragraph 287, and repeated the statement from the prior Form 10-Qs that the financial statements were ***"prepared in conformity with [GAAP]"*** and ***"pursuant to the rules and regulations of the [SEC]."***

290. The Q1 2024 10-Q provided additional details about the Company's "Cost of Goods Sold and Gross Profit Margin" in the three months ended March 31, 2024:

> *Cost of Goods Sold and Gross Profit Margin.* ***Cost of goods sold increased $3.3 million, or 37%, from $8.9 million during the three months ended March 31, 2023, to $12.2 million during the corresponding period in 2024,*** primarily due to increased variable costs. ***Gross profit margin for the three months ended March 31, 2024 decreased to***

> ***80.0%, compared to 82.9% in the same period of 2023***. The decrease in gross profit margin is primarily the result of higher prices from suppliers, changes in product mix in the United States and increased revenue from International which has lower average selling prices.

291. For Adjusted EBITDA, the Company repeated figures that it would ultimately restate in August 2024:

> ***Adjusted EBITDA was negative $5.5 million for the three months ended March 31, 2024***, ***compared to negative $1.4 million for the three months ended March 31, 2023.*** The decrease in Adjusted EBITDA is primarily attributable to an increase in operating expenses, partially offset by an increase in gross profit.

292. The Q1 2024 10-Q also attached Sarbanes-Oxley certifications by DaCosta and Wright assuring investors of the same matters alleged in paragraph 216 above. With respect to the Company's disclosure controls and procedures, DaCosta and Wright had evaluated Paragon 28's disclosure controls and procedures and concluded they were "***effective at the reasonable assurance level***."

### 3. During the May 8, 2024 Earnings Call, Defendants Repeat the False Financial Results and Fail to Disclose the Material Weaknesses in Internal Controls.

293. On May 8, 2024, Defendant DaCosta and interim CFO Wright hosted an earnings call. In her prepared remarks, Wright repeated the falsely stated results for gross profit margin:

> ***Gross profit margin for the quarter was 80% compared to 82.9% in the first quarter of 2023***. The decrease in gross profit margin is primarily the result of higher prices from suppliers as well as product and geographic mix shift.

294. Wright also detailed the false Adjusted EBITDA result:

> ***Adjusted EBITDA for the first quarter of 2024 was a $5.5 million loss compared to a $1.4 million loss in the prior year period.*** The decrease in adjusted EBITDA is primarily attributable to an increase in operating expenses. While we remain laser-focused on driving operating leverage across the P&L in the months and quarters ahead, the impact of investments made in Q1 has slightly pushed out our expectation for EBITDA breakeven in 2024. Importantly, we are prioritizing initiatives directly associated with our growth strategies and top line performance.

### 4. Reasons Why Defendants' May 2024 Statements Were False and Misleading.

#### a. Statements Regarding Q1 2024 Financial Results.

295. Each of the above identified statements regarding Q1 2024 financial results marked in bold and italicized in ¶¶ 286-293, including those (i) reporting and characterizing certain financial results, (ii) claiming that the financial statements were "prepared in conformity with [GAAP]" and "pursuant to the rules and regulations of the SEC," and (iii) certifying that the Q1 2024 10-Q did not contain "any untrue statement of a material fact or omit to state a material fact" and "fairly present[ed], in all material respects, the financial condition and result of operations of the Company," were materially false and misleading and omitted material facts for the reasons stated in ¶¶ 224-227 and *supra,* §§ IV.A.-D.

296. The financial metrics Defendants represented were true in May 2024 were false as follows:

| Metric for Q1 2024 | Original | Restated/Actual | % Diff. |
|---|---|---|---|
| Inventories, net | 104,298 | 94,626 | 9.3% |
| Provision for (reversal of) excess and obsolete inventory | 471 | 2,882 | 511.9% |
| Cost of goods sold | 12,186 | 13,842 | 13.6% |
| Gross profit | 48,896 | 47,240 | 3.4% |
| Operating loss | (12,903) | (15,126) | 17.2% |
| Net loss | (15,234) | (17,399) | 14.2% |
| Gross margin | 80.0% | 77.3% | 3.4% |
| Adjusted EBITDA | (5,481) | (7,704) | 40.6% |

Values in thousands (except for percentages).

