# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 24-cv-02712-PAB-TPO
(Consolidated with Civil Case No. 24-cv-02898-PAB-TPO)

Civil Case No. 24-cv-02712-PAB-TPO

JOHN K. ELLINGTON, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

PARAGON 28, INC.,
ALBERT DACOSTA,
STEPHEN M. DEITSCH, and
KRISTINA WRIGHT,

     Defendants.

---

Civil Case No. 24-cv-02898-PAB-TPO

NICHOLAS TIEDT, individually and on behalf of all others similarly situated,

     Plaintiff,

v.
PARAGON 28, INC.,
ALBERT DACOSTA,
STEPHEN M. DEITSCH,
KRISTINA WRIGHT, and
ERIK MICKELSON,

     Defendants.

---

## DEFENDANTS' MOTION TO DISMISS
## THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS (DKT. 32)

---

i

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION .................................................................................................................1

II.    BACKGROUND ...............................................................................................................3

       A.     Paragon 28, Inc.'s Business and Operations...............................................3

       B.     The Restatement....................................................................................................5

       C.     The Litigation.........................................................................................................7

III.   LEGAL STANDARD.......................................................................................................7

IV.    ARGUMENT......................................................................................................................8

       A.     The Complaint Does Not State a Claim Under Section 10(b) and Rule 10b-5 .......8

              1.     The Complaint Should Be Dismissed Because Plaintiff Fails to
                     Plead a Strong Inference of Scienter..............................................................8

                     a.     Plaintiff Does Not Allege Any Motive for the Alleged
                            Fraud ......................................................................................................9

                     b.     The Restatement Does Not Support Scienter................................10

                     c.     The "Former Employee" Allegations Do Not Establish
                            Scienter ...............................................................................................13

                     d.     Plaintiff's Other Allegations Do Not Adequately Plead
                            Scienter ...............................................................................................17

                     e.     The Non-Fraudulent Inference Is More Compelling .....................20

              2.     Plaintiff Challenges Certain Statements That Are Not Actionable ...........22

              3.     Certain "Corrective Disclosures" Do Not Establish Loss Causation.........24

       B.     The Complaint Does Not State a Claim Under Section 20(a) ..............................25

V.     CONCLUSION..................................................................................................................25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
 340 F.3d 1083 (10th Cir. 2003) ...................................................................................11, 25

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
 827 F.3d 1229 (10th Cir. 2016) .........................................................8, 9, 10, 14, 15, 16, 17

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..................................................................................................................7

*Bouzaglo v. Inspirato Inc.*,
 2024 WL 3738813 (D. Colo. July 16, 2024) ...........................................................................18

*City of Philadelphia v. Fleming Cos.*,
 264 F.3d 1245 (10th Cir. 2001) ...........................................................................................3, 19

*Connor v. Unisys Corp.*,
 2024 WL 387633 (E.D. Pa. Feb. 1, 2024) ................................................................................12

*Grossman v. Novell, Inc.*,
 120 F.3d 1112, 1119–20 (10th Cir. 1997) ...............................................................................22

*In re Dell Inc.*,
 591 F. Supp. 2d 877 (W.D. Tex. 2008)....................................................................................11

*In re Gold Res. Corp. Sec. Litig.*,
 776 F.3d 1103 (10th Cir. 2015) ........................................................................................11, 19

*In re Hanson Natural Corp. Sec. Litig.*,
 527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................................................20

*In re IKON Office Solutions, Inc.*,
 277 F.3d 658 (3d Cir. 2002)....................................................................................................11

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*,
 537 F.3d 527 (5th Cir. 2008) ...................................................................................................17

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
 45 F.4th 1236 (10th Cir. 2022) ...............................................................................................22

*Joyce v. Amazon.com, Inc.*,
 2025 WL 835054 (W.D. Wash. Mar. 17, 2025) .....................................................................12

*Koch v. Koch Industries, Inc.*,
 203 F.3d 1202 (10th Cir. 2000) ................................................................................................8

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) .................................................................2, 8, 9, 10, 20, 22

*Medina v. Clovis Oncology, Inc.*,
  215 F. Supp. 3d 1094 (D. Colo. 2017).................................................................................22

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings,
  Inc.*,
  79 F.4th 1209 (10th Cir. 2023) .....................................................................................15, 20

*In re MicroStrategy, Inc. Sec. Lit.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................................13

*In re Molson Coors Bev. Co. Securities Litig.*,
  2020 WL 13499995 (D. Colo. Dec. 2, 2020).......................................9, 10, 11, 12, 13, 18, 19

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016).....................................................................................24

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) .............................................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................................................23

*Phillips v. Harvest Nat. Res., Inc.*,
  2016 WL 4523849 (S.D. Tex. Aug. 25, 2016) .........................................................................11

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
  387 F. Supp. 2d 1130 (D. Colo. 2005)....................................................................................13

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017)...............................................................................23

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ..................................................................................................12

*Rumbaugh v. USANA Health Scis., Inc.*,
  2018 WL 5044240 (D. Utah Oct. 17, 2018) ..........................................................................18

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
  2007 WL 760535 (N.D. Cal. 2007) ........................................................................................24

*Smallen v. The Western Union Co.*,
  950 F.3d 1297 (10th Cir. 2020) .........................................................................................8, 16

*Sorkin, LLC v. Fischer Imaging Corp.*,
  2005 WL 1459735 (D. Colo. June 21, 2005)..........................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................................3, 9

*In re Williams Sec. Lit.*,
 558 F.3d 1130 (10th Cir. 2009) ...........................................................................................24

*Zucco Partners v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ..............................................................................................15

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A)......................................................................................................8

15 U.S.C. § 78u-5(c) ...............................................................................................................23

**Other Authorities**

Ashley Nguyen, *Purchase price variance (PPV)*, (May 19, 2025)
 https://ramp.com/blog/purchase-price-variance.............................................................6

## I.    INTRODUCTION

Founded in 2010, Paragon 28, Inc. ("P28") was a Colorado-based medical device company that focused exclusively on designing and selling orthopedic solutions for foot and ankle ailments. To meet the needs of patients around the world, P28 carried high levels of inventory in the markets where its products were sold. It was necessary for surgeons to have access to the correct product, in the right size, exactly when it was needed. This business demand necessarily meant P28's inventory included excess items and items likely to become obsolete before being sold. P28 used a complex financial accounting calculation to estimate a reserve to value excess and obsolete inventory. In 2024, P28 identified an error in this calculation and in a calculation used to capitalize purchase price variances, and promptly issued a Restatement to correct those errors.

