IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

_____

Civil Action No. 24-cv-02712-PAB-TPO
     (Consolidated with Civil Case No. 24-cv-02898-PAB-TPO)

_____

Civil Case No. 24-cv-02712-PAB-TPO

JOHN K. ELLINGTON, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

PARAGON 28, INC.,
ALBERT DACOSTA,
STEPHEN M. DEITSCH, and
KRISTINA WRIGHT,[1]

     Defendants.

_____

Civil Case No. 24-cv-02898-PAB-TPO

NICHOLAS TIEDT, individually and on behalf of all other similarly situated,

     Plaintiff,

v.

PARAGON 28, INC.,
ALBERT DACOSTA,
STEPHEN M. DEITSCH,
KRISTINA WRIGHT, and
ERIK MICKELSON,[2]

---

[1] Ms. Wright was a party to this action in the original complaint. Docket No. 1 at 3, ¶ 11. However, the operative complaint, Docket No. 32, brings no claims against Ms. Wright and lists her as a relevant non-party Paragon 28 executive. *Id.* at 24, ¶ 34. Thus, although the parties list her in the case caption, she is no longer a party.

[2] Mr. Mickelson was a party to this action in the original complaint filed in *Tiedt v. Paragon 28, Inc., et. al.*, 24-cv-02898-PAB-TPO, which was consolidated with *Ellington v. Paragon 28, Inc., et. al.*, 24-cv-02712. 24-cv-02898-PAB-TPO, Docket No. 1 at 7, ¶ 23. However, the operative complaint, Docket No. 32, brings no claims against Mr.

Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendants' Motion to Dismiss the

Amended Consolidated Class Action Complaint (DKT. 32) [Docket No. 40] and

defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss

Amended Consolidated Class Action Complaint (Dkt. 32) [Docket No. 41].  Plaintiff filed

responses, Docket Nos. 42 and 43, and defendants filed replies.  Docket Nos. 44 and

45.

## I. BACKGROUND[3]

Paragon 28 ("Paragon") is a medical device company which develops and sells a

wide range of implants, instruments, and surgical systems designed to treat various foot

and ankle conditions.[4]  Docket No. 32 at 10, 28, ¶¶ 2, 51.  In the consolidated class

action complaint, lead plaintiff Nicholas Tiedt brings suit against defendant Albert

DaCosta, Paragon's Chief Executive Officer ("CEO") during the class period,[5] defendant

Stephen M. Deitsch, Paragon's Chief Financial Officer ("CFO") until April 3, 2024, and

Paragon itself.  *Id.* at 21-24, ¶¶ 29-33.  Plaintiff brings claims for securities fraud,

---

Mickelson and lists him as a relevant non-party Paragon 28 executive.  *Id.* at 24, ¶ 35.
Thus, although the parties list him in the case caption, he is no longer a party.

[3] The facts below are taken from plaintiffs' amended consolidated class action
complaint ("the complaint"), Docket No. 32, and are presumed to be true, unless
otherwise noted, for purposes of ruling on defendants' motion to dismiss.

[4] On April 21, 2025, Paragon was acquired by Zimmer Biomet Holdings, Inc.
Docket No. 32 at 20, ¶ 27.  Upon the acquisition, Paragon became a wholly-owned
subsidiary of Zimmer Biomet and was delisted from the New York Stock Exchange.  *Id.*

[5] The class period starts on May 5, 2023 and ends on September 20, 2024.
Docket No. 32 at 9.

alleging violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, and violations of Section 20(a) of the Securities Exchange Act.  *Id.* at 151-54, ¶¶ 356-370.

### A. <u>Importance of Inventory Management</u>

Medical device companies like Paragon face competing inventory demands: they must maintain sufficient stock to meet the immediate needs of surgeons and hospitals, while minimizing excess stock that can quickly become obsolete, damaged, or expired due to regulatory changes or product advancements.  *Id.* at 10, ¶ 3.  Paragon needed to have an accurate understanding of its inventory in order to gauge important financial metrics.  *Id.* at 29, 32-34, 39-41, ¶¶ 53-54, 63-67, 69, 80-87.  Inventory related data impacts how Paragon calculated its Adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("Adjusted EBITDA") and gross margin, which are financial metrics that are material to investors and analysts.  *Id.* at 39, ¶ 81.

The initial inventory data is multiple steps removed from the ultimate calculation of Adjusted EBITDA and gross margin.  *Id.* at 39-41, ¶¶ 80-87.  Paragon must have an accurate count of its existing inventory in order to determine the carrying value of its inventory.  *Id.* at 32, ¶ 63.  Paragon's estimates of its excess and obsolete inventory are also based in part on current inventory levels.  *Id.* at 32-33, ¶¶ 65-66.  Estimates of excess and obsolete inventory also relied on historical sales, and are adjusted to reflect usage patterns and life cycles of Paragon's implant systems.  *Id.*, ¶¶ 64-65.  Paragon's auditor, Deloitte & Touche LLP ("Deloitte"), identified estimates of excess and obsolete inventory as a critical audit matter ("CAM"), noting that it related to accounts or disclosures which are material to financial statements, but that there is a high degree of subjectivity involved in its calculation.  *Id.* at 33, ¶ 66.  Deloitte also noted that Paragon's

estimates involved sensitivity related to changes in key assumptions, including length of product life cycles.  *Id.*  Data related to excess and obsolete inventory is utilized when calculating costs of goods sold.  *Id.* at 39-40, ¶¶ 82-83.  Costs of goods sold refers to costs which are attributable to manufacturing or selling the inventory of a business.  *Id.* at 39, ¶ 82.  Moreover, in regard to the implants Paragon sells, the cost of goods sold is not recognized until the implant is used in surgery.  *Id.* at 39-40, ¶ 83.  As a result, being able to account for the status of implants is important for determining costs of goods sold.  *Id.*  Costs of goods sold is an important input when calculating gross profit and gross margin.  *Id.* at 40, ¶ 84.  Paragon calculated gross profit as net revenue less cost of goods sold, and gross margin as gross profit divided by net revenue.  *Id.*  As a result, any increase in the costs of goods sold—including through charges due to the amount of excess and obsolete inventory or use of implants in surgery—would lead to a decrease in Paragon's gross profit and gross profit margin.  *Id.*  A decrease in Paragon's gross profit would negatively impact Paragon's Adjusted EBITDA.  *Id.*, ¶ 85.  The inverse is true as well, understating the cost of goods sold would result in an overstatement of gross margin and Adjusted EBITDA.  *Id.*, ¶ 86.  In sum, the accurate calculation of gross margin and Adjusted EBITDA depends on properly accounting for the existence and valuation of inventory.  *Id.* at 40-41, ¶ 87.

### B. <u>Paragon's Improper Inventory Control</u>

Paragon lacked sufficient inventory controls and could not track and accurately value its inventory.  *Id.* at 42, ¶ 93.  Five former employees ("FEs") support that Paragon had inventory management problems.  *Id.* at 42-51, 54-65, ¶¶ 94, 96-97, 100-119, 126-32.  For example, FE-1 was a product manager at Paragon who was responsible for reporting and forecasting estimates of inventory availability.  *Id.* at 25, ¶ 37.  FE-1 said

4

that Paragon did not pause business operations when changing its inventory tracking system, leading to billing and tracking issues.  *Id.* at 42-43, ¶ 94.  Moreover, FE-1 stated that higher-volume Stock Keeping Units ("SKUs") were not tracked by lot numbers, which purportedly made it impossible to determine how much product was on hand or shipped to distributers.  *Id.* at 43-44, ¶ 97.  FE-1 stated there were no standard operating procedures in place for inventory tracking.  *Id.* at 49, ¶ 114.  FE-4—a senior financial analyst—stated that Paragon utilized an "SAP system."  *Id.* at 26-27, 45, ¶ 45, 101.  This system could ostensibly be used to track inventory.  *Id.* at 45, ¶ 102.  However, in practice, Paragon employees did not rely on any cohesive system to track inventory.  *Id.*, ¶ 103.