**b. Statements Regarding Internal Controls.**

297. Each of the above identified statements regarding internal controls marked in bold and italicized in ¶ 292, including (i) DaCosta's and Wrights's certification that Paragon 28 had internal controls over financial reporting and disclosure controls and procedures that provided reasonable assurance of the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, (ii) DaCosta's and Wright's certification that they had evaluated the controls as to their effectiveness and disclosed all significant deficiencies and material weaknesses in those controls, and (iii) the statements that as a result of DaCosta and Wright's evaluation, the disclosure controls and procedures were "effective at the reasonable assurance level," were materially false and misleading for the reasons stated in ¶¶ 230-232 and *supra*, §§ IV.D., F.3.f., G.

**c. Materiality.**

298. Defendants' false and misleading statements in February 2024 were material for the reasons discussed in ¶ 233 and *supra,* §§ IV.A-D, F.1-4.

## VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

299. Numerous facts, in addition to those set forth above, give rise to a strong inference that Defendants knew of Paragon 28's deficient inventory controls that prevented the Company from accurately tracking and valuing its inventory, resulted in material financial misstatements, and ultimately forced the Company to restate certain key financial results and admit to material weaknesses in internal controls. At a minimum, based on their access to relevant information, Defendants recklessly disregarded the deficient internal controls, a fact so material that Defendants

must have been aware both of its materiality and that failing to disclose it would likely mislead investors about Paragon 28's financial condition and operations.

300. ***DaCosta's and Deitsch's knowledge, or deliberate reckless disregard, of the inadequacy of Paragon 28's internal inventory controls support a strong inference of scienter.*** The facts demonstrate that DaCosta and Deitsch had knowledge of deficiencies in Paragon 28's inventory controls during the Class Period. At a minimum, DaCosta and Deitsch had access to information and recklessly disregarded the sub-par internal controls, which were plainly material so that Defendants must have been aware of their materiality and that not disclosing these deficiencies would likely mislead investors. For example, FE-1 said that DaCosta was aware of issues with the Company's transition from one inventory tracking system (Microsoft Dynamics Great Plains) to another system and the resulting the resulting billing and inventory tracking problems were widespread and obvious within the Company. ¶¶ 94-95. In addition, per FE-1, DaCosta received forecasting reports with estimates of inventory availability, but the guidance was continually ignored. ¶ 98. DaCosta, according to FE-1, also attended calls discussing tracking and inventory problems throughout 2023. ¶ 121. DaCosta and Deitch were also recipients of reports prepared for the calls. ¶ 122. These reports, referred to internally at the Company as "stockout reports," provided detailed information about products that were currently out of stock, or were projected to be out of stock, within a specific time frame. After months of meetings, in October 2023, FE-1 said there was an acknowledgement of the problem. ¶ 123.

301. The other FEs also detailed the existence and widespread knowledge of the Company's deficient inventory controls. The collective testimony of multiple former employees from various departments commonly detailing the existence and widespread knowledge of

Paragon 28's deficient inventory controls and resulting problems further supports an inference of Defendants' knowledge, or deliberate reckless disregard, of the fact that Paragon 28 lacked the ability to track and value its inventory. ¶¶ 94-142.

302. ***Defendants' undisclosed steps to address the inventory control issues, taken while publicly affirming Paragon 28's robust financial controls, collectively reveal Defendants' knowledge of a severe and pervasive breakdown in Paragon 28's inventory tracking systems, fundamentally undermining their claims of accurate reporting.*** Defendants took undisclosed steps that show their knowledge of significant deficiencies in Paragon 28's inventory controls. At the same time Defendants affirmed and certified the accuracy of their reported financial results and internal controls, including results based on their inventory accounting, Paragon 28 personnel were secretly working to fix pervasive issues in the Company's inventory controls. In particular, issues with tracking inventory were so problematic in and throughout 2023 that, according to FE-1, there was a dedicated call every week to try and fix the issues. ¶ 121. According to FE-1, action items were created, including a "hot list," "stock out list," and "high rev/run" list, which were discussed during the calls as part of attempts to formulate plans to identify issues and resolve them. ¶ 123. "Stockout reports" were prepared for the calls and distributed to the team, including DaCosta and Deitsch. ¶ 122 Separately, FE-4 formed a cross-functional meeting including the sales department, business intelligence/analytics, biologics, and others in an attempt to fix the issues and implement a new process to know what was in stock and what was not and to fine tune the process. ¶ 124. FE-5 further explained that during their tenure at Paragon 28, the Company's "bin accuracy" was poor and FE-5 had to work to fix it. ¶ 112. When FE-5 arrived, Paragon 28's bin accuracy was approximately 53%. *Id.* By the time FE-5 left, it had improved to around 81%,