Plaintiff attempts to turn mistakes in complex financial accounting calculations into securities fraud. Plaintiff claims Defendants misled investors by (1) disclosing financial metrics that ultimately had to be restated and (2) making statements regarding P28's internal controls over financial accounting despite later discovering weaknesses in those controls. But it is well-established that a Restatement alone does not give rise to a claim of securities fraud. To survive this motion, the Complaint must meet the heightened pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA") and Federal Rule of Civil Procedure 9(b), and state with particularity facts giving rise to a strong inference of scienter, or that each Defendant made the false or misleading statements with the intent to deceive investors. Despite filing a 147-page Complaint, Plaintiff has not, and cannot, meet this standard.

At the outset, Plaintiff has not alleged any Defendant had a reason to lie to investors. The Complaint lacks any allegations regarding stock sales, compensation benefits, financing needs, or

1

anything else that would indicate motive. When a plaintiff lacks motive allegations, other scienter allegations must be "correspondingly greater" for a complaint to survive dismissal. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1347 (10th Cir. 2012). Yet Plaintiff relies primarily on an accounting restatement that involved errors in complex accounting calculations. The Restatement also only covered a short period of time and had a marginal impact on P28's overall financial status. Far from the correspondingly stronger allegations necessary to plead scienter without motive-related allegations, nothing about the Restatement here gives rise to an inference of scienter.

Plaintiff also relies on statements from former employees ("FE") regarding inventory operations. This reliance is misplaced. The FE allegations are irrelevant to the alleged false and misleading statements at issue. As noted, Plaintiff challenges two categories of allegedly false or misleading statements: (1) financial metrics that were ultimately restated due to *accounting calculation errors*, and (2) statements regarding P28's internal controls over *financial accounting*. The FE allegations focus on issues with *physical* inventory management and tracking; they do not relate to calculations related to inventory valuation or financial accounting controls. There is a mismatch between the FE allegations and the allegedly false or misleading statements because the Restatement did not involve errors or weaknesses in counting physical inventory on hand. The Restatement was the result of errors in financial accounting calculations for excess and obsolete inventory reserves and purchase price variances—something the FE allegations do not mention at all. Moreover, not a single FE alleges having substantial contact with any Defendant, nor do they allege any Defendant knew, or recklessly disregarded, information that contradicted the false statements when they were made. These FE allegations are far from "correspondingly stronger."

2

The Complaint is then left with a grab-bag of other allegations, including allegations regarding executive departures, the Individual Defendants' senior positions, and that the Individual Defendants signed SOX Certifications. Those allegations, however, do not give rise to a strong inference of scienter. In fact, the only inference to be drawn is a non-fraudulent one: P28 made errors in complex financial accounting calculations—errors that were even missed by outside auditors at Deloitte & Touche LLP—and corrected those errors promptly when they were discovered by issuing a Restatement. There is no plausible basis to infer fraud here.

Congress passed the PSLRA and heightened the standards for securities fraud to serve as "a check against abusive [securities] litigation[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), and prevent "the routine filing of lawsuits whenever there is a significant change in an issuer's stock price." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258–59 (10th Cir. 2001) (cleaned up). This purpose is thwarted if general, conclusory, and illogical allegations like those here are sufficient. The Complaint should be dismissed with prejudice.

## II.     BACKGROUND[1]

### A.     Paragon 28, Inc.'s Business and Operations

P28 was a Colorado-based medical device company exclusively focused on the foot and ankle orthopedic market. ¶¶2, 27–28 (Zimmer Biomet Holdings, Inc. acquired P28 on April 21, 2025). Albert DaCosta was P28's Chief Executive Officer, President, and Chairman of the Board. ¶29. Stephen Deitsch served as P28's Chief Financial Officer until March 29, 2024. ¶30.

---

[1] By summarizing Plaintiff's allegations, Defendants do not concede the allegation are true. Citations to "¶__" are to Plaintiff's Amended Consolidated Class Action Complaint (Dkt. 32). Citations to "Ex. __" refer to the exhibits to the Declaration of Allison K. Kostecka, filed herewith. Unless noted, all emphasis is added, and all internal quotation marks and citations are omitted.

P28 developed and sold a wide range of surgical systems to treat foot and ankle conditions. ¶¶2, 27, 51. After going public in 2021, P28 expanded both its global reach and product offerings, selling its products in 22 different countries. Ex. 1 at 2, 8. As was typical for any medical device company, managing physical inventory was complex. P28 had to maintain high levels of inventory where its products were sold due to the nature and intended use of its products. *Id.* at 46. P28 had nearly 80 product systems to help fit the specific needs of each patient and procedure. *Id.* at 8. Each system could include plates, screws, staples, nails, advanced joint and bone replacements, orthobiologics, and other implantation instruments and disposables. *Id.* at 2. The instruments and products in these systems came in a variety of sizes as surgeons may not know what solutions or sizes they need until mid-surgery. ¶¶3, 65; Ex. 1 at 8. P28's products are manufactured by third-parties. ¶¶52–53, 65. Supply chain and other issues coming out of COVID-19 led to increased lead times and stock-outs for certain system components, and led P28 to increase its inventory levels even further in 2022 and 2023. *E.g.*, Ex. 2 at 4 (stockouts and supply chain problems); Ex. 3 at 14 (discussing supply chain disruptions requiring higher capital spends and "stockpiling").

P28 evaluated the "carrying value" of its inventories in relation to "historical sales, current inventory levels, and consideration of the life cycle of the product." ¶63; Ex. 1 at 96.  P28's need to maintain substantial levels of inventory meant it needed to account for excess or obsolete items in its inventory. ¶65; Ex. 1 at 47, 96. Not only would a decrease in demand or the development of new products result in an increase of obsolete items on hand, P28's need to maintain products in a variety of sizes necessarily meant certain items in the inventory were necessarily maintained in excess and unlikely to ever be used. ¶65; *see also* Ex. 1 at 96. P28 anticipated and calculated reserve estimates to account for excess and obsolete inventory, ¶65, "based on current inventory

levels and historical sales," ¶64, making adjustments for product usage patterns and life cycles, ¶65; *see also* Ex. 1 at 96. Calculating this reserve required "a high degree of subjectivity … and sensitivity." ¶66 (citing Ex. 4 at 99). This calculation impacted P28's overall inventory valuation and the cost of goods sold. ¶¶82–83.