For example, FE-4 stated that there was no system in place to know what was in stock and what was needed.  *Id.* at 45-46, ¶ 104.  FE-4 claimed that each department seemed to have a different method to track inventory, with many using Excel spreadsheets.  *Id.*  FE-1 said that many Paragon employees used Excel spreadsheets to track inventory.  *Id.* at 46-47, ¶ 107.  FE-3—a sales representative—stated that sales representatives similarly struggled to track inventory.  *Id.* at 47-48, ¶ 109.  FE-3 said that, when FE-3 did receive direction from Paragon on how to track inventory, the system Paragon provided failed to track when products expired.  *Id.*, ¶¶ 109-110.  FE-2—a senior design quality engineer—noted that some parts were not tracked once they were shipped out.  *Id.* at 25 58, ¶¶ 40, 140.  FE-5—a distribution supervisor responsible for inventory—said that Paragon's "bin accuracy" was poor for industry standards.  *Id.* at 27, 48-49, ¶¶ 47-49, 112.  Bin accuracy is a term which describes whether a physical bin contains its documented components.  *Id.* at 48-49, ¶ 112.  FE-5 stated that, when

5

FE-5 began working at Paragon in October 2022, the bin accuracy was approximately 53%, but was up to 81% in January 2025.  *Id.*  According to FE-4 and FE-5, audits showed that Paragon's reported inventory figures did not align with the actual inventory counts.  *Id.* at 54-55, ¶¶ 126-130.  FE-5 said that Deloitte personnel expressed concern to FE-5 about the accuracy of the audits.  *Id.* at 55, ¶ 131.  Exacerbating the inventory problems further, FE-5 stated that FE-5 was often told to stop receiving inventory.  *Id.* at 56, ¶ 133.  FE-5 stated that Paragon's supply chain director and Paragon's supply chain manager told FE-5 that this was because they did not want the inventory recorded on the books.  *Id.*

There were also inventory issues stemming from Paragon's inventory management of "Hindfoot" products.  *Id.* at 49-50, ¶¶ 115-116.  Hindfoot was Paragon's largest product line and consisted of various nails, plates, and screws.  *Id.*, ¶ 115.  FE-1 stated that a product manager, Mark Traina, knew that there were glaring problems involving the inventory levels of Hindfoot products.  *Id.* at 50, ¶ 116.  However, in spite of this knowledge, FE-1 said that Paragon executives informed employees that the inventory levels for Hindfoot products were satisfactory.  *Id.*  Thus, the Paragon salesforce would promote Hindfoot products when there was not sufficient inventory to sell them.  *Id.*

### C.  Paragon Executive's Knowledge of Inventory Issues

Mr. DaCosta and Mr. Deitsch had varying levels of involvement with the purported ongoing inventory management issues.  FE-1 said that Mr. DaCosta attended weekly calls dedicated to fixing tracking and inventory issues.  *Id.* at 52, ¶ 121.  Mr. DaCosta "gave guidance" during these meetings.  *Id.* at 43, ¶ 95.  Spreadsheets entitled "stockout reports" were prepared for the weekly calls and were emailed to various

recipients, including Mr. DaCosta and Mr. Deitsch.  *Id.* at 52, ¶ 122.  The stockout reports detailed current levels of inventory.  *Id.*  According to FE-1, the stockout reports were used during the calls to show discrepancies between what procurement said was available in Paragon's inventory and what was actually available in inventory.  *Id.* at 52-53, ¶ 123.  Furthermore, "[a]ccording to FE-1, DaCosta was totally informed of [the] inventory issues affecting the Hindfoot products."  *Id.* at 50, ¶ 116.  "[I]nventory controls fell under the Company's overall internal control for financial reporting."  *Id.* at 41, ¶ 89. Mr. DaCosta and Mr. Deitsch certified that they were responsible for establishing and maintaining internal controls, that they evaluated internal controls, and that they reported on their effectiveness.  *Id.* at 42, ¶ 92.

Other Paragon executives besides Mr. DaCosta and Mr. Deitsch were informed about the inventory issues.  For instance, FE-4 formed a monthly meeting dedicated to establishing a new process for determining what Paragon has in stock.  *Id.* at 53-54, ¶ 125.  Multiple senior employees participated in these meetings.  *Id.*  FE-5 sent emails regarding inventory tracking issues to multiple Paragon executives.  *Id.* at 49, ¶ 113. Similarly, FE-1 discussed inventory issues in-person with Paragon executives.  *Id.* at 51, ¶ 119.

### D.  Defendants' Misstatements[6]

Plaintiff alleges that defendants artificially inflated or maintained Paragon's stock price by falsely reporting key financial results, including Paragon's Adjusted EBITDA

---

[6] Plaintiff pleads 57 separate paragraphs detailing defendants' allegedly false and misleading statements, with some of these paragraphs consisting of multiple statements.  Docket No. 32 at 87-93, 100-106, 109-113, 115-120, 124-126, ¶¶ 211-222, 234-247, 254-262, 267-279, 286-294.  While the Court has analyzed the details of each statement, it will only provide an overview of the allegedly false and misleading statements here.

and gross margin, affirming Paragon's internal controls, and misrepresenting the state of Paragon's inventory. *Id.* at 60, ¶ 145. Specifically, plaintiff alleges that defendants falsely stated Paragon's financial metrics, including Paragon's gross margin and Adjusted EBITDA, in all quarters of 2023 and the first quarter of 2024. *Id.* at 87-90, 92-106, 109-113, 115-120, ¶¶ 211-217, 234-247, 254-262, 267-279.

On July 30, 2024, Paragon filed a restatement announcement with the Securities Exchange Commission ("SEC") which disclosed that its past financial statements should no longer be relied upon. *Id.* at 66, ¶ 157. The restatement announcement stated that Paragon "identified errors in the accounting for inventory including the calculation of its excess and obsolete inventory reserve." *Id.*, ¶ 158. These errors resulted in the overstatement of inventory in all quarters of 2023 and the first quarter of 2024, and an understatement in the costs of goods sold for the same period. *Id.* The restatement announcement also stated that, as a result of the accounting errors, Paragon "identified one or more material weaknesses in its internal control over financial reporting" and that its internal control was not effective. *Id.* at 67, ¶ 160. On August 8, 2024, Paragon filed its amended financial statements on Form 10-K/A and on Form 10-Q/A. *Id.* at 68, ¶ 165. In its Form 10-K/A, Paragon claimed that the restatements would correct not only the identified errors in the calculation of excess and obsolete inventory, but also errors in Paragon's accounting for inventory variances. *Id.* at 68-69, ¶ 166. It was these errors which impacted the valuation of inventory, resulting in an overstatement of "Inventories, net" and "a net understatement in Cost of goods sold." *Id.* Paragon reiterated that, "during the second quarter of fiscal year 2024, errors were identified with respect to our accounting for the valuation of inventory, including the calculation of the

8

excess and obsolescence reserve and capitalization of purchase price variances [("PPVs")]." *Id.* at 78-79, ¶ 185.

On August 8, 2024, in addition to filing its Form 10-K/A, Paragon filed restated financial statements. *Id.* at 69, ¶ 167. Paragon determined that its Q1 2023[7] gross margin was inflated by 3.1% and its Adjusted EBITDA loss was understated by 93.4%. *Id.* at 70, ¶ 170. Paragon's Q2 2023 gross margin was inflated by 6.4% and its Adjusted EBITDA loss was understated by 104.3%. *Id.* at 72, ¶ 173. Paragon's Q3 2023 gross margin was inflated by 3.6% and its Adjusted EBITDA loss was understated by 122.3%. *Id.* at 74, ¶ 176. Paragon's Q4 2023 gross margin was inflated by 6.2% and its Adjusted EBITDA loss was understated by 62.5%. *Id.* at 76, ¶ 180. For the entire 2023 fiscal year, Paragon's gross margin was inflated by 4.9% and its Adjusted EBITDA loss was understated by 86%. *Id.* Finally, Paragon's Q1 2024 gross margins were inflated by 3.3% and its Adjusted EBITDA was understated by 40.6%. *Id.* at 78, ¶ 183. For Q2 and Q3 of 2023 and for Q1 of 2024, the gross margins reported prior to the restatement were over 80%, but were under 80% after the restatement was issued. *Id.* at 72, 74, 78, ¶¶ 173, 176, 183. Mr. Deitsch had previously represented to investors that Paragon was working towards Adjusted EBITDA profitability and that Paragon expected to maintain an 80% gross margin. *Id.* at 91, 104, 119, ¶¶ 219, 243, 275-76.

Mr. Deitsch resigned from Paragon shortly after the end of Q1 2024, claiming he was pursuing an opportunity with another medical device company. *Id.* at 65, ¶ 154. Additionally, on September 20, 2024, less than two months after the restatement was issued, Paragon's Chief Accounting Officer, Erik Mickelson, resigned. *Id.* at 83, ¶ 195.

---

[7] Q1 2023 refers to the first quarter of 2023.

Paragon's stock price dropped shortly after announcing each of these resignations. *Id.*

at 65, 83, ¶¶ 154-56, 195-96.

Mr. DaCosta and Mr. Deitsch attached Sarbanes-Oxley certifications[8] ("SOX

certifications") to various financial reports. *Id.* at 89-91, 102, 112, 118-119, ¶¶ 216-17,

---

[8] Section 302 of the Sarbanes-Oxley Act of 2002, PL 107-204, 116 Stat 747 requires certain officers of public companies to certify all annual and quarterly reports filed with the SEC. Sarbanes-Oxley § 302 certification, 1 Sec. Law Handbook § 12:41; 15 U.S.C. § 7241(a). Specifically, the officers certify that:

**(1)** the signing officer has reviewed the report;

**(2)** based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

**(3)** based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

**(4)** the signing officers--

**(A)** are responsible for establishing and maintaining internal controls;

**(B)** have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

**(C)** have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

**(D)** have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date;

**(5)** the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function)--

**(A)** all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

**(B)** any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

**(6)** the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses. 15 U.S.C. § 7241(a)(1)-(6).

239, 260, 274, 292.  These certifications attested to the effectiveness of Paragon's internal controls.  *Id.*  Mr. Deitsch misrepresented the state of Paragon's inventory by, among other things, creating an impression that Paragon was able to accurately track its inventory.  *Id.* at 103-04, 106, 120, ¶¶ 241, 243, 247, 278-79.  During the Class Period, Paragon's stock lost hundreds of millions of dollars in market capitalization, down more than 65% from its Class Period high.  *Id.* at 19, ¶ 20.  Plaintiff alleges that the inaccurate financial metrics, the SOX certifications regarding Paragon's internal controls, and the misrepresentations about inventory artificially impacted Paragon's stock price.  *Id.* at 60, ¶ 145.