which per FE-5 was "still not good." *Id.* "Bin accuracy" is a fundamental metric of inventory control, directly measuring the percentage of inventory records that match the physical count of items in their designated storage locations. *Id.* A bin accuracy of 53%, improving to only 81% (which is still considered "not good" in industry standards), unequivocally demonstrates a systemic failure at Paragon 28 to accurately track where inventory was located within the warehouse.

303. Collectively, these intense, Company-wide efforts reflecting widespread awareness of inventory control and tracking problems – from weekly dedicated calls to fix tracking issues and the creation of specific stockout lists, to cross-functional meetings establishing new inventory processes, and alarmingly low "bin accuracy" figures that remained poor even after remedial efforts – not only paint a clear picture of an organization struggling mightily to accurately account for its inventory, but also demonstrate the knowledge of these severe deficiencies by DaCosta and Deitsch, despite their public assurances of financial accuracy and adequate internal controls.

304. ***The significant deficiencies in Paragon 28's inventory controls were widely known at Paragon 28 and their adverse implications were apparent.*** Among Paragon 28 employees, it was widely agreed and known that the Company had deficient internal controls to track and value its inventory. In FE-1's own words, Paragon 28 had deficient inventory tracking or control systems in place, as higher volume SKUs (including implants) were not tracked by lot numbers. ¶ 97. FE-1 also described how a product may have 25 component parts (*i.e.*, widgets) attached to it, but the Company "had no idea where any of this [inventory] was." ¶ 114. As such, FE-1 said there was no way to determine how much product was on hand or shipped to distributors. ¶ 97. More critically, the sales number goals FE-1's team could not meet were directly based on incorrect figures regarding available products provided by Paragon 28's purchasing team to senior

management, including DaCosta. *Id*. Specifically, per FE-1, the purchasing team claimed a certain quantity of products would be available, when in reality, there was insufficient inventory to match those figures. *Id*. According to FE-1, Paragon 28's salesforce would promote to customers the Company's Hindfoot products – which was the largest product line – only to learn that they could not support the sales because the products the purchasing department said the Company had inventory for really was not available. ¶ 116. Per FE-1, DaCosta and other executives was informed of these inventory tracking and sales execution issues with products through reports, including weekly emails for months with spreadsheets and guidance updating the finance and forecasting departments and advising them of massive discrepancies in inventories, as well as forecasting reports including estimates of available inventory. ¶¶ 38, 98, 116, 122. FE-1's account regarding untracked high-volume SKUs and the pervasive discrepancy between the purchasing team's reported inventory levels and actual product availability—a discrepancy that directly undermined sales team goals and was communicated to senior management like DaCosta—strongly indicates that these severe inventory tracking control deficiencies were not isolated incidents but rather widely known throughout Paragon 28 including by DaCosta and Deitsch.

305. In addition, the Company engaged in massive over-ordering, lacked tracking of critical parts and failed to enact recall controls. Specifically, for example, FE-1 explained that Paragon 28 over-ordered replacement parts for the Hindfoot product after a shipping container was lost. ¶ 118. Twenty times more parts than needed were ordered, mostly of uncommon sizes. *Id*. These replacement parts, thousands of microscopic screws that would go inside people's bodies to fuse ankle joints, were never tracked by lot number. *Id*. Indeed, FE-1 said there were no controls in place for recalls or other inventory tracking issues that may arise. *Id*. Ordering 20 times more

replacement parts than needed, particularly thousands of microscopic screws that would go inside people's bodies, highlights a fundamental inability to accurately assess inventory needs and track incoming stock. Crucially, these parts were never tracked by lot number. For medical devices, lot number tracking is a basic and critical control for quality, recalls, and regulatory compliance.[47] The sheer scale of the over-order, combined with the complete absence of lot tracking for such vital, high-value components, implies a profound lack of oversight and basic inventory management, which senior executives would be expected to understand and oversee, especially given their direct impact on financials and regulatory risk. FE-1's statement that "there were no controls in place for recalls or other inventory tracking issues that may arise" is a ***critical indicator*** of a severe systemic flaw. For a medical device company, robust recall controls are non-negotiable for patient safety, regulatory compliance, and brand reputation. The absence of such controls is a monumental deficiency that carries severe financial and legal risks. This level of systemic failure would undoubtedly be a red flag for any executive with fiduciary duties and responsibility for internal controls, leaving little room for ignorance.