**B.      The Restatement**

Deloitte was P28's outside auditor. ¶¶66, 131. During its 2023 audit, Deloitte identified P28's "estimate of excess and obsolete inventories" as a "critical audit matter" ("CAM") because of the subjective nature of this calculation. ¶66. So, Deloitte looked carefully at P28's reserve estimate, including by: (1) "test[ing]" "the effectiveness of internal controls over management's inputs, estimates and assumptions used to evaluate excess and obsolete inventories"; (2) "perform[ing] "analytical procedures to evaluate the reasonableness of changes in inventory balances and related excess, slow moving and obsolete reserves by comparing the current year and prior year balances"; (3) discussing with operational personnel "certain estimates and assumptions specific to selected inventory items"; (4) testing "certain underlying data used … by management in making their estimates and assumptions related to excess and obsolete inventories, including quantities of inventory on hand, historical sales by product and considerations or product life cycles"; and (5) "test[ing]" "the mathematical accuracy" of a sample set of P28's calculations. Ex. 4 at 99. After its careful review of this estimate, Deloitte issued an unqualified audit opinion for 2023, certifying P28's financial statements "present fairly, in all material respects, the financial position of [P28] … in conformity with [generally accepted] accounting principles." Ex. 4 at 98–99. Deloitte did not identify *any* accounting errors or material weaknesses over P28's internal controls over financial reporting in its 2023 audit. *See id.*

5

On July 30, 2024, P28 disclosed its management had identified material accounting errors and its financial statements for 2023 and the first quarter of 2024 should not be relied upon. ¶157. The errors involved the calculation of P28's excess and obsolete inventory reserves and its capitalization of purchase price variances ("PPVs"),[2] and resulted in an overstatement in inventory value and an understatement in the cost of goods sold. ¶158. P28 further disclosed that it had "identified one or more material weaknesses in its internal control over financial reporting." ¶160.

On August 8, 2024, P28 filed restated quarterly and annual financial results for 2023 and the first quarter of 2024. *See* ¶¶165–67. The restated financials confirmed the errors involved "the calculation of the excess and obsolescence reserve and capitalization of purchase price variances." ¶185. The error in the *calculation* did not involve errors in counting physical inventory on hand. *See id.*; *see also* Ex. 1 at 113. The Restatement resulted in an $8.01 million decrease in inventories and an $8.36 million increase in the cost of goods sold for 2023, ¶¶178–80, and a $9.67 million decrease in inventories and a $1.656 million increase in the cost of goods sold for the first quarter of 2024, ¶¶ 181–82. The overall financial impact of the Restatement was marginal. The Restatement did not impact P28's net revenue, and even after the Restatement, P28's gross margin for 2023 was 76%. ¶¶179–82.

With the Restatement, P28 identified three material weaknesses in its internal controls over financial reporting, including that it lacked "financial and accounting personnel with the necessary technical and accounting knowledge, experience, and training related to accounting for inventory

---

[2] A PPV is the difference between the actual price paid for a product and the price that was expected. Capitalizing a PPV means including the variance in the inventory valuation or the valuation of cost of goods sold, rather than expensing the variation immediately. Ashley Nguyen, *Purchase price variance (PPV)*, (May 19, 2025) https://ramp.com/blog/purchase-price-variance.

in accordance with GAAP," "controls designed and implemented to timely prevent a material misstatement in the accounting for the valuation of inventory," and "effective ongoing monitoring of business performance reviews and account analysis." ¶185. P28 developed a remediation plan to strengthen its accounting functions and support its needs as a growing public company. ¶186.

## C.    The Litigation

This lawsuit was filed on September 30, 2024. Dkt. 1. The Complaint alleges that during the alleged class period, which spans from May 5, 2023 through September 20, 2024, Defendants made a series of false or misleading statements about P28's (1) financial results (for metrics that had to be restated) and (2) internal controls over financial accounting. ¶¶1, 145–52. Plaintiff alleges the "truth" was revealed through a series of four partial corrective disclosures: (1) when Deitsch's departure was announced on April 4, 2024, (2) when P28 initially notified the market about the Restatement on July 20, 2024, (3) when P28 filed its restated financial statements on August 8, 2024, and (4) when P28's Chief Accounting Officer's resignation was announced on September 20, 2024. ¶¶153–55, 157–62, 165–67, 195.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires that fraud claims based on false or misleading statements identify the statements, the speaker, and why the statements were fraudulent. The PSLRA further elevates this standard, requiring plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

## IV.    ARGUMENT

### A.    The Complaint Does Not State a Claim Under Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that each defendant (1) made a material misrepresentation or omission, (2) with scienter, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Level 3*, 667 F.3d at 1333. "A plaintiff suing under Section 10(b) … bears a heavy burden at the pleading stage." *Id.* To survive a motion to dismiss, the plaintiff must plead all elements of a securities fraud action with specificity and particularity. The failure to sufficiently plead even one element *requires* dismissal. *See, e.g.*, *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1251 (10th Cir. 2016).

### 1.    The Complaint Should Be Dismissed Because Plaintiff Fails to Plead a Strong Inference of Scienter

To plead scienter, the Complaint must allege with particularity facts that show each defendant made each false or misleading statement intentionally or with recklessness "akin to conscious disregard." *Smallen v. The Western Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences," including inferences unfavorable to the

plaintiff. *Tellabs*, 551 U.S. at 323–24. In addition, the inference of scienter must be more than "'reasonable' or 'permissible,'" it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Anderson*, 827 F.3d at 1237 (cleaned up). Here, the Complaint fails to allege any inference of scienter, much less a cogent or compelling inference that outweighs non-fraudulent explanations.

### a.    Plaintiff Does Not Allege Any Motive for the Alleged Fraud

To support an inference of scienter, "[m]otive allegations must show that 'the defendant benefitted from the alleged fraud in some concrete and personal way.'" *In re Molson Coors Bev. Co. Securities Litig.*, 2020 WL 13499995, at *7 (D. Colo. Dec. 2, 2020). While "personal financial gain may weigh heavily in favor of a scienter inference," *Tellabs*, 551 U.S. at 325, "general motives … to further the interests of the corporation fail to raise an inference of scienter," *Level 3*, 667 F.3d at 1346. The Complaint lacks allegations indicating Defendants had *any* motive to commit securities fraud.