## II.  LEGAL STANDARD

"Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder 'prohibit making any material misstatement or omission in connection with the purchase or sale of any security.'"  *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1304 (10th Cir. 2020) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  To prevail on a Section 10(b) and Rule 10b-5 claim, a plaintiff must prove that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) *the defendant acted with scienter, that is, with intent to defraud or recklessness*; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Smallen*, 950 F.3d at 1304 (citation omitted).  In this case, the third element—scienter— is at issue.

11

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).[9]  In most civil actions, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, "federal law creates a heavy burden on claimants alleging securities fraud."  *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1216 (10th Cir. 2023).  In an effort to decrease abusive securities fraud actions by private parties, "Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737."  *Tellabs,* 551 U.S. at 313.  The PSLRA "imposed heightened pleading standards that 'require[ ] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter."  *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (quoting *Tellabs*, 551 U.S. at 313).

In the context of securities fraud, "[s]cienter is a mental state embracing [1] intent to deceive, manipulate, or defraud, or [2] recklessness."  *Smallen*, 950 F.3d at 1304 (citation and internal quotations omitted).  "[R]ecklessness under section 10(b) is a

---

[9] Moreover, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 322.  Defendants have filed a motion for the Court to take judicial notice of multiple SEC filings and transcripts from earnings calls.  Docket No. 41.  The motion is opposed.  Docket No. 43.  However, the complaint fails to state a claim on its face, thus obviating the need to refer to the substance of the documents filed by defendants.  Thus, the Court will deny the motion as moot.

particularly high standard."  *Dronsejko v. Thornton*, 632 F.3d 658, 668 (10th Cir. 2011)

(citation omitted); *see also In re Zagg*, 797 F.3d at 1201 ("Recklessness in the context

of securities fraud is a high bar.").  "It is defined as conduct that is an extreme departure

from the standards of ordinary care, and which presents a danger of misleading buyers

or sellers that is either known to the defendant or is so obvious that the actor must have

been aware of it."  *In re Zagg*, 797 F.3d at 1201 (citation and internal quotations

omitted).  In other words, "recklessness is akin to conscious disregard—allegations of

negligence or even gross negligence fall 'below the high threshold for liability under

Section 10(b) of the Exchange Act.'"  *Smallen*, 950 F.3d at 1305 (quoting *Dronsejko*,

632 F.3d at 668).

In order to properly plead scienter under the PLSRA, the complaint must, "with

respect to each act or omission . . ., state with particularity facts giving rise to a *strong*

*inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2)(A) (emphasis added).  In *Tellabs*, 551 U.S. at 314, the Supreme Court analyzed

the term "strong inference," holding that "an inference of scienter must be more than

merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent."  *Id.*  Thus, the analysis is "inherently

comparative: How likely is it that one conclusion, as compared to others, follows from

the underlying facts."  *Id* at 323.  In making this determination, "a court must consider

plausible, nonculpable explanations for the defendant's conduct, as well as inferences

favoring the plaintiff."  *Id.* at 324.  The Supreme Court further specified that "[t]he inquiry

. . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference

of scienter, not whether any individual allegation, scrutinized in isolation, meets that

13

standard." *Id.* at 322-23 (emphasis in original).  Therefore, courts must "assess all the allegations holistically." *Id.* at 326.

## III.  ANALYSIS

In their motion to dismiss, defendants argue that plaintiff has failed to plead particularized facts creating a strong inference of scienter.  Docket No. 40 at 9.  The Court agrees.[10]  The Court begins its analysis by examining the parties' competing inferences of defendants' scienter.

### A.  Competing Scienter Theories

Defendants claim that defendants made an accounting error, which they argue creates a compelling inference that defendants acted without fraudulent intent.  *Id.* at 21-22.  Specifically, defendants argue that Paragon has complex inventory requirements which require it to calculate excess and obsolete inventory reserves.  *Id.* at 22.  The calculation of excess and obsolete inventory reserves is complicated and requires subjective judgment with respect to multiple variables.  *Id.*  In 2024, Paragon discovered an error in its calculation, which impacted its financial metrics.  *Id.*  Upon discovery of this error, Paragon immediately disclosed its mistake, issued a restatement, and took steps to correct the error.  *Id.*

Conversely, plaintiff posits a theory of the case which he claims creates a compelling inference that defendants did act with fraudulent intent.  Docket No. 42 at

---

[10] Defendants also argue that plaintiff challenges certain statements which are not actionable because they are either not false or because they are "mere puffery." Docket No. 40 at 22-24.  Additionally, defendants claim that plaintiff has failed to establish loss causation in regard to press releases announcing the departures of Mr. Deitsch and Mr. Mickelson.  *Id.* at 24-25.  Because the Court will grant the motion to dismiss on defendants' scienter argument, it need not consider defendants' other arguments.

22-23.  Plaintiff argues that Paragon's ability to accurately track inventory was deeply flawed.  *Id.* at 22.  Defendants were aware of Paragon's inventory management issues, and knew they would skew material financial metrics—specifically, Adjusted EBITDA and gross margin.  *Id.*  Defendants were motivated to avoid disrupting Paragon's key financial goals and to conceal Paragon's issues with its inventory management.  *Id.* at 23.  In order to accomplish this, defendants stated false financial metrics.  *Id.*  When the falsity could no longer be maintained, the restatements and resignations occurred.  *Id.* Plaintiff alternatively argues that the complaint alleges scienter based on recklessness. *Id.* at 22.

Plaintiff's theory is premised on the notion that the misstated financial metrics leading to the restatement were due to Paragon's issues with managing its inventory. Defendants argue that this is a fatal flaw in plaintiff's theory of scienter because "[t]he Complaint itself alleges that the Restatement was the result of errors in accounting *calculations*—in P28's calculation of its E&O inventory reserve and its capitalization of PPVs—and *not* due to issues with physical inventory inputs into those calculations." Docket No. 44 at 4.  In this regard, defendants are correct.  According to the complaint, the restatement announcement stated that Paragon "identified errors in the accounting for inventory including the *calculation* of its excess and obsolete inventory reserve" and that these errors resulted in the overstatement of inventory and an understatement in costs of goods sold.  Docket No. 32 at 66, ¶ 158 (emphasis added).  Moreover, the restatement announcement indicated that Paragon "identified one or more weaknesses in its internal control over financial reporting" as a result of the accounting errors.  *Id.* at 67, ¶ 160.  The Form 10-K/A reiterates that "errors were identified with respect to our

15

accounting for the valuation of inventory, including the *calculation* of the excess and obsolesce reserve and capitalization of purchase price variances."  *Id.* at 78-79, ¶ 185. The Form 10-K/A further noted that the restatements would correct these accounting errors, but does not mention that Paragon would change any inventory management practices.  *Id.* at 68-69, ¶ 166.  Thus, the complaint alleges that the misstated financial metrics were due to accounting errors, not due to issues managing inventory.

Plaintiff, however, argues that "[i]nventory levels are an input for calculating Paragon's 'cost of goods sold,' which is an important figure used to determine Adjusted EBITDA and gross margin."  Docket No. 42 at 4.  Plaintiff is correct that inventory data was an important input in Paragon's calculations for determining Adjusted EBITDA and gross margin.  Paragon's estimates of its excess and obsolete inventory were based in part on its current inventory levels.  Docket No. 32 at 32-33, ¶¶ 65-66.  In fact, defendants themselves note that certain data, including quantities of inventory on hand, was used by management "in making their estimates and assumptions related to excess and obsolete inventories."  Docket No. 40 at 6 (citation omitted).  Data related to excess and obsolete inventory was used to calculate the costs of goods sold, which is an important input when calculating gross margin and Adjusted EBITDA.  Docket No. 32 at 39-41, ¶¶ 82-84, 87.  But where plaintiff's argument fails is that the complaint does not allege that inaccurate inputs were the cause of the misstated financial metrics. Rather, the complaint indicates that errors in accounting for excess and obsolete inventory and capitalization of PPVs[11] were what led to the restatement.  *Id.* at 78-79,

---

[11] Plaintiff does not argue that Paragon's inventory management problems led to errors in accounting for capitalization of PPVs.  *See generally* Docket No. 42.

¶ 185.  In other words, the problem was not with the data input into the equation, but with the equation itself.

The Court will therefore analyze whether there is a strong inference that defendants acted with scienter when stating the financial metrics that were affected by the accounting error.  For defendants to have done so, they must have either known of the accounting error or must have acted in reckless disregard of its existence. Moreover, even though the complaint does not allege that inventory issues led to the misstated financial metrics, plaintiff is correct that there is a necessary link between inventory data and the calculation of Adjusted EBITDA and gross margin.  And not all allegations of fraud in the complaint are based on the misstated financial metrics; some arise from alleged misstatements Mr. DaCosta and Mr. Deitsch made about Paragon's inventory.  *Id.* at 103-04, 106, 120, ¶¶ 241, 243, 247, 278-79.  Additionally, it is possible that the financial metrics were inaccurate due to inventory management issues even though defendants claimed in the restatement that an accounting error was to blame. Thus, the Court will also analyze whether Paragon's inventory issues create a compelling inference of scienter.