306. Likewise, there were instances of significant missing inventory at Paragon 28. FE-1's discussion of the incident where 50 out of 100 units of plantar plates went missing, valued at approximately $1,000 each, is compelling. ¶ 119. This was not a minor discrepancy; it represents

[47] In fact, the Company's February 2024 10-K noted that once a "product is cleared or approved for marketing . . . numerous and pervasive regulatory requirements continue to apply." These regulations include the "FDA's recall authority, whereby the agency can order device manufacturers to recall from the market a product that is in violation of governing laws and regulations" as well as "Quality System Regulation (QSR) requirements, which require manufacturers . . . to follow stringent design, testing, control, documentation, and other quality assurance procedures during all aspects of the design and manufacturing process." *See* February 2024 10-K at 56.

a 50% loss of a batch of high-value inventory. Such a substantial loss, particularly with a specific product line, would likely trigger internal investigations, financial adjustments, and discussions at leadership levels. The financial implications alone of $50,000 in missing product from a single batch are significant enough to warrant executive attention. In fact, FE-1 discussed these inventory issues with Matt Jarboe (Chief Commercial Officer), a member of the C-Suite. ¶ 119.

307. Finally, there was widespread internal acknowledgement and external auditor concern over Paragon 28's inventory tracking deficiencies. FE-5 said it was well known with the distribution department that inventory accuracy was an issue, and that this was a concern up at the VP level as well. ¶ 113. FE-5 further said that personnel at Deloitte, Paragon 28's independent auditor, expressed concern regarding the accuracy of the Company's year-end inventory audit. ¶ 131.

308. Taken together, these examples—massive over-ordering of critical, untracked components, a complete absence of recall controls, the disappearance of substantial quantities of valuable inventory, and widespread internal acknowledgment coupled with auditor concerns—represent not just errors, but fundamental failures in core operational and financial controls. These are the kinds of issues that affect the bottom line, expose the Company to regulatory scrutiny, and impact production and sales, making executive knowledge highly probable. As such, CEO DaCosta and CFO Deitsch, who were responsible for the Company's financial reporting and internal control adequacy, would be well aware of such widespread and impactful deficiencies.

309. ***Defendants' repeated and explicit certification of their evaluation of Paragon 28's financial controls and the effectiveness of such controls, despite the underlying reality of severe inventory deficiencies, provide compelling evidence of their scienter.*** In Paragon 28's

2023 annual report on Form 10-K, along with each Form 10-Q filed in 2023 and the first Form 10-Q of 2024, DaCosta and/or Deitsch represented that: (i) they were responsible for establishing and maintaining adequate internal controls over financial reporting; (ii) they had conducted an evaluation of the effectiveness of Paragon 28's financial reporting; and (iii) they had concluded that Paragon 28's internal controls over financial reporting were effective at the reasonable assurance level throughout the Class Period. ¶¶ 216, 239, 260, 274, 292. Moreover, in their certifications pursuant to SOX submitted with the Company's 2023 annual report along with each Form 10-Q filed during 2023 and in the first quarter of 2024, DaCosta and/or Deitsch represented that (i) they had reviewed the Company's respective filings; (ii) the reports did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (iii) the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.* These types of public certifications – through which DaCosta and Deitsch held themselves out as knowledgeable on these subjects – further support a strong inference of scienter. In addition, the later admission of control weaknesses establishes Defendants had access to information about the deficient inventory controls and were therefore, at a minimum, reckless in ignoring these issues and certifying effective internal controls. ¶¶ 184-188, 197-207. Therefore, the stark contradiction between Defendants' repeated attestations, particularly after claiming to have "evaluated" the effectiveness of such internal controls and the subsequent acknowledgment of severe deficiencies supports an inference that DaCosta and Deitsch either knew of the material misstatements at the time of certification or acted with extreme recklessness by disregarding readily available information about the Company's pervasive inventory control failures.