Plaintiff weakly claims Defendants had "reason to tout" certain financial metrics that were ultimately restated to demonstrate P28's improving performance, and Defendants "were incentivized to reach at least 80% gross profit margin." ¶312. But wanting to demonstrate a company's improving performance is clearly a "general motive[] … to further the interests of the corporation," *Level 3*, 667 F.3d at 1346, and not indicative of any intent to commit fraud. The Complaint lacks allegations suggesting Defendants were incentivized to commit fraud by "personal financial gain" or "benefitted from the alleged fraud in some concrete and personal way." *Molson Coors*, 2020 WL 13499995 at *7 (cleaned up). Therefore, the motive allegations in the Complaint do not support an inference of scienter.

Where, as here, "a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Level 3*, 667 F.3d at 1347; *see also Anderson*, 827 F.3d at 1239 (failing to allege "a motive for securities fraud, [] mitigates an inference of scienter" from other allegations). Plaintiff attempts to allege scienter through a whole host of allegations. ¶¶299–320. But not one allegation, whether viewed independently or holistically, gives rise to a cogent or compelling inference that Defendants intended to deceive investors. *See, e.g.*, *Anderson*, 827 F.3d at 1251 (even considering multiple allegations—including motive, corroborating witnesses, core operations, accounting violations, and a large loss—plaintiffs "do not create a cogent, compelling inference of scienter").

### b.    The Restatement Does Not Support Scienter

Plaintiff alleges scienter can be inferred from the Restatement. ¶¶310, 314–16, 319. But it is well established that "the mere existence of an error warranting restatement does not necessarily reflect on the scienter behind that error." *Molson Coors*, 2020 WL 13499995, at *4. "To hold otherwise would subject every financial restatement to liability." *Id.* When assessing whether a restatement or the underlying accounting error gives rise to an inference of scienter, courts consider the complexity of the error at issue, the time period covered by the restatement, and the magnitude of the changes made. *Id.* at *4–6. Here, all three factors compel against an inference of scienter.

***Complexity.*** Restatements are more likely to give rise to scienter when the errors that required correction are obvious or simple. *See Molson Coors*, 2020 WL 13499995, at *4 (finding a "technical tax-accounting error" complex and not indicative of scienter). Here, the Restatement involved an error in financial calculations related to excess and obsolete inventory reserves and

10

the capitalization of PPVs. ¶185; Ex. 1 at 113. The errors were not the "violation of [] simple accounting rule[s]," *Molson Coors*, 2020 WL 13499995, at \*4, and are not indicative of scienter.[3]

The fact that Deloitte failed to identify the financial accounting errors in its 2023 audit supports the notion that they were complex and not obvious. Deloitte even identified P28's estimate of excess and obsolete inventory reserves as a CAM, examined the calculation carefully, and still provided an unqualified audit opinion for 2023. ¶66; Ex. 4 at 98–99. When the errors were ultimately discovered, they were discovered by P28's CFO, not Deloitte. ¶34. That Deloitte did not identify the errors strongly suggests that they are not indicative of scienter. *See, e.g.*, *Molson Coors*, 2020 WL 13499995, at \*4–5 (PwC's clean audits of financials that had to be restated "weigh against an inference of scienter"); *Phillips v. Harvest Nat. Res., Inc.*, 2016 WL 4523849, at \*3 (S.D. Tex. Aug. 25, 2016) (auditor's failure to identify errors shows they "were not so obvious" "[to] demonstrate[] an intent to defraud investors"); *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 669 (3d Cir. 2002) (same).

***Time Period.*** After discovering the accounting errors, P28 restated certain financial figures in four quarterly filings and one annual filing, covering a period of one year and one quarter. ¶¶157, 165–67. The short period of time subject to the Restatement weighs against an inference of scienter. *See In re Dell Inc.*, 591 F. Supp. 2d 877, 894–95 (W.D. Tex. 2008) (no scienter despite

---

[3] The Complaint also alleges Defendants' violation of GAAP supports an inference of scienter. ¶319. But "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1113 (10th Cir. 2015). GAAP violations must be coupled with particularized facts showing defendants had an intent to mislead. *Id.* For example, in *Adams v. Kinder-Morgan*, GAAP violations, together with allegations suggesting a CFO falsely reported a key operation was profitable despite knowing it was losing money, supported scienter. 340 F.3d 1083, 1106 (10th Cir. 2003). Plaintiff offers no similar allegations here.

11

four-year restatement period); *Molson Coors*, 2020 WL 13499995, at *1, *6, *13 (no scienter despite two years and three quarters of restated financials).[4]

*Magnitude.* The Complaint alleges that the magnitude of the Restatement was significant and supports an inference of scienter. ¶¶79, 87, 310–11. Plaintiff relies heavily on the allegation that P28's Adjusted EBIDTA went from approximately negative $9.7 million to negative $18 million for 2023, and from negative $5 million to negative $7 million in Q1 2024. To exaggerate the actual impact, Plaintiff creates his own chart to reflect the difference between original and restated Adjusted EBIDTA as a percentage *of the restated figure*. ¶16. For example, Plaintiff alleges the percentage difference between the original and restated Adjusted EBIDTA figures for Q3 2023 was 122%. *Id.* But Plaintiff's made-up metrics provide an incomplete picture, conveniently ignoring the relatively small impact the Restatement had on other key metrics. Indeed, when corrected, the Restatement's impact on P28's overall financial status was marginal, as reflected in the chart below. The Restatement resulted in a less than 5% decrease to P28's gross margin, ¶180 (4.8% for 2023), ¶183 (3.3% for Q1 2024), and a less than 4% decrease to Adjusted EBITDA margin, which measures P28's core operating profitability by dividing Adjusted EBITDA by net revenue, ¶¶ 180, 183 (3.9% for 2023 and 3.6% for Q1 2024); *see also* Ex. 5 at 23 (see chart below). And the Restatement had no impact on net revenue. ¶¶179–82.

---

[4] Plaintiff claims the temporal proximity between the filing of Paragon 28's Form 10-Q for Q1 2024 (May 8, 2024) and the announcement of the Restatement (July 30, 2024) shows scienter. ¶316. But courts regularly find temporal proximity between an allegedly fraudulent statement and a correction insufficient to show scienter. *See, e.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001), *abrogated on other grounds*; *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at *14 (W.D. Wash. Mar. 17, 2025); *Connor v. Unisys Corp.*, 2024 WL 387633, at *11 (E.D. Pa. Feb. 1, 2024).