### 1.  Knowledge of Accounting Error

The only allegations that plaintiff points to which could support an inference that defendants had knowledge of the accounting error relate to the restatement.[12]  Docket No. 42 at 21-22.  "But the mere existence of an error warranting restatement does not necessarily reflect on the scienter behind that error."  *In re Molson Coors*, 2020 WL 13499995, at *4.  Rather, "[w]hether the Restatement and the underlying [ ]accounting

---

[12] Plaintiff, however, notes that he "does not rely on Paragon's restatements as primary support for scienter."  Docket No. 42 at 21.

error imply scienter depends on what exactly the error entailed." *Id.* An error that is simple or obvious is more likely to support an inference of scienter. *Id.* Moreover, "[t]he magnitude of an alleged falsity can strengthen a scienter inference." *Id.* at *5.

Here, the accounting error is not simple. Although the complaint does not allege how Paragon accounted for the capitalization of PPVs, *see generally* Docket No. 32, it does allege facts which support a finding that calculating estimates of excess and obsolete inventory was a complicated task. *Id.* at 32-33, ¶¶ 64-66. Specifically, the complaint alleges that Deloitte identified the estimates of excess and obsolete inventory as a CAM.[13] *Id.* at 33, ¶ 66. Deloitte identified the estimate of excess and obsolete inventory as a CAM "because of the high degree of subjectivity involved in developing the estimates and sensitivity related to changes in key assumptions including length of product life cycles."[14] *Id.* Thus, according to Deloitte, calculating estimates of obsolete and excess inventory involved subjective judgment calls and required sensitive assumptions to be made. Yet, despite Deloitte's awareness of these potential issues in calculating estimates of obsolete and excess inventory, plaintiff does not allege that Deloitte was aware of the accounting error or that defendants concealed the accounting

---

[13] "A CAM is any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee, and that 1) relates to accounts or disclosures that are material to the financial statements; and 2) involved especially challenging, subjective, or complex auditor judgment." Robert G. Eccles, A Critical Audit Matter: It's Time for Auditors To Come Clean On Climate Change, Forbes (Mar. 10, 2021, at 13:04 ET), https://www.forbes.com/sites/bobeccles/2021/03/10/a-critical-audit-matter-its-time-for-auditors-to-come-clean-on-climate-change/.

[14] In his response, plaintiff asserts that Deloitte "flagged the importance of properly tracking inventory as a critical audit matter." Docket No. 42 at 21. However, for support, plaintiff cites Docket No. 32 at 33, ¶ 66, which states that Deloitte "identified management's estimate of excess and obsolete inventories as a critical audit matter." Docket No. 32 at 33, ¶ 66.

error from Deloitte.  These allegations lead to an inference that the accounting error was

complicated.  *See Molson Coors*, 2020 WL 13499995 (finding the fact that "Plaintiffs

bring no claim against [their auditor] and do not allege that Defendants concealed the

fraud from [their auditor] or that [their auditor] was aware of the accounting error or

participated in the alleged fraud" to be indicative that the auditor failed to identify the

error, and thus to be indicative that the error was not "simple" or "obvious.").

Moreover, cases have acknowledged that "[a]ccounting for the financial results of

a large publicly-traded company is a highly complicated task," and plaintiff points to no

allegations indicating that the accounting here would be an exception.  *U.S. S.E.C. v.

Dunn*, 587 F. Supp. 2d 486, 504 (S.D.N.Y. 2008); *see also McGrane v. Reader's Dig.

Ass'n, Inc.*, 822 F. Supp. 1044, 1046 (S.D.N.Y. 1993) ("For better or worse, in most

large corporate entities financial structures and their associated accounting, reporting

and recordkeeping aspects are highly complex.").  Finally, plaintiff alleges that the error

is not complex because "it is obvious to a CEO and CFO that the inability to track its

large inventory undercut the financial statements."  Docket No. 42 at 21.  This misses

the point.  As discussed above, according to the complaint, the financial statements

were inaccurate not because of an inability to track inventory, but because of an

accounting error.  In any event, as will be discussed below, the Court finds that it would

not be obvious to Mr. DaCosta and Mr. Deitsch that Paragon's inventory management

issues would lead to misstated financial metrics.  Thus, the complexity of the error

weighs against an inference that defendants must have known about the error.

The magnitude of the restatement also weighs against an inference that

defendants knew about the error.  The complaint indicates Paragon's gross profit was

19

not severely impacted by the restatement.  Docket No. 32 at 70, 72, 74, 76, 78, ¶¶ 170, 173, 176, 180, 183.  For example, Paragon only restated five quarters worth of financial metrics.  *Id.*  Paragon initially reported that its gross profit for the 2023 fiscal year—consisting of four of the quarters restated—was $172,791,000[15] whereas its restated gross profit for the 2023 fiscal year was $164,435,000.  *Id.* at 76, ¶ 180.  Paragon initially reported that its gross profit for Q1 2024 was $48,896,000, whereas its restated gross profit for Q1 2024 was $47,240,000.  *Id.* at 78, ¶ 183.  Thus, the difference between Paragon's initially reported gross profit and its restated gross profit is $10,012,000.  Conversely, in *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1147 (D. Colo. 2005), the plaintiff alleged a "sustained pattern of repeated manipulations and misrepresentations over a period of more than two and one-half years . . . of a substantial magnitude amounting to hundreds of millions of dollars." There, the court found that the "magnitude of these alleged manipulations and misrepresentations is large enough to provide substantial support for a strong inference of scienter."  *Id.*  In this case, an error causing a difference of $10,012,000 dollars in quarterly gross profit over the course of five quarters, while not insignificant, is not substantial enough to indicate that defendants must have known of the error.

The Court will now analyze whether Paragon's inventory management issues give rise to a strong inference of scienter.

---

[15] The chart in the complaint indicates that the amount is $172,791.  Docket No. 32 at 76, ¶ 80.  The Court presumes that the amount is actually $172,791,000, and the chart uses $172,791 as a shorthand for formatting purposes.  This is the case for all the subsequent mentions of gross profit in this paragraph.

### B. Inventory Management

Plaintiff has pled sufficient allegations with particularity to indicate that Paragon failed to effectively manage its inventory.  *See, e.g.,* Docket No. 32 at 25, ¶ 37 (Paragon's transition to a new inventory tracking system); *id.* at 45, ¶¶ 102-03 (disjointed methods for tracking inventory across departments); *id.* at 25, 58, ¶¶ 40, 140 (a failure to track inventory once it was shipped); *id.* at 43-44, ¶ 97 (a failure to track higher-volume SKUs by lot numbers).  Moreover, plaintiff alleged that audits and bin accuracy statistics confirmed that Paragon did not have an accurate count of its inventory.  *Id.* at 48-49, 54-55, ¶¶ 112, 126-131.

### C. Knowledge of Inventory Management Issues

Plaintiff's allegations about Mr. DaCosta and Mr. Deitsch's knowledge of the inventory management issues are less compelling.  Plaintiff attempts to establish defendants' knowledge through the statements of FEs.[16]  First, plaintiff relies on allegations from FE-1 that Mr. DaCosta knew about the inventory management issues due to his participation in a weekly call.  Docket No. 42 at 12.  The complaint alleges that "FE-1 said that CEO DaCosta . . . sat in on numerous calls discussing the [inventory management] issues and gave guidance to get people moving in the right direction."  Docket No. 32 at 43, ¶ 95.  Moreover, according to FE-1, "there was a dedicated call that took place once per week to try to fix tracking and inventory issues. FE-1 attended these calls, and said that DaCosta would be on the calls discussing

---

[16] When analyzing the statements of the former employees, the court "accept[s] the truth of the witness's accounts as pleaded in the complaint and do[es] not assess the witnesses' credibility." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d, 1229, 1239 (10th Cir. 2016) (citations omitted).

these issues." *Id.* at 52, ¶ 121.  While plaintiff alleges that inventory management issues were discussed in the call, plaintiff does not allege any details of what Mr. DaCosta was told or if he was informed of the full extent of Paragon's inventory tracking issues.  Furthermore, while plaintiff alleges Mr. DaCosta discussed the issues and gave guidance, plaintiff does not allege what Mr. DaCosta's statements concerned or what guidance he gave.  Thus, the Court cannot determine from these allegations what specific knowledge Mr. DaCosta had regarding the inventory issues.

Moreover, the Tenth Circuit has stated that "mere attendance at meetings does not contribute to an inference of scienter."  *Anderson*, 827 F.3d at 1246 (citing *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014)); *see also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1344 (10th Cir. 2012).  The Tenth Circuit analyzed the effect of defendants' regular attendance at meetings in *In re Level 3 Commc'ns*, 667 F.3d at 1344.  There, the defendants' alleged misstatements revolved around the integration of an acquired company into the parent company.  *Id.*  The plaintiff alleged that defendants monitored the integration process through regular meetings and reports.  *Id.*  The court held that, while the defendants' monitoring of the situation could plausibly lead to an inference of scienter, it was not as compelling as a competing inference.  *Id.* at 1344-45.  In order to make this determination, the court analyzed the content of the meetings and reports.  *Id.* Here, plaintiff has not alleged the details of the meetings' content with particularity, so the Court cannot properly analyze competing inferences regarding whether the calls imparted Mr. DaCosta with knowledge about the extent of Paragon's inventory issues. And while Mr. DaCosta might have had some knowledge of the inventory management

22

issues through these calls, there is no indication that he had knowledge that these inventory issues were pervasive and severe.  *See Smallen*, 950 F.3d at 1307 ("We fail to see how . . . discussions about the need for improving Western Union's compliance controls equates to knowledge of ongoing, unaddressed compliance violations.").  The allegation that Mr. DaCosta gave guidance during the calls suggests that Mr. DaCosta did more than merely passively attend the meetings, but, as noted earlier, the allegation about guidance does not explain what guidance Mr. DaCosta gave or how it related to his knowledge of Paragon's inventory issues.