310. ***The persistent, unremedied nature and broad scope of Paragon 28's inventory control deficiencies, spanning multiple quarters and public filings, strongly indicate that Company executives possessed scienter regarding the material misstatements in their financial reporting.*** As noted above, on August 8, 2024, Defendants admitted that there were material weaknesses related to internal control deficiencies that existed as of December 31, 2023. ¶ 185. As a result of these material weaknesses, Paragon 28's disclosure controls and procedures were not effective as of December 31, 2023, March 31, 2024, and June 30, 2024. ¶ 184. Since that time, Defendants have consistently represented in its public filings that management had been working to, among other things, further strengthen the Company's internal controls relating to the existence and valuation of inventory, including the calculation of the excess and obsolescence reserve, capitalization of purchase price variances, and existence and completeness of inventory on hand. ¶¶ 198-207. Nonetheless, in Paragon 28's subsequent quarterly filings and Annual Report covering the period through December 31, 2024, Defendants have admitted that implementation remains ongoing and that management concluded, as of December 31, 2024, material weaknesses related to inventory accounting continued to exist. ¶ 200.

311. Executives of public companies committed to accurate financials do not allow material weaknesses in internal controls to exist, let alone remain unremedied for at least eight consecutive quarters. Defendants' prolonged failure to remediate these critical, admitted material weaknesses – spanning significant financial reporting periods and impacting fundamental aspects of inventory accounting – extends beyond mere negligence and compellingly suggests a knowing or recklessly indifferent disregard for the accuracy of their financial statements, thereby establishing scienter.

312. ***The Executive Defendants' demonstrated fluency in Paragon 28's financial performance, coupled with their consistent public discussions of key metrics like Adjusted EBITDA and gross margin, establishes a strong basis for inferring their scienter regarding the impact of the Company's pervasive inventory deficiencies.*** Defendants' false and misleading statements concerned materially significant financial results for Paragon 28, including the Company's Adjusted EBITDA and gross margin. Defendants had reason to tout, and did tout, Adjusted EBITDA and demonstrate it was improving and the Company would soon return to profitability. ¶¶ 72 -74, 218. Similarly, with gross profit margin, Defendants were incentivized to reach at least 80% gross margin given an 80% margin represents an exceptionally high figure for a medical device company and in light of their prior statements that Paragon 28 was a 80% gross margin business. ¶¶ 76-79, 220, 243, 276. The emphasis by analysts on the Adjusted EBITDA and gross margin performance – particularly by asking Defendants direct questions about these figures during earnings calls and investor conferences – further demonstrates the importance of these results to the Company and investors. *See, e.g.*, ¶¶ 219, 243.

313. Indeed, as the most senior executives at Paragon 28 responsible for financial oversight, the Executive Defendants routinely engaged with financial models, budgets, and operational reports. ¶¶ 29-31. They were highly fluent in the drivers of Paragon 28's profitability and consistently articulated the Company's financial health, including Adjusted EBITDA and gross margins, during numerous earnings calls and investor presentations. During these frequent discussions with analysts and investors, the Executive Defendants would have been acutely aware of how operational inefficiencies, particularly those impacting inventory—such as over-ordering, missing units, and low bin accuracy which directly affect cost of goods sold and potential write-

offs—would fundamentally impact both gross margin and ultimately Adjusted EBITDA. Given their deep involvement in and public representation of these critical financial metrics and role with the Company, the Executive Defendants understood the material link between the known, severe inventory control issues and the accuracy of the reported Adjusted EBITDA and gross margin figures they repeatedly presented as pillars of the Company's performance.

314. ***The timing of Deitsch's and Mickelson's departures is evidence of scienter.*** The timing of Deitsch's departure on April 4, 2024, just days after the close of Q1 2024, further supports scienter. ¶ 154. Q1 2024 was the last quarter for which Defendants would need to restate financial results. Months later, in July and August 2024, Defendants disclosed the need for restatements and internal control material weaknesses. ¶¶ 157-194. The suspicious timing and nature of Deitsch's departure supports an inference that Deitsch left because the fraud was uncovered. In the alternative, if Deitsch departed for unrelated reasons, it nonetheless supports an inference of scienter because it indicates that his replacement, interim CFO Wright, discovered the fraud almost immediately, which suggests the fraud was obvious. ¶ 34.