12

## Review of Impact Related to Recent Restatements

*Restatement of FY 2023 and 1Q 2024 financials resulting in non-cash adjustments to COGS and Net Inventory*

|  | 1Q 2023 | 2Q 2023 | 3Q 2023 | 4Q 2023 | FY 2023 | 1Q 2024 |
|---|---|---|---|---|---|---|
| Gross Profit as Previously Reported | $43,130 | $42,151 | $42,389 | $45,121 | $172,791 | $48,896 |
| *Gross Margin as Previously Reported* | 82.9% | 82.6% | 80.3% | 74.5% | 79.9% | 80.0% |
| Effect of Restatement (from COGS) | ($1,323) | ($2,741) | ($1,528) | ($2,764) | ($8,356) | ($1,656) |
| Gross Profit as Restated | $41,807 | $39,410 | $40,861 | $42,357 | $164,435 | $47,240 |
| *Gross Margin as Restated* | 80.3% | 77.3% | 77.4% | 69.9% | 76.0% | 77.3% |
| | | | | | | |
| Adjusted EBITDA as Previously Reported | ($1,417) | ($2,629) | ($1,249) | ($4,423) | ($9,718) | ($5,481) |
| *Adjusted EBITDA Margin as Previously Reported* | (2.7%) | (5.2%) | (2.4%) | (7.3%) | (4.5%) | (9.0%) |
| Effect of Restatement (from COGS) | ($1,323) | ($2,741) | ($1,528) | ($2,764) | ($8,356) | ($1,656) |
| Effect of Restatement (from SG&A)[1] | -- | -- | -- | -- | -- | ($567) |
| Adjusted EBITDA as Restated | ($2,740) | ($5,370) | ($2,777) | ($7,187) | ($18,074) | ($7,704) |
| *Adjusted EBITDA Margin as Restated* | (5.3%) | (10.5%) | (5.3%) | (11.9%) | (8.4%) | (12.6%) |
| | | | | | | |
| Inventories, net as Previously Reported | $69,174 | $85,225 | $94,380 | $98,062 | $98,062 | $104,298 |
| Effect of Restatement (from COGS) | ($983) | ($3,724) | ($5,252) | ($8,016) | ($8,016) | ($9,672) |
| Inventories, net as Restated | $68,191 | $81,501 | $89,128 | $90,046 | $90,046 | $94,626 |

Copyright ©2024 Paragon 28. All rights reserved.    (1) Adjustment to SG&A related to timing of recognition of bad debt expense for customer bankruptcy.    8

The small magnitude of the Restatement here stands in stark contrast to cases where the magnitude of a restatement supported scienter. *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1147 (D. Colo. 2005) (finding scienter based on "manipulations and misrepresentations … amounting to many hundreds of millions of dollars"); *see also In re MicroStrategy, Inc. Sec. Lit.*, 115 F. Supp. 2d 620, 636–37 (E.D. Va. 2000) (finding scienter when income was restated downward by 290% ); *cf. Molson Coors*, 2020 WL 13499995, at *5, *13 (no scienter despite restatement requiring correction of $400 million in deferred tax liabilities).

Nothing about the Restatement gives rise to a strong inference of scienter, and the fact that Deloitte initially signed off on the financial figures that ultimately had to be restated supports that the Restatement reflects the correction of a mistake in a complex calculation, not fraud.

### c.    The "Former Employee" Allegations Do Not Establish Scienter

Plaintiff attempts to allege scienter through allegations from five unidentified FEs. But these FE allegations concern P28's management of *physical* inventory and fail to allege that

13

Defendants (or anyone else) *knew* there were (1) errors in P28's calculations for excess and obsolete reserves or capitalized PPVs that rendered certain financial metrics false when made, or (2) deficiencies in P28's internal controls over financial reporting. Instead, the FE allegations concern issues in general physical inventory tracking. Because the FE allegations do not relate to the alleged false statements, they cannot give rise to an inference of scienter.

Even if Plaintiff's FE allegations properly addressed the subject matter of the alleged false and misleading statements at issue (they do not), the FE allegations still fail. For former employee allegations to contribute to an inference of scienter, they must (1) have "reliable personal knowledge of the defendants' mental state" and (2) "provide a level of specific detail" about defendants' knowledge. *Anderson*, 827 F.3d at 1244 (the allegations must "provide sufficiently particularized accounts of what the [] executives must have known"). The Tenth Circuit has consistently found that allegations concerning general corporate knowledge, attendance at meetings, and receipt of reports are not enough to establish scienter. *Id.* at 1241, 1244, 1246 (citing cases). Here, the FE allegations do not reveal anything about Defendants' mental states, much less show that any Defendant had actual knowledge of facts that contradicted their public statements.

***Personal Knowledge of Defendants' Mental States.*** The Complaint does not provide a reasonable basis to conclude that the FEs have personal knowledge of Defendants' mental states or what Defendants knew when they made the alleged misstatements. As an initial matter, none of the FEs are in direct reporting relationships with the Individual Defendants.[5] When a FE is not in

---

[5] Further underscoring that the FEs offer no reliable allegations about Defendants' mental states or actual knowledge, several FE allegations are not even based on the FEs' personal knowledge, but instead are hearsay. *E.g.*, ¶¶101 ("FE-4 heard from superiors that DaCosta reviewed dashboard data on a daily basis"), 139 ("FE-2 was told that the push to release non-conforming products came from upper management."), 113 ("FE-5 also knew there was concern up at the VP level regarding

14

a "reporting relationship" with, or is separated from defendants by multiple reporting levels, "the

[FE] [] lacks a close connection to the defendants." *Meitav Dash Provident Funds & Pension Ltd.*

*v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1220 (10th Cir. 2023); *see also Anderson*, 827

F.3d 1229 at 1244 ("[R]elatively low-level employees" cannot "provide evidence bearing on []

executives' mental states"). Here, FE-3 (Medical Sales Rep.) and FE-5 (Distribution Supervisor)

are lower-level employees far removed from Defendants. ¶¶42, 47. FE-1 (Product Manager), FE-

2 (Sr. Design Quality Engineer), and FE-4 (Sr. Financial Analyst), are each separated from

DaCosta and Deitsch by at least two reporting levels. ¶¶38, 41, 46.

Critically, four of the five FEs offer *no* particularized allegations about what either Deitsch

or DaCosta knew at any point in time. Not a single FE claims to have had personal interactions

with Deitsch. Only FE-1 claims to have had any contact with DaCosta. And while FE-1 claims

they "had frequent interactions with DaCosta," the Complaint cites only a weekly call they both

attended, ¶39, and does not specifically allege what was discussed on the call nor that anything

discussed contradicted DaCosta's public statements, *see* ¶¶121, 300. "[O]ccasional contact with [a

defendant] at meetings" is inadequate to demonstrate FE-1 had personal knowledge of Mr.