Plaintiff's reliance on FEs for inferring the scienter of defendants is limited by the FEs' access to the defendants.  The Tenth Circuit has found evidence from former employees less compelling when they were not in a reporting relationship with defendants.  *See Anderson*, 827 F.3d at 1243-44; *Meitav Dash*, 79 F.4th at 1220-21. FE-1 did not report to Mr. DaCosta directly.  Docket No. 32 at 25, ¶ 38.  Plaintiff has not alleged that anybody FE-1 reported to was in a reporting relationship with Mr. DaCosta. Docket No. 32 at 25, ¶ 38.  FE-1 reported to the VP of Marketing and Product Management, who reported to the Chief Commercial Officer.  *Id.*  There is no allegation that the Chief Commercial Officer reported to Mr. DaCosta.  Thus, plaintiff's allegations regarding Mr. DaCosta's participation in the weekly calls does not create a compelling inference that Mr. DaCosta was aware of the severity of Paragon's inventory management issues.

Plaintiff's other allegations on this subject have similar deficiencies.  For example, plaintiff alleges that "FE-1 sent weekly emails for months with spreadsheets and guidance updating the finance and forecasting departments and advising them of

massive discrepancies in inventories.  FE-1's forecasting reports – which included estimates of inventory availability – were also sent to DaCosta.  FE-1 said their guidance was continuously ignored."  Docket No. 32 at 44, ¶ 98.  This allegation provides no inference that Mr. Deitsch knew of the inventory management issues.  While Mr. Deitsch, as CFO, would presumably be in the finance department, there is no particularized allegation that Mr. Deitsch received the email.  *See Anderson*, 827 F.3d at 1240 (finding that reports which allegedly undercut a defendant's statements did not contribute to a cogent or compelling inference of scienter because, among other reasons, there were no allegations that the reports were sent to the defendant).

These emails do not create a compelling inference of scienter regarding Mr. DaCosta either.  While plaintiff alleges that Mr. DaCosta was sent the emails, the allegation does not explain what guidance was sent or how severe the discrepancies were.  *See id.* at 1240-41 (finding that reports which allegedly undercut a defendant's statements did not contribute to a cogent or compelling inference of scienter because, among other reasons, there were not sufficient allegations as to the content of the reports).

Plaintiff alleges, based on FE-1's statements, that Paragon executives, including Mr. DaCosta and Mr. Deitsch, were regularly sent "stockout reports."  Docket No. 32 at 52, ¶ 122.  The stockout reports listed current levels of inventory and, according to FE-1, were used in the weekly calls to show discrepancies between what procurement believed was available and what was actually in Paragon's inventory.  *Id.* at 52-53, ¶ 123.  This allegation has the same deficiencies as the allegations above.  For one, there are no particularized allegations regarding the discrepancies identified in the

24

stockout reports or how they were discussed during the weekly meetings.  Second, there is no allegation that Mr. Deitsch was on the weekly calls.  Accordingly, the stockout reports fail to establish a compelling inference of scienter.

Plaintiff points to the allegation that Mr. DaCosta was "totally informed of inventory issues affecting the Hindfoot products" as evidence that Mr. DaCosta knew about Paragon's inventory management issues.  Docket No. 42 at 9.  The general claim that Mr. DaCosta was "totally informed" is not stated with particularity, as it does not explain how he became informed.  Thus, it fails to satisfy the heightened pleading standards of the PSLRA and does not contribute to a compelling inference of scienter.

Plaintiff argues that the "core operations doctrine lends further support to a strong scienter inference."  *Id.* at 13-14.  "Core-operations refer to instances where the nature of the relevant facts allegedly known and not disclosed by defendants was 'of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.'"  *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016) (citation omitted).  The Tenth Circuit has held that courts "cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."  *Anderson*, 827 F.3d at 1245; *see also Meitav* Dash, 79 F.4th at 1222; *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1264 (10th Cir. 2001).  "However, an allegation that an individual defendant knew certain information based on that individual's position in a company, combined with other relevant allegations concerning knowledge or motive, can be sufficient to support a strong inference of scienter under the PSLRA."  *In re Qwest*, 396 F. Supp. 2d at 1206 (D. Colo. 2004) (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105-06 (10th Cir. 2003));

25

*see also In re Molycorp.*, 157 F. Supp. 3d at 1010-11.  Thus, the mere fact that Mr. DaCosta was CEO and Mr. Deitsch was CFO cannot establish scienter, but it can help support a strong inference of scienter in conjunction with other allegations.

As CEO, Mr. DaCosta would likely have a general understanding of large-scale issues impacting Paragon, like the inventory management issues, particularly considering his involvement in the weekly calls.  However, just as the allegations about the weekly calls did not establish that Mr. DaCosta had an in-depth knowledge of the extent of the inventory management issues, there is no reason to believe Mr. DaCosta would know the full extent of the inventory management issues by nature of being CEO.  Moreover, "an executive's position in the company doesn't show knowledge of specific facts."  *Meitav Dash*, 79 F.4th at 1217 (citations omitted).

As for Mr. Deitsch, plaintiff has not provided sufficient allegations establishing that he had any knowledge of the inventory management issues.  Thus, because there are no relevant allegations regarding Mr. Deitch's knowledge, no inference of scienter can be established solely by reference to his position.  In any event, it is not clear why it would be "absurd," *In re Molycorp.*, 157 F. Supp. 3d at 1011, to suggest that Mr. Deitsch, as CFO, did not have knowledge of Paragon's inventory management issues.

Finally, the complaint contained allegations that other Paragon executives were informed about the inventory management issues.  Docket No. 32 at 49, 51, 53-54, ¶¶ 113, 119, 125.  While these allegations help establish that Paragon did in fact have issues managing its inventory, they do nothing to establish that Mr. DaCosta or Mr.

26

Deitsch had knowledge of those issues. [17]   Accordingly, while plaintiff arguably establishes that Mr. DaCosta had some knowledge of the inventory management issues, plaintiff does not establish that Mr. DaCosta knew those issues were ongoing, pervasive, and severe.  Moreover, plaintiff does not establish that Mr. Deitsch had any knowledge of the inventory issues whatsoever.

### D.  Inventory Issues' Impact on Financial Metrics

As discussed above, Paragon's inventory management issues are unrelated to Paragon's misstated financial metrics.  This is because the complaint alleges that the financial metrics were misstated due to accounting errors related to the calculation of excess and obsolete inventory and capitalization of purchase price variants, not due to issues with inventory.  Docket No. 32 at 78-79, ¶ 185.  The fact that inventory data is an input in calculating excess and obsolete inventory does not change this; the issue is with the calculation itself, not the underlying data.  Thus, issues with inventory management cannot give rise to an inference of scienter as to the financial statements.  However, as explained below, even if Paragon's inventory management issues did impact the misstated financial metrics, they would still not give rise to a strong inference of scienter.

---

[17] Plaintiff argues that the allegation which claims FE-5 was told to stop receiving inventory further supports scienter.  Docket No. 42 at 20-21.  However, the allegation states that "FE-5 received these directions from Omar Romo . . . and Jesus Regosa." Docket No. 32 at 56, ¶ 133.  Nevertheless, plaintiff argues that "such a scheme of operational scope and material impact would likely require the direct knowledge or approval of DaCosta and Deitsch, who are ultimately responsible for the accuracy of reported financials."  Docket No. 42 at 20.  The complaint contains no allegations that Mr. DaCosta or Mr. Deitsch knew of the alleged direction to stop receiving inventory, nor does the Court find that such an action would invariably be approved by a company's CEO or CFO.  Thus, this allegation does not support an inference of scienter.

### E.  **Knowledge of Inventory Issues' Impact on Financial Metrics**

If Mr. DaCosta and Mr. Deitsch did not know that the inventory management issues would materially impact Paragon's financial metrics, then there can be no inference of scienter arising from misstating the financial metrics.  Plaintiff notes that Paragon's 2024 annual report detailed how Paragon's inventory levels affected Adjusted EBITDA and gross margin.  Docket No. 42 at 14.  Plaintiff also claims that the financial statements in Paragon's quarterly and annual reports reference inventories as part of the earnings, expense, and income calculations.  *Id.*  Plaintiff argues that Mr. DaCosta and Mr. Deitsch were aware that Paragon's inventory management issues would affect Adjusted EBITDA and gross margin because they certified the annual reports.  *Id.* at 15.

Defendants point to *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015), as support for the proposition that "[t]he 'bare allegation' that defendants lied when they certified [their] financial statements pursuant to SOX adds 'nothing substantial to the scienter calculus.'"  Docket No. 44 at 12.  But, in this context, plaintiff is not attempting to establish scienter by stating that defendants lied when certifying the annual reports.[18]  Docket No. 42 at 15-16.  Rather, plaintiff is arguing that the SOX certifications show that defendants had knowledge of the annual reports, and thus had knowledge that inventory levels would impact financial metrics.  *Id.*  SOX certifications can be indicative of a defendant's knowledge.  *See Croker v. Carrier Access Corp.*, No. 05-cv-01011-LTB-OES, 2006 WL 2035366, at *11 (D. Colo. July 18, 2006) (noting that SOX certifications are "one factor among many that courts may consider, in the totality

---

[18] Plaintiff does make this argument in the context of SOX certifications regarding Paragon's internal controls, which will be discussed below.  Docket No. 42 at 13.

of the circumstances, to evaluate scienter" and that SOX certifications can be indicative

of a defendant's knowledge.).