315. Similarly, Mickelson stepped down as the Chief Accounting Officer in September 2024, just one month after the full scope of Defendants' restatements and revelation of the internal control material weaknesses to investors. ¶ 195. While the Company said that Mickelson's departure was "not the result of any issue, concern or disagreement regarding the Company's accounting or internal control over financial reporting," Mickelson's role and the timing of the departure is evidence of scienter because it indicates that the fraud was obvious and should have been identified earlier. *Id.* In fact, as part of his departure, Mickelson entered into a transition and severance agreement "in consideration of his release of claims against the Company." *Id.*

Crucially, in Paragon 28's public disclosures, there was no corresponding mention that the Company provided a release of claims against Mickelson.[48] Mickelson's unilateral release of claims suggests potential disputes regarding Mickelson's departure, including any role he had in overseeing or failing to rectify the readily apparent and pervasive accounting and internal control issues at Paragon 28. In any event, the fact that the Chief Accounting Officer left his position after the financial restatements and the revelation of material weaknesses in internal control supports, at a minimum, that Defendants were deliberately reckless in ignoring the state of their accounting and internal controls and were aware of the obvious risk of misleading investors by failing to disclose this material information.

316. ***The temporal proximity between Defendants' false statements and omissions and revelations of the truth supports an inference of scienter.*** In May 2024, Paragon 28 announced its financial results for the first quarter of 2024 through SEC filings and an earnings call with investors. ¶¶ 286-294. These communications to investors: (i) contained false and misleading statements concerning the Company's adjusted EBITDA and gross profit margin, which depended on error-filled accounting of the Company's inventory; and (ii) falsely stated that the Company's internal control over financial reporting were effective. *Id.* Just months later, in July 2024, the truth emerged when Paragon 28 disclosed: (i) errors in the accounting for inventory including the calculation of Paragon 28's excess and obsolete inventory reserve; and (ii) the identification of material weaknesses in its internal control over financial reporting. ¶¶ 157-164. Weeks later, Paragon 28 filed an amended Form 10-K for 2023 and disclosed all of its restated financials based on these inventory accounting errors and divulged the full extent of the material weaknesses in

[48] *See* Paragon 28's Form 8-K dated September 20, 2024.

internal control over financial reporting. ¶¶ 165-194 . The close temporal proximity between the May 2024 false statements and the July/August 2024 disclosures support a strong inference of Defendants' scienter.

317. ***The Executive Defendants' direct responsibility for financial reporting, combined with clear evidence of systematic efforts to conceal millions of dollars in inventory, supports an inference of their scienter***. Defendants deliberately took steps to not record inventory during the Class Period. Per FE-5, there were several times during their employment, including Q2 and Q4 2023 and Q2 and Q4 2024, where FE-5 was told by Paragon 28's Supply Chain Director and Supply Chain Manager to stop receiving inventory so it would not be recorded on Paragon 28's books and would not appear on its balance sheet. ¶ 133. As a result, at points there were millions of dollars worth of Paragon 28 inventory stacked up in the warehouse that was not accounted for in Paragon 28's financial statements. ¶ 133. This deliberate attempt to manipulate the Company's financial statements, particularly the intentional omission of millions of dollars in inventory from the balance sheet across multiple quarters, is a scheme of such material financial impact and operational scope that it could not have been executed, let alone sustained, by middle management and without the direct knowledge, approval, or reckless indifference of the CEO and CFO, who are ultimately responsible for the accuracy of the Company's reported financials.

318. ***Defendants cut corners and were reckless in resolving issues with non-conforming products and speeding up the inspection process.*** FE-2 believed the Company's push to release non-conforming products was driven by DaCosta and Deitsch. ¶ 139. Per FE-2, this push resulted in the quality management department approving and releasing the number of non-confirming products quickly. ¶¶ 139-140. FE-2 also raised concerns with FE-2's superiors about

speeding up the inspection process of products. ¶ 142. Those superiors told FE-2 that the Company was "willing to take on the risk of a recall." *Id.* Such indifference to meeting quality control standards is further evidence of the pervasiveness of controls issues within the Company and supports an inference of scienter.

319. ***Defendants' violations of basic accounting guidelines further support scienter.*** As discussed above, Paragon 28 must comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. ¶ 56. Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. ¶ 57. Filings that do not comply with GAAP are presumed to be misleading or inaccurate. *Id.* Furthermore, the fact that Paragon 28 subsequently stated in connection with its restatements that its financial statements should not be relied upon is an admission that they were false and misleading when originally issued. ¶ 157. GAAP rules and regulations regarding inventory and assets are fundamental for publicly traded companies. As such, brazen violations of these basic and well-known rules, as Paragon 28 admittedly did, further demonstrates intent, or at least extreme departure from the standards of ordinary care.