DaCosta's mental state. *Meitav*, 79 F.4th 1209 at 1221.

***Awareness of General Physical Inventory Issues.*** At most, the allegations attributed to the

FEs indicate that P28 had issues tracking physical inventory. But, again, the Restatement involved

an error in the calculations used to estimate excess and obsolete inventory reserves and capitalize

PPVs. ¶185. Issues with tracking physical inventory did not cause these errors or lead to the

---

inventory accuracy"); *see also* ¶¶116, 130–31, 133. When FEs offer hearsay, courts must assess
whether it is "sufficiently reliable, plausible, or coherent." *Zucco Partners v. Digimarc Corp.*, 552
F.3d 981, 998 n.4 (9th Cir. 2009). These hearsay allegations lack any indicia of reliability.

Restatement, and knowledge of physical inventory issues is not indicative of knowledge that the calculations supporting disclosed financial metrics are incorrect.[6]

The FE allegations amount, at most, to claims of corporate mismanagement. Even if a plaintiff alleges a "pervasive" issue affects a company or identifies "red flags" that could alert defendants to ongoing problems, it is not enough if the plaintiff does not plead specific facts tying defendants to knowledge of the alleged fraud. *See Smallen*, 950 F.3d at 1306–07. In *Smallen*, the plaintiff alleged defendants had notice of the "pervasive nature" of fraudulent activities occurring in its money transfer system based on hundreds of thousands of consumer complaints, hundreds of millions of dollars in fraudulent transactions, and other "red flags." *Id.* at 1306. Yet, the plaintiff still failed to plead particularized facts showing the defendants *knew* that defendants' compliance program was not effectively addressing these concerns. *Id.* at 1307. The same is true here.

Plaintiff claims that there was "widespread knowledge" of "pervasive and systemic" issues with physical inventory tracking during the alleged class period. *E.g.*, ¶¶113–19. But Plaintiff lacks particularized facts showing Defendants knew these issues rendered their financial accounting calculations erroneous, much less that they rendered any challenged statement false or misleading when made. *See Anderson*, 827 F.3d at 1243 (describing FE allegations as "broad concerns" about "delays and additional costs" that did not connect to the alleged misstatements).

***Attendance at Meetings.*** Plaintiff relies on FE-1's allegations that DaCosta attended weekly meetings to discuss "inventory issues" to infer scienter. ¶¶121, 148, 224, 300, 302. But

---

[6] FE-1, FE-2, FE-3, and FE-5 cannot support scienter because they are "not persons whose job responsibilities would have given them access to information about how the Company determined its inventory accounting policies." *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *9 (D. Colo. June 21, 2005). And FE-4 offers no allegations about the errors, much less that anyone knew there was an error and made false statements anyway. ¶¶101,104–07, 117, 125–29, 281, 302.

FE-1 offers no details about these meetings, like when they occurred, what was discussed, or whether information was provided that contradicted DaCosta's public statements. It is well established that "mere attendance at meetings does not contribute to an inference of scienter," *Anderson*, 827 F.3d at 1246, and that is all that is alleged here.

*Reports.* Plaintiff further claims FE-1's allegations that Defendants received "stockout reports" detailing "levels of inventory" demonstrates scienter. ¶¶122, 224, 300, 302. According to FE-1, Defendants were "on the email distribution list" for the stockout reports, which included "current levels of inventory … SKU #, the supplier name, and current on-hand quantity." ¶122. FE-1 asserts that these reports were "used to prove that the issues flagged by FE-1 … were happening." ¶123. But FE-1 "do[es] not adequately describe the contents" of the reports or how they contradicted any allegedly false statement, and without this, the reports cannot give rise to an inference of scienter.[7] *Anderson*, 827 F.3d at 1241 (cleaned up). Receiving a report, especially without allegations that the reports "included information at odds with [Defendants'] public statements," is not sufficient to establish scienter. *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group*, Inc., 537 F.3d 527, 540 (5th Cir. 2008); *see also Anderson*, 827 F.3d at 1241.

### d.    Plaintiff's Other Allegations Do Not Adequately Plead Scienter

Plaintiff's additional allegations of scienter do not save his deficient securities fraud claims.

*Executive Departures.* The Complaint alleges scienter can be inferred because Deitsch and Erik Mickelson, P28's Chief Accounting Officer, left P28 during the alleged class period. ¶¶314–

---

[7] FE-4 alleges they "managed a financial dashboard" that showed "month-to-month product cash flow which was utilized to forecast product decisions," and they "heard from superiors that DaCosta reviewed dashboard data on a daily basis." ¶101. Setting aside that this allegation is based on unreliable hearsay, it does not allow for an inference of scienter due to Plaintiff's failure to plead *how* this financial dashboard contradicted DaCosta's public statements.

15. To establish scienter based on an executive's departure, a plaintiff must offer "particularized allegations connecting the departures to the alleged fraud." *Bouzaglo v. Inspirato Inc.*, 2024 WL 3738813, at \*5 (D. Colo. July 16, 2024), *report and rec. adopted sub nom. Koch v. Inspirato Inc.*, 2024 WL 4591328 (D. Colo. Sept. 23, 2024). "Particularized allegations" include allegations "that the resignations were 'numerous,' 'uncharacteristic' in relation to the company's 'typical hiring and termination patterns,' or were accompanied by 'suspicious circumstances.'" *Rumbaugh v. USANA Health Scis., Inc.*, 2018 WL 5044240, at \*9 (D. Utah Oct. 17, 2018). Without particularized allegations linking the resignations to the alleged fraud, "an inference of scienter will 'never' be as compelling as the inference that the resignation was due to unrelated personal or business reasons." *Id.* Plaintiff's allegations here fall flat.

Plaintiff alleges that the timing of Deitsch's departure—three months before the Restatement was announced—was "suspicious" and indicates that he left because of the "fraud." ¶314. But Plaintiff offers no other factual allegations to indicate Deitsch's departure was related to the alleged fraud, and Plaintiff's strained argument regarding temporal proximity alone is insufficient. *See Molson Coors*, 2020 WL 13499995 at \*11 ("Plaintiffs fail to explain why this retirement was suspicious, pointing only to its temporal proximity to the Restatement.").