Plaintiff also argues that Mr. DaCosta and Mr. Deitsch demonstrated their

knowledge of how inventory affects Adjusted EBITDA and gross margins in earnings

calls.  Docket No. 42 at 16.  A defendant's statements to analysts and investors can

support a finding of scienter.  *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236,

1263-64 (10th Cir. 2022).  Mr. Deitsch made comments about how excess and obsolete

inventory costs impacted gross profit margin.  Docket No. 32 at 90-91, ¶ 218.  Mr.

Deitsch also noted how inventory stockpiling relates to write-downs, which in turn

reduces gross profit margins.  *Id.* at 119, ¶ 276.

Finally, plaintiff argues that Mr. DaCosta and Mr. Deitsch would know that an

inability to track physical inventory would impact key financial metrics due to their

respective positions as CEO and CFO.  Docket No. 42 at 16.  As mentioned above, Mr.

DaCosta and Mr. Deitsch's position can only support an inference of scienter in

conjunction with other allegations.  The Court finds it reasonable that a CFO would have

the financial literacy to understand that physical inventory would affect the calculation of

Adjusted EBITDA and gross margin.  This is particularly true here, where Mr. Deitsch

certified the annual reports and made statements regarding how inventory impacted

gross profit margins.[19]  It is less clear that a CEO would necessarily have this

knowledge.  Nevertheless, the Court finds that defendant provided enough allegations

to establish at least a weak inference that Mr. DaCosta might have known that issues

---

[19] As noted earlier, plaintiff has not sufficiently alleged that Mr. Deitsch was aware that Paragon was experiencing issues managing its inventory.

with inventory management could affect financial metrics.  This does not, however,

establish that Mr. DaCosta knew that Paragon's inventory issues were pervasive or

severe enough to materially affect its Adjusted EBITDA and gross margin calculations.

### F.  Motive

Merely arguing that a defendant had access to information which contradicted

the defendant's statements is not sufficient to draw a strong inference of scienter.

*Meitav Dash*, 79 F.4th at 1217.  Rather, "[a] plaintiff must . . . allege facts with

particularity showing not only the executive's access to contradictory information but

also the executive's fraudulent intent or reckless disregard of accessible information."

*Id.*  Plaintiff attempts to allege facts showing Mr. DaCosta and Mr. Deitsch's fraudulent

intent by arguing that they had a motive to represent to investors that Paragon reached

its financial goals of maintaining an 80% gross margin level and of working towards

EBITDA profitability.  Docket No. 42 at 18-19.  Plaintiff argues that the fact that the

inaccurate financial metrics "directly caused Paragon to reach these touted metrics

strongly suggests an inference of motive."  *Id.* at 19.  Plaintiff also argues that Mr.

DaCosta and Mr. Deitsch "had a personal motive to conceal the inventory problems to

avoid being seen as incapable of managing Paragon or being caught misrepresenting

facts" and that "Defendants . . . hoped to obtain additional time to create a successful

image."  *Id.*

Allegations of motive are relevant to the scienter analysis, but the absence of a

motive allegation is not fatal.  *Tellabs*, 551 U.S. at 325.  "Motive allegations must show

that the defendant benefitted from the alleged fraud in some concrete and personal

way."  *Molson Coors*, 2020 WL 13499995, at *7 (citation and internal quotations

omitted).  For instance, "personal financial gain may weigh heavily in favor of a scienter

inference." *Tellabs*, 551 U.S. at 325; *see also MHC Mut. Conversion Fund, L.P.*, 761

F.3d at 1122 (finding that allegations of motive did not establish scienter because the

complaint did not allege that the defendants stood to personally benefit). "But general

motives for management to further the interests of a corporation fail to raise an

inference of scienter. Corporate officers always have an incentive to improve the lot of

their companies, but this is not, absent unusual circumstances, a motive to commit

fraud." *In re Level 3 Commc'ns*, 667 F.3d at 1346 (citation and internal quotations

omitted).

Here, plaintiff's motive allegations are those of general motive and are insufficient

to establish scienter. Every corporate officer would desire to represent to investors that

a company has reached its financial goals by achieving its aspired Adjusted EBITDA

and gross margin. Thus, such an allegation fails to show that defendants would benefit

from the alleged fraud in a concrete and personal way. This is particularly true when

there are no allegations that defendants had any unique stake in Paragon reaching its

financial goals. Moreover, the inaccurate gross margins were not always over 80%.

For instance, the originally reported gross margin for Q4 2023 was 74.5%, but was

restated as 69.9%. Docket No. 32 at 76, ¶ 180. Additionally, the gross margin for fiscal

year 2023 was originally reported as being 79.9%, but was restated as 76%. *Id.* Thus,

the alleged motive of keeping gross margins at or above 80% was not consistently

achieved. And even when the gross margins were originally reported as being over

80%, but were later restated as being below 80%, the discrepancy was relatively minor.

For instance, the originally reported gross margin for Q3 2023 was 80.3%, but was

restated as 77.4%. *Id.* at 74, ¶ 176. This weakens the allegations of motive because

31

there is less of a reason to defraud investors when Paragon's accurate financial metrics were not significantly lower than its aspired to metrics.[20]

Plaintiff's argument that Mr. DaCosta and Mr. Deitsch had a personal motive to conceal the inventory problems to avoid being seen as incapable also fails to establish scienter.  For one, there are no allegations in the complaint that Mr. DaCosta or Mr. Deitsch had any specific duty to oversee Paragon's inventory or that they were uniquely responsible for the inventory issues.  There are no specific allegations in the complaint that Mr. DaCosta or Mr. Deitsch had a compelling reason to cover up Paragon's inventory issues.  Thus, this does not show that Mr. DaCosta or Mr. Deitsch would benefit from the alleged fraud in a concrete and personal manner.  The argument that Mr. DaCosta and Mr. Deitsch hoped to obtain additional time to create a successful image fails for the same reason; it is a general corporate motive that is not specific to defendants.  *See Anderson*, 827 F.3d at 1238-39 (stating that a motive to mislead in order to buy time in the hope that a difficult financial situation would right itself was insufficient to establish scienter because it suggests a "generalized corporate motive.").

There are also logical flaws present in plaintiff's motive argument.  As explained above, the allegations in the complaint relating to Paragon's inventory issues show that Paragon was unable to accurately track its inventory.  There are no allegations,

---

[20] Plaintiff argues that, even if the originally reported gross margins and Adjusted EBITDAs were not significantly different than the restated metrics, the restatement still had a substantial effect, "as Paragon's share price dropped 13.7% and 20% on July 31 and August 9, 2024, respectively, after investors learned of the restatements."  Docket No. 42 at 21 (citing Docket No. 32 at 144, ¶¶ 327, 329).  It is possible the drop in stock price was because Paragon's gross margins were no longer consistently at 80% and because Paragon was no longer on the road to EBITDA profitability.  However, it is a more compelling inference that the drop in stock price was because Paragon had to issue a restatement to begin with, which disconcerted investors.

however, that Mr. DaCosta or Mr. Deitsch intentionally falsified inventory data in order to increase Adjusted EBITDA and gross margin, or that Mr. DaCosta or Mr. Deitsch knew the inaccurate inventory data would lead to a higher Adjusted EBITDA and gross margin. Thus, even if Mr. DaCosta and Mr. Deitsch knew that Paragon had severe and pervasive inventory issues and knew that those inventory issues would impact its financial metrics, there is no indication that Mr. DaCosta or Mr. Deitsch knew those inaccurate financial metrics would be inflated. More importantly, the restatement indicated that the initially reported financial metrics were inaccurate due to an accounting error, not because of issues managing inventory. As discussed above, there are no allegations supporting an inference that Mr. DaCosta or Mr. Deitsch knew about the accounting error. Without knowledge of the accounting error, there is no plausible inference that they used improper accounting or inventory management practices to manipulate the financial statements. This significantly undercuts plaintiff's argument that Mr. DaCosta and Mr. Deitsch were acting with the intent to defraud investors.

### G. Recklessness

Even if Mr. DaCosta and Mr. Deitsch did not act with fraudulent intent when stating Paragon's inaccurate financial metrics, plaintiff argues, in the alternative, they acted recklessly. Docket No. 42 at 22. Plaintiff states that, "[a]t a minimum, Defendants acted with recklessness, as they were well aware that their inventory tracking and accounting system was ineffective and . . . they consciously disregarded the impact the inventory tracking uses has on their public representations." *Id.*

As noted above, "recklessness under section 10(b) is a particularly high standard." *Dronsejko*, 632 F.3d at 668 (citation omitted). In fact, "recklessness in this

context is . . . something closer to a state of mind approximating actual intent." *In re*

*Zagg*, 797 F.3d at 1206 (citations and internal quotations omitted).  Plaintiff has failed to

meet this high standard.

As discussed above, the complaint indicates that the accounting error was

complicated.  There are no allegations that defendants knew of the error but did nothing

about it.  Moreover, failing to catch such a complicated error does not represent an

extreme departure from the standards of ordinary care, especially for non-accountants.