320. ***Corporate scienter and respondeat superior.*** Each of the Executive Defendants was a high-ranking management-level employee that either (i) made the false or misleading statements alleged here; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false and misleading statements alleged herein. In doing so, each was acting in his or her role as an executive employee and representative of Paragon 28.

The scienter of each of these individuals and all other management-level employees of Paragon 28 is therefore imputed to Defendant Paragon 28.

## VII. LOSS CAUSATION

321. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class Members have suffered significant losses and damages.

322. During the Class Period, and as detailed herein, Defendants engaged in a scheme to deceive the market and/or engaged in a course of conduct that artificially inflated or maintained the price of Paragon 28's securities and deceived purchasers of Paragon 28's securities. By failing to disclose the true state of Paragon 28's financial performance, business and operations, Defendants presented a misleading picture of Paragon 28's condition and value, which had the intended effect and caused Paragon 28's securities to trade at artificially inflated or maintained prices during the Class Period. Investors purchased Paragon 28's securities based on these false premises. Paragon 28 stock would have been sold at dramatically lower prices, had investors been aware of Paragon 28's true state of affairs.

323. Because Lead Plaintiff and the Class were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose material information regarding Paragon 28's financial results and operations), Lead Plaintiff and the Class paid an artificially inflated and unreasonable price for their purchases of Paragon 28 securities.

## A. Corrective Disclosures

324. The artificial inflation or maintenance created by Defendants' alleged misrepresentations and omissions regarding the true state of Paragon 28's financial performance and internal controls was removed from Paragon 28's share price in direct response to information revealed in disclosures that took place on April 4, 2024, July 30, 2024, August 8, 2024 and September 20, 2024. As set forth herein, these disclosures divulged information that corrected Defendants' prior misrepresentations and omissions of material fact and/or disclosed facts Defendants misrepresented and omitted that were a substantial factor in causing investors' economic loss.

325. On April 4, 2024, Paragon 28 issued a press release announcing that Deitsch resigned and the Company's Audit Committee Chair, Kristina Wright, would be the interim CFO. On this news, Paragon 28 shares fell $1.86, or 15%, to close at $10.20.

326. On July 30, 2024, after the market closed, Paragon 28 announced its conclusion that its audited consolidated financial statements for the fiscal year ended December 31, 2023, contained in the Annual Report on Form 10-K, and the unaudited condensed consolidated financial statements contained in the Quarterly Reports on Form 10-Q for the Q1-Q3 2023 and Q1 2024, should no longer be relied upon due to errors in the financial statements. Accordingly, the Company announced that a restatement of the prior financial statements was required. The errors identified on July 30, 2024 related to accounting for inventory, specifically the calculation of Paragon 28's excess and obsolete inventory reserve, which resulted in an overstatement of inventory and understatement of cost of goods sold for the periods at issue. As a result of these inventory accounting errors, Paragon 28 also disclosed that it had identified one or more material

weaknesses in its internal control over financial reporting, and management therefore concluded that the Company's internal control over financial reporting was not effective as of December 31, 2023, and the disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2023 and March 31, 2024.

327. On this news, the price of Paragon 28 common stock feel by $1.24 per share, or 13.7%, to close at $7.79 on July 31, 2024.

328. Then, on August 8, 2024, after the market closed, Paragon 28 filed its amended financial statements on Form 10-K/A and on Form 10-Q/A that revealed the extent of the Company's financial misstatements and material weaknesses in internal control over financial reporting.

329. On this news, the price of Paragon 28 common stock fell by $1.67 per share, or 20%, to close at $6.64 on August 9, 2024.

330. Finally, on September 20, 2024, Paragon 28 announced that Chief Accounting Officer Erik Mickelson had stepped down. The news sent the price of the Company's shares down $0.30, or 4.3%, to close at $6.57. on September 23, 2024.

331. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class Members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class Members would not have purchased or otherwise acquired Paragon 28 securities or would not have purchased or otherwise acquired these securities at the artificially inflated or maintained prices that they paid.