Plaintiff's allegations about Mickelson fare no better. Plaintiff claims Mickelson's departure shows scienter because of "his role and the timing of his departure," which occurred more than a month after the Restatement, and because he released claims against P28. ¶315. Plaintiff ignores that when Mickelson's departure and release of claims were disclosed, P28 also disclosed that he would continue to advise P28 as a consultant. Ex. 6 at 2. In *Inspirato*, the court found that the timing of an executive's departure following a restatement, without more, was not

18

probative of scienter. 2024 WL 3738813 at \*5. The court noted that scienter is further mitigated when a former executive is retained to consult after his resignation. *Id.* Mickelson's post-Restatement departure, and his continued work for P28, belie any inference of scienter.

***SOX Certifications.*** Plaintiff argues DaCosta's and Deitsch's SOX certifications allow for an inference of scienter because they were subsequently contradicted by the Restatement and admissions of material weaknesses. ¶309. SOX certifications, standing alone, are not indicative of scienter. *See In re Gold Res.*, 776 F.3d at 1116. To allege scienter based on SOX certifications, a complaint must also allege particularized facts showing the SOX certifications were knowingly false when made. *See id.* Plaintiff lacks such allegations here.

***Senior Positions of Defendants***. Plaintiff alleges Defendants' roles as senior executives support a strong inference of scienter. ¶¶146, 308, 313. Not so. The Tenth Circuit routinely holds that it "cannot infer scienter based only on a defendant's position in a company." *Anderson*, 827. F.3d at 1245; *see also Fleming*, 264 F.3d at 1264 ("the mere fact that the individual Defendants occupied senior positions in the company … is not sufficient to" support scienter). "[A]dditional particularized facts are necessary" to prove "the defendants' actual exposure to information." *Anderson*, 827. F.3d at 1245. Plaintiff alleges an inference of scienter is warranted only because of DaCosta's and Deitsch's experience with financial analysis, ¶¶312–13, but offers no particularized facts showing they had "actual exposure" to information on the erroneous financial accounting calculations that lead to the Restatement.

***Material Weaknesses in Internal Controls.*** Plaintiff claims Defendants knew, or were at a minimum reckless, to the fact that P28's internal controls over financial accounting were deficient at the time of the challenged statements based solely on the fact that P28 later admitted

19

to these deficiencies. ¶310. Disclosing a material weakness in internal controls on its own cannot establish scienter, *Molson Coors*, 2020 WL 13499995, at *6, given that such admission is commonplace when a company issues a restatement, *In re Hanson Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) ("Presumably every company that issues a financial restatement … will cite as a reason lack of effective controls."). For allegations about material weaknesses to carry any weight, a plaintiff must offer particularized facts showing defendants "knew the internal controls were inadequate or recklessly disregarded their inadequacy." *Molson Coors*, 2020 WL 13499995, at *6. Here, Plaintiff has not alleged any facts indicating Defendants were aware of any internal control weaknesses over financial accounting prior to the restatement. While Plaintiff relies on the FEs to allege "persistent" and "unremedied" *physical inventory controls*, ¶310, these allegations say nothing about *internal controls over financial accounting*.

**Post-Class Period Allegations**. Finally, Plaintiff alleges that P28's March 2025 disclosure of a material weakness related to "the existence and completeness of inventory on hand" gives rise to an inference of scienter. ¶¶17, 144. But this post-class period disclosure has nothing to do with the Restatement and does not suggest "defendants knew or recklessly disregarded information contrary to their public statements" two years earlier. *Level 3*, 667 F.3d 1331, 1347 (10th Cir. 2012) (holding post-class period disclosures are not admissions).[8]

### e.    The Non-Fraudulent Inference Is More Compelling

Plaintiff's theory boils down to allegations Defendants knew P28 had pervasive issues tracking and managing its physical inventory and knew this would result in the disclosure of

---

[8] Because the Complaint fails to adequately allege scienter for either DaCosta or Deitsch, it fails to adequately allege corporate scienter for P28. *See, e.g.*, *Meitav*, 79 F.4th at 1229–30 (to impute scienter to a corporation, a plaintiff must allege scienter for a senior official within the corporation).

inaccurate financial metrics simply because P28's inventory values were an input into other financial metrics. ¶¶1–11. Plaintiff alleges Defendants intentionally mislead investors regarding these financial metrics, not for any personal financial gain, but to falsely imply Paragon's gross margin was over 80%, when it was actually only four points lower, around 76%. ¶¶16, 282. Plaintiff's theory assumes Defendants' awareness of issues with physical inventory tracking somehow means Defendants *also* knew P28 made an error in the complex inventory accounting calculations that were the source of the Restatement—errors that even its outside auditors failed to identify—without providing any specific allegations about how these unrelated issues are connected. ¶¶8, 83–87 (allegations fail to adequately connect the Restatement to issues in physical inventory tracking). This theory is implausible and illogical.

The non-fraudulent inference that can be drawn from Plaintiff's allegations is far more compelling. P28 had complex inventory requirements, which required high levels of inventory. ¶52. P28's inventory needs grew in the wake of the COVID-19 pandemic when supply chain issues were prevalent. Ex. 2 at 4. High inventory levels meant P28 had to calculate reserves for excess and obsolete inventory, which required complex and subjective judgment calls with respect to multiple variables. ¶¶65–66. P28's outside auditors recognized the complexity in this calculation, ¶66, examined it, and still initially provided a clean audit for 2023.  In 2024, P28 discovered an error in how it calculated excess and obsolete inventory reserves and how it capitalized PPVs. ¶¶17, 157–58. It immediately disclosed this, issued a Restatement, and took steps to improve its internal financial accounting controls. ¶¶157, 185–86. Defendants received no personal benefit from this error and the overall financial impact of the error was minimal with no impact on P28's

21

revenue. *See* ¶¶179, 182. The straightforward, non-fraudulent inference is far more cogent and compelling.

### 2.   Plaintiff Challenges Certain Statements That Are Not Actionable

In his 147-page complaint, Plaintiff challenges a litany of statements made during the alleged class period. While most challenged statements focus on financial figures impacted by the Restatement and financial reporting controls, which should be dismissed for the reasons stated above, Plaintiff also challenges several statements that are not false or actionable.