Thus, the Court finds that the complaint fails to allege that defendants were reckless as

to the accounting error.

Furthermore, Mr. DaCosta and Mr. Deitsch were not reckless as to Paragon's

inventory management issues either.  As explained above, the allegations in the

complaint fail to plausibly allege that Mr. Deitsch had knowledge of Paragon's inventory

management issues, and only establish a weak inference that Mr. DaCosta had

knowledge of the inventory management issues.  However, the allegations of the

complaint do not sufficiently allege that the inventory management issues would impact

the financial metrics which would need to be restated, as the restatement was issued

due to the accounting error.  But even if financial metrics did need to be restated

because of inventory issues, there would still not be a compelling inference of scienter

based on recklessness.  While the complaint alleges that Mr. Deitsch was aware that

inventory management issues would impact financial metrics, this is not relevant to

scienter because the complaint does not plausibly allege that Mr. Deitsch knew Paragon

was experiencing inventory management issues.  The complaint only makes a weak

showing that Mr. DaCosta knew that inventory management issues would impact

34

financial metrics, which is further undercut by the fact that the complaint does not sufficiently allege that Mr. DaCosta had particularized knowledge of how severe or pervasive Paragon's inventory management problems were.  Thus, plaintiff has not strongly established that Mr. DaCosta or Mr. Deitsch knew Paragon's originally stated financial metrics were inaccurate, and thus has not strongly established that Mr. DaCosta or Mr. Deitsch knew the originally stated financial metrics would present a danger of misleading investors.

However, even if plaintiff made a stronger showing that Mr. DaCosta and Mr. Deitsch had knowledge of the inventory management issues and the possibility that those issues could impact financial metrics, there would still not be an extreme departure from the standards of ordinary care.  The fact that Paragon experienced inventory management issues is akin to a "red flag" that could have put Mr. DaCosta and Mr. Deitsch on alert that there might be issues with accurately calculating Paragon's Adjusted EBITDA and gross margin.[21]  The Tenth Circuit has been reluctant to find that defendants are reckless for failing to properly account for red flags, instead finding it to be negligent.  *See Smallen*, 950 F.3d at 1312 (finding that a failure to give adequate weight to red flags established an inference of, "at most, . . . negligence or possibly even gross negligence."); *Anderson*, 827 F.3d at 1238 (finding that a failure to give adequate weight to financial red flags likely was indicative of benign optimism rather than malevolence); *In re Level 3 Commc'ns*, 667 F.3d at 1345 (holding that

---

[21] No red flags arise from the accounting error, however, because the accounting error was complicated and did not substantially impact Paragon's financial metrics. Thus, there was nothing that should have reasonably put defendants on notice that such an error existed.

allegations based on an inconsistency between the defendants' progress reports and

internal reports were inadequate to establish scienter because "the strongest inference

we can draw is that defendants were negligent in failing to put together the pieces.").

Plaintiff's complaint arguably establishes a weak inference that Mr. DaCosta and Mr.

Deitsch did not properly account for Paragon's inventory management issues when

stating Paragon's Adjusted EBITDA and gross margin; however, that inference is not

helpful to plaintiff on scienter because the complaint does not indicate that the inventory

management issues caused the Adjusted EBITDA and gross margin to be restated.

And even if inventory management did impact the financial metrics, such an oversight

would be at worst negligent.  Allegations that amount to negligence or even gross

negligence do not suffice to establish recklessness.  *In re Zagg*, 797 F.3d at 1201.

Accordingly, the complaint fails to create a strong inference that Mr. DaCosta or Mr.

Deitsch were reckless.

### H.  Other Alleged Misstatements

Beyond allegations that defendants disclosed inaccurate financial metrics,

plaintiff's claims are also based on statements regarding Paragon's internal controls

over financial accounting and the state of Paragon's inventory.  Docket No. 42 at 9.

Plaintiff fails to establish that these alleged statements were made with scienter.

#### 1.  Internal Controls

Plaintiff notes that "DaCosta and Deitsch certified their responsibility for

establishing and maintaining internal controls and evaluating their effectiveness."  *Id.* at

13.  These certifications affirmed the effectiveness of Paragon's internal controls.  *Id.*

Plaintiff argues that "[t]he stark contradiction between their repeated attestations of the

effectiveness of internal controls and the subsequent acknowledgement of severe

36

deficiencies . . . supports scienter." *Id.* However, for SOX certifications to establish scienter, the question is not whether they were false when made, "but whether defendants made them knowing that they were false." *In re Molson Coors*, 2020 WL 13499995, at *10. "Absent particularized facts suggesting that Defendants knew of the certifications' falsity, the certifications' mere existence is 'unpersuasive' to prove scienter and at most supports an inference of negligence." *Id.* (citing *In re Zagg*, 797 F.3d at 1205). An argument that statements regarding effective internal controls were false when made because the defendant later admitted the controls were inadequate "says nothing about whether Defendants made them with scienter." *Id.* at *6. In fact, "the material weakness in [defendants'] internal controls over financial reporting may well favor Defendants by explaining why the accounting problem was missed, without implying anything about Defendants' scienter." *Id.* Accordingly, Mr. DaCosta and Mr. Deitsch's SOX certifications do not create an inference of scienter because there is no indication that they knew the certifications were false at the time they were made.

### 2.  State of Paragon's Inventory

Plaintiff claims that defendants misrepresented the state of Paragon's inventory, citing various allegations in the complaint for support. Docket No. 42 at 9 (citing Docket No. 32 at 103-04, 106, 116-17, 120, ¶¶ 241, 243, 247, 269-70, 278-79). Plaintiff does not provide any argument to establish scienter relating to these allegations. *See generally id.* The Court does not find that any of the allegations establish a strong inference of scienter.

Notably, the allegations in paragraphs 241, 242, 247, 278, and 279 involve statements made by Mr. Deitsch about Paragon's inventory. Docket No. 32 at 103-04, 106, 120, ¶¶ 241-42, 247, 278-279. These statements do not establish a strong

inference of scienter because, as discussed above, plaintiff has not shown that Mr. Deitsch had knowledge of Paragon's inventory management issues.  For example, paragraphs 241, 242, and 247 state that Mr. Deitsch misleadingly represented that Paragon's inventory levels were increasing.  *Id.* at 103-04, 106, ¶¶ 241-42, 247.  The complaint alleges that these statements were misleading because Paragon did not have the ability to track and value its inventory.  *Id.*  However, Mr. Deitsch could not have made these allegations with fraudulent intent because there are no allegations establishing that he knew Paragon did not have the ability to track and value its inventory.  Thus, the allegations related to Mr. Deitsch do not establish an inference of scienter.

Paragraph 269 alleges that defendants made statements which "gave the false impression that the Company's significant inventory write-off of $4 million was a one-time event '[r]elated to the recent inventory stockpiling' and not, in reality, ongoing issues affecting the Company's ability to track and value its inventory."[22]  *Id.* at 116-17, ¶ 269.  However, this allegation is conclusory, as plaintiff provides no particularized facts showing how defendants gave this false impression.  Paragraph 270 expands on this allegation, stating that, in an investor presentation, defendants showed a slide which noted that Paragon's EBITDA was "negatively impacted by $4.0M of inventory write-downs recorded in the fourth quarter."  *Id.* at 117, ¶ 270.  According to the complaint, this "misrepresented that the $4.0 million inventory write-off was a one-off event."  *Id.*  The Court does not find that this language gives the impression that the

---

[22] Plaintiff does not allege which defendants made these statements, claiming that they came from a press release from the February 2024 8-k.  Docket No. 32 at 116, ¶ 269.

write-off was a one-off event.  Moreover, even if it did give that impression, plaintiff does not provide argument that defendants did not honestly believe that the $4.0 million dollar write-off was a one-off event.  Thus, these allegations fail to establish an inference of scienter.

## I.    Additional Allegations of Scienter

Plaintiff points to additional allegations which he claims support scienter.  Docket No. 42 at 19-22.  These include allegations relating to Mr. Deitsch and Mr. Mickelson resigning from Paragon and allegations relating to Paragon violating Generally Accepted Accounting Principles ("GAAP").  *Id.*

### 1.  *Executive Departures*

Plaintiff argues that Mr. Deitsch's and Mr. Mickelson's departures from Paragon support an inference of scienter.  *Id.* at 19-20.  Specifically, plaintiff points out that "Deitsch departed Paragon in April 2024, just months before Defendants disclosed the restatements and internal control material weaknesses."  *Id.* at 19.  Plaintiff argues that timing of this resignation is suspicious and supports a finding of scienter.  *Id.* Additionally, plaintiff notes that Mr. Deitsch's replacement—interim CFO Kristina Wright—quickly discovered the inventory error, suggesting that it was obvious.  *Id.* at 20.  Plaintiff argues that Mr. Mickelson—the Chief Accounting Officer—also departed Paragon under suspicious circumstances.  *Id.*  Plaintiff points to Mickelson's unilateral release of claims, arguing that it suggests a potential dispute regarding the role he had in overseeing the accounting and internal control issues.  *Id.*  Plaintiff also finds it suspicious that Paragon did not announce a replacement for Mr. Mickelson.  *Id.*

An executive's resignation does not give rise to a strong inference of scienter merely because it occurs close in time to a restatement; instead, there must be

39

particularized allegations connecting the resignation to the alleged fraud. *See Bouzaglo v. Inspirato Inc.*, No. 23-cv-00438-RMR-SBP, 2024 WL 3738813, at * 5 (D. Colo. July 16, 2024), *report and recommendation adopted sub nom. Koch v. Inspirato Inc.*, 2024 WL 4591328 (D. Colo. Sept. 23, 2024); *In re Molson Coors*, 2020 WL 13499995, at *11 ("Plaintiffs fail to explain why this retirement was suspicious, pointing only to its temporal proximity to the Restatement. Absent factual allegations connecting Hunter's retirement to the alleged fraud, his departure at best gives rise to only a weak inference of scienter."). Thus, the argument that Mr. Deitsch's resignation is suspicious because it occurred months before the restatements were disclosed does not create a strong inference of scienter. Moreover, the complaint alleges that Mr. Deitsch claimed he resigned to pursue an opportunity with a different medical device company. Docket No. 32 at 65, ¶ 154. *See Bouzaglo*, 2024 WL 3738813, at *5 ("there are any number of reasons that an executive might resign, most of which are not related to fraud") (citation omitted).