## B. Materialization of the Risk

332. As detailed herein, Defendants engaged in a scheme and/or course of conduct to deceive Lead Plaintiff and the Class, which artificially inflated or maintained the price of Paragon 28 stock and operated as a fraud or deceit on Lead Plaintiff and the Class by failing to disclose and misrepresenting the adverse facts detailed herein.

333. Paragon 28's financial results and future business prospects were based upon false and misleading statements and omissions regarding financial metrics depending upon reported inventory accounting.

334. Throughout the period during which Lead Plaintiff and Class members purchased Paragon 28 stock, the prices of these securities were artificially inflated or maintained as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

335. Defendants' false statements served to conceal the risks that their misconduct would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, earnings calls, and industry conferences.

336. It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including (i) key executive departures, including former CFO Deitsch and former Chief Accounting Officer Mickelsen; (ii) the announcement of non-reliance of the Company's reported financial results for 2023, along with the first quarter of 2024; (iii) the restatement of certain of the Company's financial results for 2023, along with the first quarter of 2024; and (iv) the disclosure of material weaknesses in the Company's internal

controls. The materialization of any one or more of these factors would lead to a significant decline in the price of Paragon 28' stock.

337. The value of Lead Plaintiff's and the Class's investments in Paragon 28 stock was negatively impacted when the concealed risks noted above materialized.

338. The declines in the price of Paragon 28 stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

339. Had Lead Plaintiff and the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind their misstatements, they would not have purchased the Paragon 28 stock at artificially inflated prices.

340. As a result of their purchases of the Paragon 28 stock, Lead Plaintiff and the Class suffered economic loss and damages, as contemplated by the federal securities laws.

341. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class Members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class Members would not have purchased or otherwise acquired Paragon 28 securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants the misrepresenting and concealing these material facts from the public would artificially inflate the price of Paragon 28 securities and the ultimate disclosure of this information, or the materialization of the risk concealed by Defendants' material misrepresentations and omissions, would cause the price of Paragon 28 securities to decline.

## VIII. NO SAFE HARBOR

342. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in the Complaint. The statutory safe harbor or bespeaks caution doctrine do not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Paragon 28's current and historical financial condition and internal controls, among other topics.

343. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Paragon 28's financial condition and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Paragon 28 were insufficient to insulate Defendants from liability for their materially false and misleading statements.

## IX. THE PRESUMPTION OF RELIANCE

344. At all relevant times, the market for Paragon 28's common stock was efficient for the following reasons:

(a) Paragon 28's stock met the requirements for a listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Paragon 28 filed periodic reports with the SEC and the NYSE;

(c) Paragon 28 regularly communicated with public investors via established market communication mechanisms, including through regulator dissemination of press releases, other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Paragon 28 was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

345. As a result of the foregoing, the market for Paragon 28's common stock reasonably promptly digested current information regarding Paragon 28 from all publicly available sources and reflected such information in the price of Paragon 28's common stock. All purchasers of Paragon 28 common stock during the Class Period suffered similar injury through their purchase of Paragon 28 common stock at artificially inflated prices, and a presumption of reliance applies.

346. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

347. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who

were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Executive Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

348. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

349. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

350. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

351. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and;
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

352. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

353. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;
- as a public issuer, the Company filed periodic public reports;
- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

354. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

355. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**FIRST CLAIM FOR RELIEF**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

356. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

357. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

358. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

359. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

360. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

361. Executive Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Lead Plaintiff and the Class.

362. As a result of the foregoing, the market price of the Company's securities was artificially inflated or maintained during the Class Period. In ignorance of the falsity of Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated or maintained as a result of Defendants' false and misleading statements.

363. Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

364. As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

365. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violations of Section 20(a) of the Exchange Act Against the Executive Defendants

366. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

367. During the Class Period, the Executive Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

368. As officers of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

369. Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Executive Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated or maintained the market price of the Company's securities.

370. By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

A. declaring this action to be a proper class action, certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Plaintiff's counsel as Lead Counsel;

B. awarding damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

C. awarding Lead Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. awarding Lead Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: June 13, 2025

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By *<u>/s/ Lucas E. Gilmore</u>*
Lucas E. Gilmore

Reed R. Kathrein
Lucas E. Gilmore
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Brian J. Schall
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335

Facsimile: (310) 388-0192
brian@schallfirm.com

*Counsel for Lead Plaintiff Nicholas Tiedt*