***Statements of Corporate Optimism.*** Plaintiff challenges several statements that constitute "mere puffery" and are "the kind of rosy affirmations" that are "loosely optimistic" and "lacking specificity" and "no reasonable investor could find them important." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1249 (10th Cir. 2022) (cleaned up). For example, Plaintiff challenges statements discussing P28's *"impressive top-line growth,"* ¶212, and *"compelling financial margins,"* ¶244. Statements of corporate optimism like this are routinely dismissed as immaterial as they are "'incapable of objective verification.'" *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1122 (D. Colo. 2017) (statements using language like "compelling" or "impressive" are non-actionable puffery). "[G]eneral, forward-looking expressions of confidence" are also non-actionable because "no reasonable investor would base a trading decision" on such statements. *Level 3*, 667 F.3d at 1340; *see also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119–20 (10th Cir. 1997) (statements regarding "expected" growth rate are puffery). The statements in paragraphs 212, 219–20, 235, 243–44, 246, 278–79 should be dismissed as inactionable puffery.[9]

---

[9] Plaintiff also challenges non-actionable statements that are protected under the PSLRA's safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c). For example, Plaintiff challenges the statement "we ***expect*** our annual gross profit margins to continue to be approximately 80% ***going***

***Statements of Opinion****.* Plaintiff also challenges non-actionable statements of opinion. An opinion is actionable only if (1) it is "literally false – which requires proving the issuer did not believe [it]," or (2) it is based on facts that the speaker did not develop or reasonably inquire into. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193–94 (2015). Plaintiff alleges Defendants' *opinions* about financial metrics that ultimately had to be restated were false when made. For example, Plaintiff challenges statements indicating P28 was "*really proud of*" its "*82.9% [gross profit margin] this most recent quarter,*" ¶221, describing P28's margins as "*compelling,*" ¶244, and indicating P28's adjusted EBITDA improvements were "*nice,*" ¶246. But the Complaint lacks allegations indicating Defendants' subjective beliefs differed from their outward statements when they were made, much less allegations showing the statements were based on false information or lacked a reasonable basis. Even if the Court credits Plaintiff's conclusory claims that Defendants discussed how to manage P28's physical inventory, the Restatement was *not* caused by physical inventory management issues. The statements challenged in paragraphs 212, 216, 219–21, 235, 239, 243–44, 246, 260, 274, 279, and 292 should be dismissed as inactionable opinions.

***SOX Certifications****.* Plaintiff claims Defendants filed false SOX certifications throughout the alleged class period because P28 later disclosed material weaknesses in its internal controls over financial reporting. ¶¶216, 239, 260, 274, 292. Although the Tenth Circuit has not weighed in, "courts are divided about whether [] boilerplate language [in SOX certifications] are actionable." *Rok v. Identiv, Inc.*, 2017 WL 35496, at *9 (N.D. Cal. Jan. 4, 2017) (citing cases); *see*

---

*forward.*" ¶276. This statement is forward-looking and accompanied by meaningful cautionary language. *See* Ex. 7 at 1. Nor has Plaintiff alleged the forward-looking statements were made with actual knowledge of their falsity. The statements in paragraphs 243, 276, 279 should be dismissed.

23

*also In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at \*17 (N.D. Cal. 2007) ("[T]here is nothing in either the 1934 Securities Exchange Act or the Sarbanes-Oxley Act … that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a [SOX] certification."). Regardless, this claim sounds in hindsight and should be dismissed.

### 3.    Certain "Corrective Disclosures" Do Not Establish Loss Causation

Loss causation refers to the "causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). To adequately plead loss causation, a "plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission … is … connected with a drop in stock price." *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1012 (D. Colo. 2016). When an alleged corrective disclosure does not reveal new information regarding the alleged fraud, it cannot establish loss causation. *In re Williams Sec. Lit.*, 558 F.3d 1130, 1137 (10th Cir. 2009). Here, two alleged "corrective disclosures" fail to reveal "new" information and cannot have caused Plaintiff's loss.

Plaintiff alleges press releases announcing the departures of Deitsch and Mickelson are partial corrective disclosures revealing the truth behind the alleged misstatements. ¶¶154–56, 195–96, 325, 330. On April 4, 2024, P28 issued a press release announcing Deitsch's departure. ¶325. This press release did not reveal anything about calculating the excess and obsolete reserve, capitalizing PPVs, or financial reporting controls. *See* ¶¶154–56, 325 (Deitsch resigned, Wright became CFO). Deitsch left P28 months before the accounting errors and internal control issues were discovered. ¶154. The Complaint also lacks allegations indicating the September 20, 2024 announcement of Mickelson's departure revealed new information to the market. *See* ¶¶19, 195.

24

In fact, the Complaint alleges when P28 filed its restated financials a month earlier, on August 8, 2024, that filing "revealed the full scope of the internal control material weaknesses that plagued P28 during the Class Period." ¶17. These press releases do not reveal anything new to the market regarding the alleged fraud, and they do not show loss causation.

**B.      The Complaint Does Not State a Claim Under Section 20(a)**

To state a claim for "control person" liability under Section 20(a), a complaint must show "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Adams*, 340 F.3d at 1107–08. Because Plaintiff fails to allege a primary violation of the Act, the control person claims should also be dismissed.

## V.      CONCLUSION

The Complaint attempts to conjure securities fraud by alleging Defendants intentionally misled investors about errors in complex accounting calculations to determine excess and obsolete inventory reserves and the capitalization of PPVs. Plaintiff claims Defendants knew about these errors all along because some FEs allege issues with physical inventory management. But this theory of fraud falls apart as the Restatement was not due to, and did not "reveal," issues with physical inventory management. At bottom, Plaintiff fails to allege even a scintilla of scienter. The Court should dismiss the Complaint in its entirety and with prejudice. Defendants respectfully request a hearing on this Motion.

25

DATED: August 15, 2025

s/ *Monica K. Loseman*

Monica K. Loseman
Allison K. Kostecka
Lydia Lulkin
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2642
Telephone: (303) 298-5700
Fax: (303) 323-2929
Email: mloseman@gibsondunn.com
Email: akostecka@gibsondunn.com
Email: llulkin@gibsondunn.com

*Attorneys for Defendants Paragon 28, Inc.,
Albert DaCosta, and Stephen M. Deitsch*

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2025, a true and correct copy of the foregoing was served via the ECF/PACER to counsel of record.

*s/ Lynette Apodaca*
Lynette Apodaca


## CERTIFICATION UNDER PRACTICE STANDARD

Pursuant to Judge Brimmer's Practice Standard III.F.2.a, Defendants' counsel conferred with Plaintiff's counsel regarding this Motion and the Request for Judicial Notice. Defendants maintain the Complaint's pleading deficiencies cannot be cured by amendment. Plaintiff disagrees with Defendants' position on the Complaint.

*s/ Allison K. Kostecka*
Allison K. Kostecka

27