Plaintiff's argument that Ms. Wright's quick discovery of the inventory error shows that the error was obvious similarly fails to create a strong inference of scienter. Arguably, Ms. Wright's quick discovery of the error creates a weak inference that Mr. Deitsch was negligent, but negligence is insufficient to establish scienter. *In re Zagg*, 797 F.3d at 1201.

Furthermore, Mr. Mickelson's resignation is irrelevant to defendants' scienter. When an executive is a non-party and when there are no allegations connecting them to the alleged fraud, courts do not give their resignations any weight. *See In re Molson Coors*, 2020 WL 13499995, at *11 ("None of these executives are named as defendants

40

and there are no allegations connecting them to the alleged fraud.  The Court gives these departures no weight.").  Here, there are no allegations explaining why Mr. Mickelson's release of claims or Paragon's failure to announce a replacement relates to defendants' mental state.  Thus, the Court finds it does not contribute to an inference of scienter.

### 2.  GAAP Violations

Plaintiff argues that Paragon's GAAP violations support scienter.  Docket No. 42 at 22.  GAAP "are the conventions, rules, and procedures that define accepted accounting practices."  *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n.7 (1984) (citations omitted).  Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be inaccurate or misleading.  17 C.F.R. § 210.4-01(a)(1); Docket No. 32 at 30, ¶ 57.  Defendants represented that Paragon's financial statements were prepared and issued in conformity with GAAP.  *Id.*  Plaintiff alleges that Paragon's inability to track its inventory constituted a GAAP violation.  *Id.* at 34, ¶ 68.

"[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *In re Gold*, 776 F.3d at 1113 (citation omitted).  "Only where such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim."  *Fleming*, 264 F.3d at 1261.  As discussed when the Court analyzed motive, defendants did not have fraudulent intent to mislead investors.  Accordingly, defendants' alleged GAAP violations do not support scienter.

### J.  <u>Holistic Analysis</u>

Once a court has addressed plaintiff's scienter-related allegations, it must "assess all the allegations holistically." *Tellabs*, 551 U.S. at 326 (citation omitted).  In doing so, the court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference." *Id.*  Here, the answer is no.  The Court will first address allegations related to Mr. DaCosta and then address allegations related to Mr. Deitsch.

Under plaintiff's theory of the case, Paragon had severe and pervasive issues managing its inventory.  Mr. DaCosta became aware of these issues through participating in a weekly call (the exact details of which are not alleged), receiving various reports and emails (the exact details of which are not alleged), and through his role as CEO.  Mr. DaCosta knew the inventory management issues would impact Paragon's ability to accurately calculate its Adjusted EBITDA and gross margin, as evidenced through his certification of annual reports which contained this information, through a statement he made after Paragon had already disclosed its error, and through his role as CEO.  Using this knowledge, Mr. DaCosta risked engaging in fraud to inflate Paragon's Adjusted EBITDA and gross margins to reach Paragon's financial goals, while not inflating gross margins enough to consistently achieve those goals.  Mr. DaCosta did this despite not knowing whether the accurate inventory data would cause Paragon's Adjusted EBITDA and gross margin to be higher or lower than what was reported.  Mr. DaCosta then decided to issue a restatement which falsely claimed that the financial metrics were misstated due to an accounting error, when the real cause

42

was because of issues with managing inventory.  Mr. DaCosta issued this restatement despite the risk that a restatement could lead to a drop in stock price.

As for Mr. Deitsch, the complaint alleges that he became fully apprised of Paragon's inventory management issues through his role as CFO and through receiving stockout reports which detailed current levels of inventory, without having participated in the weekly calls discussing the stockout reports to understand their context.  Mr. Deitsch had the financial knowledge to understand that these inventory issues would impact Paragon's financial metrics.  Not knowing whether the accurate Adjusted EBITDA and gross margin would be higher or lower than what was calculated, Mr. Deitsch nevertheless stated inaccurate financial metrics in the hopes of defrauding investors.  Afterwards, Mr. Deitsch resigned in disgrace.

This theory of the case does not create a compelling inference of scienter. Plaintiff's additional allegations related to GAAP violations, Mr. Mickelson's departure, inventory controls, and what other Paragon executives knew do little to bolster them. The simpler, more compelling explanation is that Paragon's inventory issues were not the cause of the misstated financial metrics at all.  Rather, as indicated in the restatement, Paragon's financial metrics were skewed due to a complex accounting error.  Mr. DaCosta and Mr. Deitsch did not know about this error, and once they discovered it, Paragon issued a restatement explaining the mistake.  As for the misstatements regarding Paragon's inventory, the most compelling explanation is that Mr. DaCosta and Mr. Deitsch did not fully understand Paragon's inventory issues, leading them to state some mistakenly inaccurate comments.  This opposing

43

explanation suggests no inference of scienter.  Thus, plaintiff has failed to establish

scienter, and his Section 10(b) claim and Rule 10b-5 claim will be dismissed.[23]

### K.  Control Person Liability

Plaintiff also brings a claim for "control-person" liability under Section 20(a) of the

Securities Exchange Act, 15 U.S.C. § 78t(a).  Docket No. 32 at 153-56, ¶¶ 366-70.

"[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a

primary violation of the securities laws and (2) 'control' over the primary violator by the

alleged controlling person."  *Adams*, 340 F.3d at 1107 (citing *Fleming*, 264 F.3d at

1270-71).  Plaintiff has failed to establish a primary violation of the securities laws.

Thus, the Court will dismiss plaintiff's Section 20(a) claim.  *See Smallen*, 950 F.3d at

1315 (dismissing Section 20(a) claims after the plaintiff failed to establish scienter, and

thus failed to allege a primary violation of the securities fraud).

### L.  Dismissal With Prejudice

At the end of his response to defendants' motion, plaintiff notes that, "[i]f the

Court grants any part of the motion, Lead Plaintiff believes any defects can be resolved

and requests that dismissal be without prejudice as to have the opportunity to amend

based on the Court's order."  Docket No. 42 at 25.  Plaintiff, however, has not filed a

motion to amend the complaint.

---

[23] "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."  *Adams*, 340 F.3d at 1006.  The Court found that Mr. DaCosta and Mr. Deitsch did not act with scienter.  Thus, no scienter may be attributed to Paragon from their actions.  Plaintiff makes no other argument regarding Paragon's scienter.  *See generally* Docket No. 42.  Thus, plaintiff has failed to establish that Paragon acted with scienter and dismissal against all parties is appropriate.

"It is normally improper to request leave to amend a complaint in response to a motion to dismiss." *Nardy v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01760-WYD-STV, 2019 WL 3297467, at *18 (D. Colo. Mar. 29, 2019) (citing *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999)).  The Local Rules of this District state that "a motion shall not be included in a response or reply to the original motion," D.C.COLO.LCivR 7.1(d), and the Federal Rules of Civil Procedure require that a "request for a court order must be made by motion."  Fed. R. Civ. P. 7(b)(1).  Thus, plaintiff has inadequately presented his request to amend the complaint.

Moreover, plaintiff's request is merely a single sentence and does not explain how plaintiff would amend his complaint.  "[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it."  *In re Gold*, 776 F.3d at 1118 (quoting *Calderon*, 181 F.3d at 1186-87).  Plaintiff's single sentence fails to provide any such notice here.  "Absent any stated basis for the proposed amendment, 'a district court need not independently determine whether grounds justifying an amendment exist.'"  *In re Molson Coors*, 2020 WL 13499995, at *13 (quoting *Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 725 (10th Cir. 2016) (unpublished)).  Plaintiff has already filed a detailed, 156-page amended complaint, and has not explained how he plans to amend it to remedy its deficiencies.  Accordingly, the Court will deny plaintiff's request for leave to amend and will dismiss plaintiff's Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, Docket No. 32, with prejudice.

## IV.  CONCLUSION

Therefore, it is

45

**ORDERED** that Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Dkt. 32) [Docket No. 40] is **GRANTED**.  It is further

**ORDERED** that the Request for Judicial Notice in Support of Defendants' Motion to Dismiss Amended Consolidated Class Action Complaint (Dkt. 32) [Docket No. 41] is **DENIED as moot**.  It is further

**ORDERED** that plaintiff's Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws [Docket No. 32] is **DISMISSED with prejudice**.  It is further

**ORDERED** that this case is closed.

DATED March 24, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge